Receipt number 9998-3746205

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MOLINA HEALTHCARE OF CALIFORNIA, INC., )
MOLINA HEALTHCARE OF FLORIDA, INC., )
MOLINA HEALTHCARE OF MICHIGAN, INC., )
MOLINA HEALTHCARE OF NEW MEXICO, INC., )
MOLINA HEALTHCARE OF OHIO, INC., )
MOLINA HEALTHCARE OF TEXAS, INC., )
MOLINA HEALTHCARE OF UTAH, INC. )
MOLINA HEALTHCARE OF WASHINGTON, INC., )
and MOLINA HEALTHCARE OF WISCONSIN, INC., )
)
    Plaintiffs, )
)
v. )
)
THE UNITED STATES OF AMERICA, )
)
    Defendant. )
)

**FILED**

JAN 23 2017
U.S. COURT OF
FEDERAL CLAIMS

No. **17-97 C** _____

## **COMPLAINT**

    Plaintiffs Molina Healthcare of California, Inc. ("Molina CA"), Molina Healthcare of

Florida, Inc. ("Molina FL"), Molina Healthcare of Michigan, Inc. ("Molina MI"), Molina

Healthcare of New Mexico, Inc. ("Molina NM"), Molina Healthcare of Ohio, Inc. ("Molina

OH"), Molina Healthcare of Texas, Inc. ("Molina TX"), Molina Healthcare of Utah, Inc.

("Molina UT"), Molina Healthcare of Washington, Inc. ("Molina WA"), and Molina Healthcare

of Wisconsin, Inc. ("Molina WI") (collectively "Plaintiffs" or "Molina"), by and through their

undersigned counsel, bring this action against Defendant, the United States of America

("Defendant," "United States," or "Government"), and allege the following:

## **INTRODUCTION**

    1.    Molina brings this action to recover damages owed by Defendant for violations of

the mandatory risk corridors payment obligations prescribed in Section 1342 of the Patient

Protection and Affordable Care Act ("ACA"), and its implementing federal regulations, as well

as Defendant's breaches of its risk corridors payment obligations under express or implied-in-fact contracts, Defendant's breaches of the covenant of good faith and fair dealing implied in Defendant's contracts with Molina, and Defendant's taking of Plaintiffs' property without just compensation in violation of the Fifth Amendment of the U.S. Constitution.

2.      Congress' enactment in 2010 of the ACA marked a major reform in the United States health care market.

3.      The market reform guaranteed availability of health care to all Americans, and prohibited health insurers from using factors such as health status, medical history, preexisting conditions, gender, and industry of employment to set premium rates or deny coverage.

4.      The ACA introduced scores of previously uninsured or underinsured citizens into the health care marketplace, creating great uncertainty to health insurers, including Plaintiffs, that had no previous experience or reliable data to meaningfully assess the risks and set the premiums for this new population of insureds under the ACA.

5.      Congress, recognizing such uncertainty for health insurers and the potential increased premiums that would come with that uncertainty, included three premium-stabilization programs in the ACA – each of which Congress intended to be administered annually – to help protect health insurers against risk selection and market uncertainty, including the temporary federally administered risk corridors program, which mandated that the Government pay health insurers annual risk corridors payments based on a statutorily prescribed formula to provide health insurers with stability as insurance market reforms began.

6.      Under the statutory parameters of the risk corridors program, the Government shares the risk with Qualified Health Plans ("QHPs") – such as Plaintiffs – associated with the new marketplace's uncertainty for each of the temporary program's three years:  2014, 2015 and

2016.  If the amount a QHP collects in premiums in any one of these years exceeds its medical expenses by a certain target amount, the QHP will make a payment to the Government.  If annual premiums fall short of this target, however, Congress required the Government to make risk corridors payments to the QHP in an amount prescribed by a formula in Section 1342.

7.      The temporary risk corridors program was designed to ease the transition between the old and new health insurance marketplaces and help stabilize premiums for consumers, and was expressly modeled on a similar program in Medicare Part D signed into law by President George W. Bush.

8.      The United States has specifically admitted in writing its obligations to pay the full amount of risk corridors payments owed to Molina for calendar years 2014 ("CY 2014") and 2015 ("CY 2015"), but Defendant has failed to pay the full amount due.  Instead, the Government arbitrarily has paid Plaintiffs only a pro-rata share of the total amount due for CY 2014, and has not paid any of the total amount due for CY 2015, asserting that full payment to Molina is limited by available appropriations, even though no such limits appear anywhere in the ACA or its implementing regulations or in Molina's contracts with the Government.

9.      This action seeks monetary damages from the Government of at least $52,378,111.20, less any prorated payments made by the Government, which represents the amount of risk corridors payments owed to Plaintiffs for CY 2014 and CY 2015.

10.     Should this Court find that the United States failed to make full and timely CY 2014 and/or CY 2015 risk corridors payments to Molina in violation of Defendant's statutory, regulatory and/or contractual obligations, and/or Plaintiffs' constitutional rights under the Fifth Amendment, and render a monetary judgment against Defendant as to those amounts, then Plaintiffs also seek incidental declaratory relief from the Court regarding the Government's

obligation to make full and timely risk corridors payments for CY 2016, in accordance with the Defendant's legal obligations.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action and venue is proper in this Court pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), because Plaintiffs bring claims for monetary damages over $10,000 against the United States founded upon the Government's violations of a money-mandating Act of Congress, a money-mandating regulation of an executive department, an express contract and/or an implied-in-fact contract with the United States, and a taking of Plaintiffs' property in violation of the Fifth Amendment of the Constitution.

12.     The actions and/or decisions of the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") at issue in this lawsuit were conducted on behalf of the Defendant United States within the District of Columbia.

## PARTIES

13.     Plaintiff MOLINA HEALTHCARE OF CALIFORNIA, INC. ("Molina CA"), a wholly owned subsidiary of Molina Healthcare, Inc., is a healthcare insurance provider with its principal place of business in Long Beach, California.  Molina CA was a QHP issuer on the California Health Insurance Marketplace for CY 2014, CY 2015, and CY 2016.

14.     Plaintiff MOLINA HEALTHCARE OF FLORIDA, INC. ("Molina FL"), a wholly owned subsidiary of Molina Healthcare, Inc., is a healthcare insurance provider with its principal place of business in Miami, Florida.  Molina FL was a QHP issuer on the Florida Health Insurance Marketplace for CY 2014, CY 2015, and CY 2016.

15.     Plaintiff MOLINA HEALTHCARE OF MICHIGAN, INC. ("Molina MI"), a wholly owned subsidiary of Molina Healthcare, Inc., is a healthcare insurance provider with its

principal place of business in Troy, Michigan.  Molina MI was a QHP issuer on the Michigan

Health Insurance Marketplace for CY 2014, CY 2015, and CY 2016.

16.     Plaintiff MOLINA HEALTHCARE OF NEW MEXICO, INC. ("Molina NM"), a

wholly owned subsidiary of Molina Healthcare, Inc., is a healthcare insurance provider with its

principal place of business in Albuquerque, New Mexico.  Molina NM was a QHP issuer on the

New Mexico Health Insurance Marketplace for CY 2014, CY 2015, and CY 2016.

17.     Plaintiff MOLINA HEALTHCARE OF OHIO, INC. ("Molina OH"), a wholly

owned subsidiary of Molina Healthcare, Inc., is a healthcare insurance provider with its principal

place of business in Columbus, Ohio.  Molina OH was a QHP issuer on the Ohio Health

Insurance Marketplace for CY 2014, CY 2015, and CY 2016.

18.     Plaintiff MOLINA HEALTHCARE OF TEXAS, INC. ("Molina TX"), a wholly

owned subsidiary of Molina Healthcare, Inc., is a healthcare insurance provider with its principal

place of business in Irving, Texas.  Molina TX was a QHP issuer on the Texas Health Insurance

Marketplace for CY 2014, CY 2015, and CY 2016.

19.     Plaintiff MOLINA HEALTHCARE OF UTAH, INC. ("Molina UT"), a wholly

owned subsidiary of Molina Healthcare, Inc., is a healthcare insurance provider with its principal

place of business in Midvale, Utah.  Molina UT was a QHP issuer on the Utah Health Insurance

Marketplace for CY 2014, CY 2015, and CY 2016.

20.     Plaintiff MOLINA HEALTHCARE OF WASHINGTON, INC. ("Molina WA"),

a wholly owned subsidiary of Molina Healthcare, Inc., is a healthcare insurance provider with its

principal place of business in Bothell, Washington.  Molina WA was a QHP issuer on the

Washington Health Insurance Marketplace for CY 2014, CY 2015, and CY 2016.

21.     Plaintiff MOLINA HEALTHCARE OF WISCONSIN, INC. ("Molina WI"), a

wholly owned subsidiary of Molina Healthcare, Inc., is a healthcare insurance provider with its principal place of business in Milwaukee, Wisconsin.  Molina WI was a QHP issuer on the Wisconsin Health Insurance Marketplace for CY 2014, CY 2015, and CY 2016.

22.     Defendant is THE UNITED STATES OF AMERICA.  The Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") are agencies of the Defendant United States of America.

## FACTUAL ALLEGATIONS

### Congress Enacts the Patient Protection and Affordable Care Act

23.     In 2010, Congress enacted the ACA, Public Law 111-148, 124 Stat. 119.

24.     The ACA aimed to increase the number of Americans covered by health insurance and decrease the cost of health care in the U.S., and includes a series of interlocking reforms designed to expand coverage in the individual health insurance market.

25.     The ACA provides that "each health insurance issuer that offers health insurance coverage in the individual . . . market in a State must accept every . . . individual in the State that applies for such coverage."  42 U.S.C. § 300gg–1(a).

26.     The ACA also generally bars insurers from charging higher premiums on the basis of a person's health.  *See* 42 U.S.C. § 300gg.

27.     Beginning on January 1, 2014, individuals and small businesses were first permitted to purchase private health insurance through competitive statewide marketplaces called Affordable Insurance Exchanges, Health Benefit Exchanges, "Exchanges," or "Marketplaces."  ACA Section 1311 establishes the framework for the Exchanges.  *See* 42 U.S.C. § 18031.

28.     Collectively, Plaintiffs voluntarily participated and offered QHPs in the ACA Marketplaces in California, Florida, Michigan, New Mexico, Ohio, Texas, Utah, Washington,

and Wisconsin in CY 2014, CY 2015, and CY 2016.

29.     Upon CMS's evaluation and certification of Plaintiffs as QHPs, Plaintiffs were required to provide a package of "essential health benefits" on the ACA Exchanges on which they voluntarily participated.  42 U.S.C. § 18021(a)(1).

### The ACA's Premium-Stabilization Programs

30.     To help protect health insurers against risk selection and market uncertainty, the ACA established three premium-stabilization programs, which began in 2014:  the temporary reinsurance and risk corridors programs to give insurers payment stability as insurance market reforms began, and an ongoing risk adjustment program that makes payments to health insurance issuers that cover higher-risk populations (*e.g.*, those with chronic conditions) to more evenly spread the financial risk borne by issuers.  These three premium-stabilization programs are known as the "3Rs."

31.     This action only addresses the temporary, three-year risk corridors program, which began in CY 2014 and expired at the end of CY 2016, and is a "Federally administered program."  77 FR 17219, 17221 (Mar. 23, 2012), attached hereto at Exhibit 01.

32.     The temporary risk corridors program was designed to provide QHP issuers, like Plaintiffs, with greater premium stability as ACA insurance reforms were implemented, and to limit the risk and uncertainty in setting rates in the ACA Marketplace by limiting the extent of QHP issuer losses and gains.  *See* 76 FR 41929, 41931 (July 15, 2011), attached hereto at Exhibit 02; 77 FR 73118, 73119 (Dec. 7, 2012), attached hereto at Exhibit 03 ("The risk corridors program … will protect against uncertainty in rates for qualified health plans by limiting the extent of issuer losses and gains.").

33.     While the risk adjustment and reinsurance programs were designed to share risk *between* health plans, Congress designed the risk corridors program to share risk between insurers *and the Government*.  *See* 77 FR 73118, 73121 (Dec. 7, 2012), Ex. 03 ("The temporary risk corridors program permits *the Federal government* and QHPs *to share* in profits or losses resulting from inaccurate rate setting from 2014 to 2016." (emphasis added)).  If a health plan's adjusted loss ratio was higher than its target level by a certain percentage, the Government committed to share the risk by making payments to the health plan, and if the adjusted loss ratio was lower than the target by the same percentage, then the health plan was obligated to pay the Government some of its profit.

34.     The Government's unilateral decision, detailed below, to belatedly interpret its statutory risk corridors obligation as requiring "budget neutrality" – *i.e.*, that Government risk corridors payments to qualifying insurers cannot exceed the amount of risk corridors charges the Government collects from insurers – is found *nowhere* in the text or purpose of the ACA and would force insurers to share the risk amongst themselves, instead of *the Government* sharing in the risk, in contravention of Congress' intent and design in passing the ACA.

35.     Congress' overarching goal of the premium-stabilization programs, along with other Exchange-related provisions and policies in the ACA, was to make affordable health insurance available to individuals who previously did not have access to such coverage, and to help to ensure that every American has access to high-quality, affordable health care by protecting consumers from increases in premiums due to health insurer uncertainty.  *See, e.g.*, 42 U.S.C. § 18091(2)(I)-(J) (stating that one of the goals of the ACA was "creating effective health insurance markets").

36.     Congress also strived to provide certainty and protect against adverse selection in

the health care market while stabilizing premiums in the individual and small group markets as the ACA's market reforms and Exchanges began in 2014.

37.     The financial protections that Congress provided in the statutory premium-stabilization programs, including the mandatory annual risk corridors payments, provided QHPs with the security – backed by federal law and the full faith and credit of the United States – to become participating health insurers in their respective states' ACA markets, at considerable cost to the QHPs, despite the significant financial risks posed by the uncertainty in the new health care markets.

38.     Since the ACA's rollout, Molina has worked in partnership with the federal government to make the ACA Exchanges successful in Molina's markets by agreeing to participate as a QHP on the ACA Exchanges in California, Florida, Michigan, New Mexico, Ohio, Texas, Utah, Washington and Wisconsin, rolling out competitive rates, and offering a broad spectrum of health insurance products.

39.     Molina has demonstrated its willingness to be a meaningful partner in the ACA program, and has done so in good faith by fulfilling all of its obligations, including the remittance of annual risk corridors charges to the Government, with the understanding that the United States would likewise honor its statutory, regulatory and contractual commitments regarding, *inter alia*, the 3Rs, including the temporary risk corridors program.

40.     The Government has failed to hold up its end of the bargain, necessitating the filing of this lawsuit.

### The ACA's Risk Corridors Program

41.     Section 1342 of the ACA expressly requires the Secretary of HHS to establish a temporary risk corridors program that provides for the Government to share in QHPs' gains or

losses resulting from inaccurate rate setting annually from CY 2014 through CY 2016 in the individual and small group markets.  *See* 42 U.S.C. § 18062, attached hereto at Exhibit 04.

42.     Congress required the ACA risk corridors program established in Section 1342 to be modeled after a similar program implemented as part of the Medicare Part D prescription drug benefit program that was signed into law by President George W. Bush.  *See* 42 U.S.C. § 18062(a), Ex. 04 (mandating that the risk corridors "program shall be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act").

43.     Section 1342's reference to the Medicare Part D risk corridors program reflects Congress' intent for and approval of an ACA risk corridors program that, like in Medicare Part D,  provides for annual payments.

44.     In the statute creating the Medicare Part D risk corridors program, Congress directed HHS to establish a risk corridor for each prescription drug plan for each plan year.  *See* 42 U.S.C. § 1395w-115(e)(3)(A).  The regulations implementing the Medicare Part D risk corridors program provided that "CMS makes payments after a coverage year" after receipt of all cost data information, and that "CMS at its discretion makes either lump-sum payments or adjusts monthly payments *in the following payment year*."  42 C.F.R. § 423.336(c) (2009) (emphasis added).

45.     For example, in the first year of the Medicare Part D risk corridors program – 2006 – HHS paid funds owed to eligible plan sponsors in November and December 2007.  *See* Office of Inspector Gen., Dep't of Health & Human Servs., *Medicare Part D Reconciliation Payments for 2006-2007*, at 14 (2009) , attached hereto at Exhibit 05 ("CMS paid most of the funds owed to sponsors for 2006 by increasing these sponsors' monthly prospective payments

for November and December 2007.").

46.     Congress was aware of HHS' regulation and payment scheme for the Medicare Part D risk corridors program when Congress enacted the ACA – including Section 1342 – in March 2010.  By directing HHS to base the ACA risk corridors program on the Medicare Part D risk corridors program, *see* 42 U.S.C. § 18062(a), Ex. 04, Congress intended that ACA risk corridors payments would be made annually and in full, the same as Medicare Part D risk corridors payments.

47.     The risk corridors program applies only to participating plans, like Molina, that agreed to participate on the ACA Exchanges, accepted all of the responsibilities and obligations of QHPs as set forth in the statute and implementing regulations, and were certified by CMS as QHPs at CMS' discretion.  All insurers that elected to enter into agreements with the Government to become QHPs were required by Section 1342(a) of the ACA to participate in the risk corridors program.

48.     By enacting Section 1342 of the ACA, Congress recognized that, due to uncertainty about the population entering the Exchanges during the first few years, health insurers may not be able to predict their risk accurately, and that their premiums may reflect costs that are ultimately lower or higher than predicted.

49.     Congress intended the ACA's temporary risk corridors provision as an important safety valve for consumers and insurers as millions of Americans would transition to new coverage in a brand new Marketplace, protecting against the uncertainty that health insurers, like Molina, would face when estimating enrollments and costs resulting from the market reforms by creating a mechanism for sharing risk between the Government and issuers of QHPs in each of the first three years of the Marketplace.

**Plaintiffs were QHPs for CY 2014, CY 2015, and CY 2016**

50.     Based on Congress' statutory commitments set forth in the ACA, including, but

not limited to, Section 1342 and the risk corridors program, as well as on the Government's

statements and conduct regarding its risk corridors obligations, each of the Plaintiffs agreed to

become QHPs, and to enter into QHP Agreements either with CMS, a federal agency within

HHS, or with the state-level operator of the ACA Exchanges in California or Washington, after

CMS and/or the state-level operator had exercised its discretion to certify each of the Plaintiffs as

QHPs in, respectively, California, Florida, Michigan, New Mexico, Ohio, Texas, Utah,

Washington and Wisconsin.  Collectively, the QHP Agreements are attached to this Complaint at

Exhibits 06 to 32.

51.     Molina FL executed a QHP Agreement with CMS on September, 19, 2013, and

QHP Agreements with CMS containing identical terms to those in the September 19, 2013

Molina FL QHP Agreement were executed by Molina MI, Molina TX, and Molina UT on

September 9, 2013, by Molina OH on September 10, 2013, and by Molina NM and Molina WI

on September 11, 2013, regarding their participation on their respective states' ACA Exchanges

for CY 2014, which QHP Agreements are referred to herein as the "CY 2014 CMS QHP

Agreements."  *See* Exhibits 06 to 12.

52.     Additionally, Molina CA executed a QHP Agreement with the state-level operator

of the ACA Exchange in California ("Covered California") on July 25, 2013, *see* Exhibit 13, and

Molina WA executed a QHP Agreement with the state-level operator of the ACA Exchange in

Washington (the "Washington Health Benefit Exchange") on September 17, 2013, *see* Exhibit

14, regarding their participation on their respective states' ACA Exchanges for CY 2014, which

QHP Agreements, along with the CY 2014 CMS QHP Agreements, are collectively referred to

herein as the "CY 2014 QHP Agreements."

53.     The CY 2014 CMS QHP Agreements were executed by representatives of the Government who had actual authority to bind the United States, and were entered into with mutual assent and consideration by both parties.

54.     Pursuant to Section III.a. of the CY 2014 CMS QHP Agreements, the CY 2014 CMS QHP Agreements had effective dates from the date of execution by the last of the two parties until December 31, 2014, the last day of CY 2014.

55.     Section II.d. of the CY 2014 CMS QHP Agreements state that CMS is obligated to "undertake all reasonable efforts to implement systems and processes that will support [QHP] functions," and that "[i]n the event of a major failure of CMS systems and processes, CMS will work with [Plaintiff] in good faith to mitigate any harm caused by such failure."

56.     On October 16, 2014, Molina FL executed a QHP Agreement with CMS containing terms that were materially and substantially similar to those found in the CY 2014 CMS QHP Agreements, and QHP Agreements with identical terms to those in the October 16, 2014 Molina FL QHP Agreement were executed by Molina NM and Molina UT on October 15, 2014, by Molina MI and Molina WI on October 16, 2014, by Molina TX on October 17, 2014, and by Molina OH on October 27, 2014, regarding their participation on their respective states' ACA Exchanges for CY 2015, which QHP Agreements are referred to herein as the "CY 2015 CMS QHP Agreements." *See* Exhibits 15 to 21.

57.     Additionally, on April 23, 2015, Molina CA executed an amendment to its CY 2014 QHP Agreement with Covered California that extended the term of the agreement through CY 2015, *see* Exhibit 22, and on July 28, 2014, Molina WA renewed its CY 2014 QHP Agreement with the Washington Health Benefit Exchange for CY 2015, *see* Exhibit 23,

confirming their participation on their respective states' ACA Exchanges for CY 2015, which

QHP Agreements, along with the CY 2015 CMS QHP Agreements, are collectively referred to

herein as the "CY 2015 QHP Agreements."

58.     The CY 2015 CMS QHP Agreements were executed by representatives of the

Government who had actual authority to bind the United States, including, but not limited to,

Kevin J. Counihan, and were entered into with mutual assent and consideration by both parties.

59.     Pursuant to Section IV.a. of the CY 2015 CMS QHP Agreements, the CY 2015

CMS QHP Agreements had effective dates from the date of execution by the last of the two

parties until December 31, 2015, the last day of CY 2015.

60.     On September 21, 2015, Molina FL executed a QHP Agreement with CMS

containing terms that were materially and substantially identical to those found in the CY 2015

CMS QHP Agreements, and QHP Agreements with identical terms to those in the September 21,

2015 Molina FL QHP Agreement were executed by Molina NM and Molina UT on September

21, 2015, by Molina MI on September 22, 2015, by Molina TX on September 23, 2015, by

Molina WI on September 24, 2015, and by Molina OH on September 25, 2015, regarding their

participation on their respective states' ACA Exchanges for CY 2016, which QHP Agreements

are referred to herein as the "CY 2016 CMS QHP Agreements."  *See* Exhibits 24 to 30.

61.     Additionally, on April 6, 2016, Molina CA executed an amendment to its CY

2014 QHP Agreement with Covered California that extended the term of the agreement through

CY 2016, *see* Exhibit 31, and on July 20, 2015, Molina WA renewed its CY 2014 QHP

Agreement with the Washington Health Benefit Exchange for CY 2016, *see* Exhibit 32,

confirming their participation on their respective states' ACA Exchanges for CY 2016, which

QHP Agreements, along with the CY 2016 CMS QHP Agreements, are collectively referred to

herein as the "CY 2016 QHP Agreements."

62.     The CY 2016 CMS QHP Agreements were executed by representatives of the

Government who had actual authority to bind the United States, including, but not limited to,

Kevin J. Counihan, and were entered into with mutual assent and consideration by both parties.

63.     Pursuant to Section IV.a. of the CY 2016 CMS QHP Agreements, the CY 2016

CMS QHP Agreements had effective dates from the date of execution by the last of the two

parties until December 31, 2016, the last day of CY 2016 and the ACA's risk corridors program.

64.     Almost identical to Section II.d of the CY 2014 CMS QHP Agreements, Section

III.a. of all of the CY 2015 and CY 2016 CMS QHP Agreements states that CMS is obligated to

"undertake all reasonable efforts to implement systems and processes that will support [QHP]

functions," and that "[i]n the event of a major failure of CMS systems and/or processes, CMS

will work with [Plaintiff] in good faith to mitigate any harm caused by such failure."

65.     In addition to certifying that Molina is a QHP in the Florida, Michigan, New

Mexico, Ohio, Texas, Utah and Wisconsin ACA Exchanges, each of the CY 2014, CY 2015, and

CY 2016 CMS QHP Agreements expressly state that they are governed by United States law and

HHS and CMS regulations, stating specifically in Section V.g. that:

> This Agreement will be governed by the laws and common law of the
> United States of America, including without limitation such regulations as
> may be promulgated from time to time by the Department of Health and
> Human Services or any of its constituent agencies, without regard to any
> conflict of laws statutes or rules.

66.     Guidance from HHS and CMS to Issuers on Federally-Facilitated Exchanges

("FFE") and State Partnership Exchanges on April 5, 2013, stated that, "A signed QHP

Agreement with CMS will complete the certification process in an FFE or State Partnership

Exchange.  The Agreement will highlight and memorialize many of the QHP issuer's statutory

and regulatory requirements and will serve as an important reminder of the relationship between

the QHP issuer and CMS."  Letter from CMS to Issuers on Federally-Facilitated Exchanges and

State Partnership Exchanges at 23 (Apr. 5, 2013), attached hereto at <u>Exhibit 33</u>.

67.     Additionally, HHS and CMS confirmed in the April 5, 2013 Guidance that

"Applicants will … be required to attest to their adherence to the regulations set forth in 45

C.F.R. parts 155 and 156 and other programmatic requirements necessary for the operational

success of an Exchange, and provide requested supporting documentation."  *Id.* at 20.

68.     Before Molina executed the CY 2014, CY 2015, and CY 2016 QHP Agreements,

Molina executed dozens of attestations certifying its compliance with the obligations it was

undertaking by agreeing to become, or continuing to act as, a QHP on the ACA Exchanges in all

of the states in which Plaintiffs voluntarily participated in the ACA Marketplace.

69.     Plaintiffs submitted their respective attestations for CY 2014 on September 10,

2013 for California, on May 1, 2013 for Florida, on July 8, 2013 for Michigan, on April 26, 2013

for New Mexico, on May 30, 2013 for Ohio, on May 3, 2013 for Texas, on June 27, 2013 for

Utah, on April 26, 2013 and July 18, 2013 for Washington, and on April 30, 2013 for Wisconsin.

*See* <u>Exhibits 34 to 43</u> (collectively referred to herein as the "CY 2014 Attestations").

70.     Plaintiffs' respective CY 2015 attestations were submitted on May 30, 2014 for

California, on June 24, 2014 for Florida, on July 2, 2014 for Michigan, on May 27, 2014 for New

Mexico, on June 30, 2013 for Ohio, on June 20, 2014 for Texas, on July 30, 2014 for Utah, on

June 4, 2014 and July 28, 2014 for Washington, and on June 24, 2014 for Wisconsin.  *See*

<u>Exhibits 44 to 53</u> (collectively referred to herein as the "CY 2015 Attestations").

71.     Plaintiffs' respective CY 2016 attestations were submitted on April 30, 2015 for

California, on May 13, 2015 for Florida, on April 14, 2015 for Michigan, on March 23, 2015 for

New Mexico, on April 30, 2015 for Ohio, on May 8, 2015 for Texas, on June 2, 2015 for Utah,

on May 18, 2015 and July 20, 2015 for Washington, and on May 8, 2015 for Wisconsin.  *See*

Exhibits 54 to 63 (collectively referred to herein as the "CY 2016 Attestations").

72.     By executing and submitting their annual attestations on CMS' forms, Plaintiffs

agreed to the many obligations and responsibilities imposed upon all QHPs that accept the

Government's offer to participate in the ACA Exchanges.  Those obligations and responsibilities

that Plaintiffs undertook include, *inter alia*, licensing, reporting requirements, employment

restrictions, marketing parameters, HHS oversight of the QHP's compliance plan, maintenance

of an internal grievance process, benefit design standards, cost-sharing limits, rate requirements,

enrollment parameters, premium payment process requirements, participating in financial

management programs established under the ACA (including the risk corridors program),

adhering to data standards, and establishing dedicated and secure server environments and data

security procedures.

73.     Through these annual attestations, Plaintiffs affirmatively attested that they would

agree to comply with certain "Financial Management" obligations, including, among others:

> 2.  Applicant attests that it will adhere to the risk corridor standards and
>     requirements set by HHS as applicable for:
>
>     a.  risk corridor data standards and annual HHS notice of benefit
>         and payment parameters for the calendar years 2014, 2015, and
>         2016 (45 CFR 153.510);
>
>     b.  remit charges to HHS under the circumstances described in 45
>         CFR 153.510(c).

74.     The federal Government's risk-sharing that Congress mandated through the risk

corridors program was a significant factor in Molina's decision to agree to become a QHP and

undertake the many responsibilities and obligations required for Molina to participate in the

ACA Exchanges.

75.     Had Molina known that the Government would fail to fully and timely make the risk corridors payments owed to Molina – reneging on the Government's assurances that "[t]he risk corridors program … will protect against uncertainty in rates for [QHPs] by limiting the extent of issuer losses and gains," 77 FR 73118, 73119 (Dec. 7, 2012), Ex. 03 – then Molina's annual premiums on the various ACA Exchanges on which it voluntarily participated would necessarily have been higher than actually charged, as a result of the increased risks in the Marketplace.  Molina also would not have agreed to participate in the ACA Marketplace had it known that the Government would have breached its obligations regarding the risk corridors program.

### The Risk Corridors Payment Methodology

76.     Under the risk corridors program, the federal government shares risk with QHP health insurers annually in "calendar years 2014, 2015, and 2016," 42 U.S.C. § 18062(a), Ex. 04, by collecting charges from a health insurer if the insurer's QHP premiums exceed claims costs of QHP enrollees by a certain amount, and by making payments to the insurer if the insurer's QHP premiums fall short by a certain amount, subject to certain adjustments for taxes, administrative expenses, the other 3Rs programs, and other costs and payments.

77.     In this manner, "[r]isk corridors create a mechanism for sharing risk for allowable costs between the Federal government and QHP issuers."  76 FR 41929, 41942 (July 15, 2011), Ex. 02.

78.     Congress, through Sections 1342(b)(1) and (2) of the ACA, established the specific payment methodology to determine the risk corridors charge amounts the QHPs must pay to the Secretary of HHS and the risk corridors payment amounts the Secretary must pay to

the QHPs if the risk corridors threshold is met.

79.     The statute does not state or otherwise require that risk corridors payments by the Government out to QHPs are constrained by the amount of risk corridors charges collected by the Government from QHPs.  *See* 42 U.S.C. § 18062.

80.     Neither Section 1342 nor its implementing regulations create an account or fund for the Government to receive annual risk corridors charges in from QHPs, or for the Government to make annual risk corridors payments out to QHPs.

81.     Section 1342 does not state or otherwise require the risk corridors program to be "budget neutral" – neither that term nor the concept of budget neutrality appear anywhere in Section 1342 or its implementing regulations.  HHS and CMS recognized this in March 2013, when in final rulemaking (following a notice-and-comment period), the agencies stated in the Federal Register:

> The risk corridors program is not statutorily required to be budget neutral. Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the Affordable Care Act.

78 FR 15409, 15473 (Mar. 11, 2013), attached hereto at Exhibit 64.

82.     The text of Section 1342(b) states:

> **(b) Payment methodology**
> **(1) Payments out**
> The Secretary shall provide under the program established under subsection (a) that if—
> (A) a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and
> (B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target

amount.

**(2) Payments in**

The Secretary shall provide under the program established under subsection (a) that if—

(A) a participating plan's allowable costs for any plan year are less than 97 percent but not less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to 50 percent of the excess of 97 percent of the target amount over the allowable costs; and

(B) a participating plan's allowable costs for any plan year are less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the excess of 92 percent of the target amount over the allowable costs.

42 U.S.C. § 18062(b), Ex. 04.

83.    To determine whether a QHP in any year must pay into, or receive payments from, the Government under the risk corridors program, HHS compares allowable costs (essentially, claims costs subject to adjustments for health care quality, health IT, annual risk adjustment payments and charges, and annual reinsurance payments) and the target amount – the difference between a QHP's earned premiums and allowable administrative costs.

84.    The risk corridors payment that HHS owes an eligible QHP for a particular year thus depends upon the amount of annual reinsurance and risk adjustment payments that QHP received for the same year.  Congress thus intended for the Government's risk corridors payments to QHPs, like the annual reinsurance and risk adjustment payments upon which they depend, to be paid annually.

85.    Pursuant to the Section 1342(b) formula, each year from CY 2014 through CY 2016, QHPs with allowable costs that are less than 97 percent of the QHP's target amount are required to remit charges for a percentage of those cost savings to HHS, while QHPs with allowable costs greater than 103 percent of the QHP's target amount will receive payments from

HHS to offset a percentage of those losses.

86.     Section 1342(b)(1) prescribes the specific payment formula from HHS to QHPs whose costs in a calendar year exceed their original target amounts by more than three percent.

87.     Section 1342(b)(1)(A) requires that if a QHP's allowable costs in a calendar year are more than 103 percent, but not more than 108 percent, of the target amount, then "the Secretary [of HHS] shall pay" to the QHP an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount.

88.     Section 1342(b)(1)(B) further requires that if a QHP's allowable costs in a calendar year are more than 108 percent of the target amount, then "the Secretary [of HHS] shall pay" to the QHP an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the allowable costs in excess of 108 percent of the target amount.

89.     Alternatively, Section 1342(b)(2) sets forth the amount of the annual risk corridors charges that must be remitted to HHS by QHPs whose costs in a calendar year are more than three percent below their original target amounts.

90.     Section 1342(b)(2)(A) requires that if a QHP's allowable costs in a calendar year are less than 97 percent, but not less than 92 percent, of the target amount, then "the plan shall pay to the Secretary [of HHS]" an amount equal to 50 percent of the excess of 97 percent of the target amount over the allowable costs.

91.     Section 1342(b)(2)(B) requires that if a QHP's allowable costs in a calendar year are less than 92 percent of the target amount, then "the plan shall pay to the Secretary [of HHS]" an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the excess of 92 percent of the target amount over the allowable costs.

92.     Through this risk corridors payment methodology, QHPs keep all gains and bear

all losses that they experience within three percent of their target amount for a calendar year.  For example, a QHP that has a target amount of $10 million in a given calendar year will not pay a risk corridors charge or receive a risk corridors payment if its allowable charges range between $9.7 million and $10.3 million for that calendar year.

93.    HHS and CMS provided specific examples of risk corridors payment and charge calculations beyond the three percent threshold – published in the Federal Register dated July 15, 2011, at 76 FR 41929, 41943 – which illustrate risk corridors payments the Government must pay under different allowable cost, target amount, and gain and loss scenarios.  *See* 76 FR 41929, 41943 (July 15, 2011), Ex. 02.

94.    The American Academy of Actuaries provided an approximate illustration of the risk corridors payment methodology – excluding the charge or payment of 2.5 percent of the target amount for gains or losses greater than eight percent – as follows:



Source:  American Academy of Actuaries, *Fact Sheet: ACA Risk-Sharing Mechanisms* (2013), *available at* http://actuary.org/files/ACA_Risk_Share_Fact_Sheet_FINAL120413.pdf, attached hereto at Exhibit 65.

95.     As detailed below, in CY 2014, Molina experienced allowable-cost losses of more than three percent of its target amounts in the Florida ACA Individual Market, requiring the Government to make full mandatory risk corridors payments to Molina under Section 1342 for CY 2014 by the end of CY 2015.  The Government failed to do so.

96.     By contrast, Molina made its full mandatory risk corridors charge remittances to the Government under Section 1342 for CY 2014 before the end of CY 2015, for Plaintiffs' allowable-cost gains of more than three percent of their target amounts in the Michigan, New Mexico, Ohio, Texas, Utah, Washington, and Wisconsin ACA Individual Markets.

97.     Additionally, as detailed below, in CY 2015, Molina experienced allowable-cost losses of more than three percent of its target amounts in the California, Florida, Utah, Washington, and Wisconsin ACA Individual Markets, requiring the Government to make full mandatory risk corridors payments to Molina under Section 1342 for CY 2015 by the end of CY 2016.  The Government failed to do so.

98.     By contrast, Molina made its full mandatory risk corridors charge remittances to the Government under Section 1342 for CY 2015 before the end of CY 2016, for Plaintiffs' allowable-cost gains of more than three percent of their target amounts in the Michigan, New Mexico, Ohio, and Texas ACA Individual Markets.

99.     Congress did not impose any financial limits or restraints on the Government's mandatory risk corridors payments to QHPs in either Section 1342 or any other section of the ACA.

100.     Congress did not establish any particular fund or account in Section 1342 to receive risk corridors charges or payments, nor did Congress prescribe in Section 1342 the use or collection of "user fees" regarding the risk corridors program.

101.    Congress also did not limit in any way the Secretary of HHS' obligation to make

full risk corridors payments owed to QHPs, due to appropriations, restriction on the use of funds,

or otherwise in Section 1342 or anywhere else in the ACA.

102.    Congress has not amended Section 1342 since enactment of the ACA.

103.    Congress has not repealed Section 1342, and all prior attempts to repeal Section

1342 have failed.  *See* S. 1726, Obamacare Taxpayer Bailout Prevention Act, *available at*

https://www.congress.gov/bill/113th-congress/senate-bill/1726.

104.    Any potential future repeal of Section 1342 could not apply retroactively to

negate the United States' obligation to make full risk corridors payments to QHPs, including

Molina, for CY 2014, CY 2015, and CY 2016.

105.    HHS and CMS thus lack statutory authority to pay anything less than 100% of the

risk corridors payments due to Plaintiffs for CY 2014, for CY 2015, and if the risk corridors data

submitted to CMS by July 31, 2017 indicates that risk corridors payments are owed to Plaintiffs

for CY 2016, for that final year of the risk corridors program as well.

106.    On March 11, 2013, HHS publicly affirmed – while health insurers, including

Molina, were contemplating whether to agree to participate in the new Exchanges that were

opening on January 1, 2014 – that "[t]he risk corridors program is not statutorily required to be

budget neutral."  HHS further confirmed that, "[r]egardless of the balance of payments and

receipts, HHS will remit payments as required under section 1342 of the Affordable Care Act."

78 FR 15409, 15473 (Mar. 11, 2013), Ex. 64.

107.    In deciding to apply to become a QHP, Molina relied upon HHS' commitments to

make full risk corridors payments annually to it as required in Section 1342 of the ACA

regardless of whether risk corridors payments to QHPs are actually greater than risk corridors

charges collected from QHPs for a particular calendar year.

108.    The United States, however, has refused to make full and timely risk corridors payments to Molina for CY 2014 and CY 2015 as required by Section 1342.

109.    In all likelihood, the United States will not make the full and timely risk corridors payments to Molina for CY 2016, either—which will be required based on the data that Molina will submit to CMS by July 31, 2017.

### HHS' Risk Corridors Regulations

110.    Congress directed HHS to administer the risk corridors program enacted in Section 1342.  *See* 42 U.S.C. § 18062(a), Ex. 04.  The HHS Secretary formally delegated authority over the Section 1342 risk corridors program to the CMS Administrator on August 30, 2011.  *See* 76 FR 53903, 53903-04 (Aug. 30, 2011), attached hereto at Exhibit 66.  That delegation recognized that the ACA risk corridors program was statutorily required to be "based on" the Medicare Part D risk corridors program.  *Id.*  By authority of this delegation from the HHS Secretary, CMS issued implementing regulations for the risk corridors program at 45 C.F.R. Part 153.

111.    In 45 C.F.R. § 153.510, CMS adopted a risk corridors calculation "for calendar years 2014, 2015, and 2016," 45 C.F.R. § 153.510(a), that is mathematically identical to the statutory formulation in Section 1342 of the ACA, using the identical thresholds and risk-sharing levels specified in the statute.  *See* 45 C.F.R. § 153.510, attached hereto at Exhibit 67.

112.    The implementing regulations, just like the controlling statute, do not limit the amount of the Government's required annual risk corridors payments out to insurers by the charge amounts the Government collects from insurers.  *See id*.

113.    The implementing regulations, like Section 1342, do not require the risk corridors

program to be "budget neutral."

114.    Nothing in 45 C.F.R. §§ 153.500 to .540 prescribes the use of "user fees"

regarding the risk corridors program.

115.    Specifically, 45 C.F.R. § 153.510(b) prescribes the method for determining risk

corridors payment amounts that QHPs "will receive":

> (b) *HHS payments to health insurance issuers*. QHP issuers will receive
> payment from HHS in the following amounts, under the following
> circumstances:
>
> > (1) When a QHP's allowable costs for any benefit year are more
> > than 103 percent but not more than 108 percent of the target
> > amount, HHS will pay the QHP issuer an amount equal to 50
> > percent of the allowable costs in excess of 103 percent of the target
> > amount; and
> >
> > (2) When a QHP's allowable costs for any benefit year are more
> > than 108 percent of the target amount, HHS will pay to the QHP
> > issuer an amount equal to the sum of 2.5 percent of the target
> > amount plus 80 percent of allowable costs in excess of 108 percent
> > of the target amount.

116.    By this regulation, the Government intended that HHS "will pay" and QHPs "will

receive" risk corridors payments in "an amount equal to" the risk corridors calculation "[w]hen"

it is determined that a QHP qualifies for risk corridors payments – not some fraction of that

amount at some indeterminate future date, or never at all.

117.    Furthermore, 45 C.F.R. § 153.510(c) prescribes the circumstances under which

QHPs "must remit" charges to HHS, as well as the means by which HHS will determine those

charge amounts:

> (c) *Health insurance issuers' remittance of charges*. QHP issuers must
> remit charges to HHS in the following amounts, under the following
> circumstances:
>
> > (1) If a QHP's allowable costs for any benefit year are less than 97
> > percent but not less than 92 percent of the target amount, the QHP

issuer must remit charges to HHS in an amount equal to 50 percent of the difference between 97 percent of the target amount and the allowable costs; and

(2) When a QHP's allowable costs for any benefit year are less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the difference between 92 percent of the target amount and the allowable costs.

118.    The payment methodology provisions at 45 C.F.R. § 153.510(a) to (c) were adopted by HHS in final rulemaking on March 23, 2012, after a notice-and-comment period.  *See* 77 FR 17219, 17251 (Mar. 23, 2012), Ex. 01.

119.    In the preceding July 15, 2011 proposed rule, CMS and HHS stated regarding risk corridors payment deadlines that:

HHS would make payments to QHP issuers that are owed risk corridor amounts from HHS within a 30-day period after HHS determines that a payment should be made to the QHP issuer.  We believe that QHP issuers who are owed these amounts will want prompt payment, and also believe that the payment deadlines should be the same for HHS and QHP issuers.

76 FR 41929, 41943 (July 15, 2011), Ex. 02.

120.    In the final rulemaking of March 23, 2012, HHS responded to comments received supporting the 30-day payment deadline to QHPs, and stated that it "plan[ned] to address the risk corridors payment deadline in the HHS notice of benefit and payment parameters."  77 FR 17219, 17239 (Mar. 23, 2012), Ex. 01.  HHS reiterated, however, that:

While we did not propose deadlines in the proposed rule, we … suggested … that HHS would make payments to QHP issuers that are owed risk corridors amounts within a 30-day period after HHS determines that a payment should be made to the QHP issuer.  *QHP issuers who are owed these amounts will want prompt payment, and payment deadlines should be the same for HHS and QHP issuers.*

*Id.* (emphasis added),

121.    This was HHS' final administrative construction and interpretation regarding the

- 27 -

deadline for HHS' risk corridors payments to QHPs.

122.    Subsequently, in a proposed rule of December 7, 2012, HHS "specified the annual schedule for the risk corridors program, including dates for claims run-out, data submission, and notification of risk corridors payments and charges."  77 FR 73118, 73200 (Dec. 7, 2012), Ex. 03.

123.    Following a notice-and-comment period, CMS published a final rule on March 11, 2013, adopting, among other things, the 30-day deadline for a QHP to remit risk corridors charges to the Government.  78 FR 15409, 15531 (Mar. 11, 2013), Ex. 64.  This resulted in 45 C.F.R. § 153.510 being amended by adding the following subsection:

> (d) *Charge submission deadline.* A QHP issuer must remit charges to HHS within 30 days after notification of such charges.

124.    HHS also adopted a final rule on March 11, 2013, amending 45 C.F.R. § 153.530 by adding subsection (d), imposing the annual requirement that "[f]or each benefit year, a QHP issuer must submit all information required under this section by July 31 of the year following the benefit year."  *Id..*

125.    While CMS never imposed in the implementing regulations a specific deadline for HHS to tender full risk corridors payments to QHPs whose allowable costs in a calendar year are greater than 103 percent of the QHP's target amount, the Government also never contravened its earlier public statements that the deadline for the Government's payment of risk corridors payments to QHPs should be identical to the deadline for a QHP's remittance of charges to the Government.  *See* 76 FR 41929, 41943 (July 15, 2011), Ex. 02; 77 FR 17219, 17238 (Mar. 23, 2012), Ex. 01.

126.    Molina relied upon these statements by HHS and CMS in the Federal Register in deciding to agree to become a QHP in California, Florida, Michigan, New Mexico, Ohio, Texas,

Utah, Washington and Wisconsin, and accept the obligations and responsibilities of a QHP,
believing that the Government would pay the full risk corridors payments owed to it within 30
days after it had been determined that Molina experienced losses sufficient to qualify for risk
corridors payments under Section 1342 of the ACA and 45 C.F.R. § 153.510.

127.    Nothing in 45 C.F.R. Part 153 limits CMS' obligation to pay QHPs the full
amount of risk corridors payments due based on appropriations, restrictions on the use of funds,
or otherwise.

128.    The United States should have paid Molina the full CY 2014 risk corridors
payments due by the end of CY 2015, but failed to do so.

129.    Likewise, the United States should have paid Molina the full CY 2015 risk
corridors payments due by the end of CY 2016, but failed to do so.

130.    The United States has failed or refused to make full and timely risk corridors
payments to Molina for CY 2014 and CY 2015 as required under Section 1342 of the ACA and
45 C.F.R. § 153.510.

131.    In all likelihood, the United States will not make full and timely risk corridors
payments to Molina for CY 2016, either—which will be required based on the data that Molina
will submit to CMS by July 31, 2017.

**HHS' and CMS' Recognition of Risk Corridors Payment Obligations**

132.    Since Congress' enactment of the ACA in 2010, HHS and CMS have repeatedly
publicly acknowledged and confirmed to Molina and other QHPs their statutory and regulatory
obligations to make full and timely risk corridors payments to qualifying QHPs.

133.    These public statements by HHS and CMS were made or ratified by
representatives of the Government who had actual authority to bind the United States.

134.    Molina relied on these public statements by HHS and CMS to assume and continue its QHP status, including its continued participation in the California, Florida, Michigan, New Mexico, Ohio, Texas, Utah, Washington, and Wisconsin ACA Exchanges each year from CY 2014 through CY 2016, and beyond.

135.    On July 11, 2011, HHS issued a fact sheet on HealthCare.gov, "Affordable Insurance Exchanges: Standards Related to Reinsurance, Risk Corridors and Risk Adjustment," stating that under the risk corridors program, "[f]rom 2014 through 2016" – not at some indeterminate future date – "qualified health plan issuers with costs greater than three percent of cost projections will receive payments from HHS to offset a percentage of those losses." HealthCare.gov, "Affordable Insurance Exchanges: Standards Related to Reinsurance, Risk Corridors and Risk Adjustment" (July 11, 2011), attached hereto at Exhibit 68.

136.    In the same July 11, 2011 fact sheet, HHS stated that "[r]isk corridors create a mechanism for sharing risk for allowable costs between the Federal government and qualified health plan issuers." *Id.*

137.    Additionally, in the July 11, 2011 fact sheet, HHS stated that proposed rulemaking would "aim[] to align the data and payment policies for this temporary [risk corridors] program with other [3Rs] programs to promote simplicity and efficiency." *Id.* The other 3Rs programs require annual payments.

138.    On July 15, 2011, in a proposed rule HHS noted that although the proposed regulations did not contain any deadlines for QHPs to remit charges to HHS or for HHS to make risk corridors payments to QHPs, such deadlines were under consideration, with HHS stating that "HHS would make payments to QHP issuers that are owed risk corridor amounts from HHS within a 30-day period after HHS determines that a payment should be made to the QHP issuer.

We believe that QHP issuers who are owed these amounts will want prompt payment, and also believe that the payment deadlines should be the same for HHS and QHP issuers." 76 FR 41929, 41943 (July 15, 2011), Ex. 02.

139.    Also in the July 15, 2011 proposed rule, HHS confirmed that the risk corridors program was designed to share risk between the Government and QHPs, stating that "[r]isk corridors create a mechanism for sharing risk for allowable costs between the Federal government and QHP issuers." *Id.* at 41942.

140.    On March 23, 2012, HHS implemented a final rule regarding Standards Related to Reinsurance, Risk Corridors and Risk Adjustment (77 FR 17219).  Although HHS recognized that it did not propose deadlines for making risk corridors payments, *HHS re-stated that "QHP issuers who are owed these amounts will want prompt payment, and payment deadlines should be the same for HHS and QHP issuers."* 77 FR 17219, 17238 (Mar. 23, 2012) (emphasis added), Ex. 01.

141.    In the same March 23, 2012 final rule, HHS also reconfirmed that the Government was sharing the risk with QHPs under the risk corridors program.  *See id.*

142.    In a March 2012 written presentation to health insurers regarding the final rule, CMS explained that risk corridors is a "Federal program under the statute," and that the risk corridors program "[p]rotects against inaccurate rate-setting by sharing risk (gains and losses) on allowable costs between HHS and qualified health plans to help ensure stable health insurance premiums."  Presentation, CMS, "Reinsurance, Risk Corridors, and Risk Adjustment Final Rule," at 11 (Mar. 2012), attached hereto at Exhibit 69.

143.    In proposed rulemaking on December 7, 2012, HHS assured QHPs, like Molina, that "[t]he risk corridors program, which is a Federally administered program, will protect

against uncertainty in rates for qualified health plans by limiting the extent of issuer losses and gains." 77 FR 73118, 73119 (Dec. 7, 2012), Ex. 03.

144.    Also in the December 7, 2012 proposed rule, HHS reconfirmed the Government-QHP risk-sharing aspect of risk corridors, stating that "[t]he temporary risk corridors program permits the Federal government and QHPs to share in the profits or losses resulting from inaccurate rate setting from 2014 to 2016." *Id.* at 73121.

145.    Additionally, in the December 7, 2012 proposed rule, HHS stated its intent that the risk corridors program would be administered on an annual basis, proposing "the annual schedule for the risk corridors program, including dates for claims run-out, data submission, and notification of risk corridors payments and charges." *Id.* at 73200.

146.    When HHS implemented a final rule on March 11, 2013, regarding HHS Notice of Benefit and Payment Parameters for 2014 (78 FR 15409), HHS confirmed, "*The risk corridors program is not statutorily required to be budget neutral.  Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the Affordable Care Act.*" 78 FR 15409, 15473 (Mar. 11, 2013) (emphasis added), Ex. 64.

147.    The March 11, 2013 final rule also "specifie[d] the annual schedule for the risk corridors program." *Id.* at 15520.

148.    A March 2013 CMS written presentation regarding the final rule to health insurers – some of whom, including Molina, were preparing to apply to become certified by CMS as QHPs for the upcoming CY 2014 ACA Marketplace – contained the same affirmations of Government-QHP risk-sharing as in the March 2012 presentation discussed above. *See* Presentation, CMS, "HHS Notice of Benefit and Payment Parameters for 2014," at 18 & 19 (Mar. 2013), attached hereto at Exhibit 70.

149.    Between April 2013 and September 2013, Plaintiffs executed and submitted their CY 2014 Attestations regarding, *inter alia*, their adherence to the risk corridors program for CY 2014.  *See* Exs. 34 to 43.

150.    In July 2013 and September 2013, in reliance on the Government's statutory, regulatory and contractual obligations and inducements described above, Plaintiffs executed their respective CY 2014 QHP Agreements and, upon approval and certification by CMS, Covered California or the Washington Health Benefit Exchange, became QHPs in, respectively, California, Florida, Michigan, New Mexico, Ohio, Texas, Utah, Washington and Wisconsin.  *See* Exs. 06 to 14.

151.    In February 2014, the Congressional Budget Office (CBO) published projections stating that, in contrast to the 3Rs' risk adjustment and reinsurance programs having "no net budgetary effect," the "payments and collections under the risk corridor program will not necessarily equal one another."  CBO, "The Budget and Economic Outlook: 2014 to 2024" at 110 (Feb. 2014), attached hereto at Exhibit 71.  The CBO's Table B-3 accordingly projected that in FY 2015, the difference between annual risk corridors payments and collections would net the Government $1 billion in positive revenue.  *Id.* at 109.  The table further projected positive annual revenue for the United States from the risk corridors program of $2 billion and $4 billion for, respectively, FY 2016 and FY 2017.  *Id.*  The CBO projected that "over the 2015-2024 period, risk corridor payments from the federal government to health insurers will total $8 billion and the corresponding collections from insurers will amount to $16 billion, yielding net savings for the federal government of $8 billion."  *Id.* at 110.

152.    The CBO's February 2014 analysis clearly contemplated that risk corridors payments would be made annually and in full, instead of payments being withheld until

sometime after the end of the risk corridors program in 2017 or later.  *Id.* at 109-110.  The CBO stated that "[c]ollections and payments for the … risk corridor programs will occur after the close of a benefit year.  Therefore, collections and payments for insurance provided in 2014 will occur in 2015, and so forth."  *Id.* at 110 n.6.  Additionally, CBO stated that "[t]o inform its projections, CBO analyzed recent data from the Medicare drug benefit (Part D)," and that "[u]nder Part D's risk corridors, collections from insurers have exceeded payments to insurers, yielding net collections that have averaged about $1 billion *per year*."  *Id.* at 115 (emphasis added).

153.    The CBO stated that its February 2014 figures reflected "new estimates of payments and collections for the risk corridor program, which had previously been projected to have no net budgetary effect."  *Id.*  at 112.  CBO explained that "in its baseline projections published in May 2013, [CBO] estimated that payments and collections for risk corridors would roughly offset one another."  *Id.* at 114.

154.    On information and belief, CBO's May 2013 baseline projections were the first CBO projections to include the risk corridors program.

155.    In a letter report to House Speaker Nancy Pelosi immediately prior to Congress' enactment of the ACA, the CBO did not include any reference to the risk corridors program in its budget projections.  *See generally* Letter, CBO to Hon. Nancy Pelosi (Mar. 20, 2010), attached hereto at Exhibit 72.

156.    CBO provided no reasons explaining why it failed to mention the risk corridors in its March 20, 2010 budget projections.  Molina has found no publicly available documentary evidence exists stating why CBO was silent regarding risk corridors in its many reports to Congress leading up to the enactment of the ACA, from May 2009 to March 2010.

157.     On information and belief, HHS engaged in speculation by stating in both July 15, 2011 and March 23, 2012 that the reason "CBO did not score the impact" of the risk corridors program in March 2010 was because CBO "assumed collections would equal payments to plans in the aggregate."  76 FR 41929, 41942 (July 15, 2011), Ex. 02; 77 FR 17219, 17244 (Mar. 23, 2012), Ex. 01.

158.     Even if CBO, prior to the May 2013 baseline projection, had determined that risk corridors would "have no net budgetary effect," that does not mean that CBO believed that risk corridor payments owed to QHPs under Section 1342 were *required* to be budget neutral based on the statute.  CBO's February 2014 report confirmed this by stating that the "payments and collections under the risk corridor program will not necessarily equal one another."  CBO, "The Budget and Economic Outlook: 2014 to 2024" at 110 (Feb. 2014), Ex. 71.

159.     On January 1, 2014, Molina began offering plans on the CY 2014 California, Florida, Michigan, New Mexico, Ohio, Texas, Utah, Washington, and Wisconsin ACA Exchanges, pursuant to its commitments with and attestations to the Government.

160.     In a proposed rule of December 2, 2013, and a final rule of March 11, 2014, HHS reiterated that the risk corridors program creates "a mechanism for sharing risk for allowable costs between the Federal government and QHP issuers," and that "[t]he risk corridors program will help protect against inaccurate rate setting in the early years of the Exchanges by limiting the extent of issuer losses and gains" 78 FR 72322, 72379 (Dec. 2, 2013), attached hereto at Exhibit 73; 79 FR 13743, 13829 (Mar. 11, 2014), attached hereto at Exhibit 74.

161.     In the March 11, 2014 final rule, HHS confirmed that risk corridors payments would be made annually, stating that "we believe that the risk corridors program as a whole will be budget neutral or, will result in net revenue to the Federal government in FY 2015 for the

2014 benefit year."  79 FR 13743, 13829 (Mar. 11, 2014), Ex. 74.

162.    Also in the March 11, 2014 final rule, HHS announced for the first time, without

prior notice in the December 2, 2013 proposed rule or anywhere else, that "HHS intends to

implement this [risk corridors] program in a budget neutral manner."  *Id.*

163.    On April 11, 2014, CMS issued a bulletin regarding its recent budget neutrality

decision, written in a question-and-answer format.  *See* Bulletin, CMS, "Risk Corridors and

Budget Neutrality," at 1 (Apr. 11, 2014), attached hereto at Exhibit 75.  To the question of

"[w]hat risk corridors payments will HHS make if risk corridors collections for a year are

insufficient to fund risk corridors payments for the year, as calculated under the risk corridors

formula?," CMS answered that "[w]e anticipate that risk corridors collections will be sufficient

to pay for all risk corridors payments.  However, if risk corridors collections are insufficient to

make risk corridors payments for a year, all risk corridors payments for that year will be reduced

pro rata to the extent of any shortfall."  *Id.*

164.    The April 11, 2014 CMS bulletin stated the Government's intent that risk

corridors payments would be made annually, and assured QHPs that the recent decision to

implement the risk corridors program in a budget neutral manner would not impact QHPs for CY

2014 because "risk corridors collections will be sufficient to pay for all risk corridors payments."

CMS also stated that "[w]e anticipate that risk corridors collections will be sufficient to pay for

all risk corridors payments over the life of the three-year program."  *Id.* at 2.

165.    In a final rule of May 27, 2014, HHS summarized its statements from the April

11, 2014 bulletin, providing that "we intend to administer risk corridors in a budget neutral way

over the three-year life of the program, rather than annually," but reiterated that payments would

be made annually by stating that "if risk corridors collections in the first or second year are

insufficient to make risk corridors payments as prescribed by the regulations, risk corridors collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and remaining funds will then be used to fund current year payments."  79 FR 30239, 30260 (May 27, 2014), attached hereto at Exhibit 76.

166.    In the May 27, 2014 final rule, HHS also repeated that "we anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments," and reassured QHPs that "a shortfall for the 2015 program year" would be an "unlikely event" – but should such an unlikely event occur, "HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers.  In that event, HHS will use other sources of funding for the risk corridors payments, subject to the availability of appropriations."  *Id.*

167.    In HHS' response letter to the U.S. Government Accountability Office ("GAO") dated May 20, 2014, HHS again admitted that "Section 1342(b)(1) … establishes … the formula to determine … the amounts the Secretary must pay to the QHPs if the risk corridors threshold is met."  Letter from William B. Schultz, General Counsel, HHS, to Julia C. Matta, Assistant General Counsel, GAO (May 20, 2014), attached hereto at Exhibit 77.

168.    Between May 2014 and July 2014, Plaintiffs executed and submitted their CY 2015 Attestations regarding, *inter alia*, their adherence to the risk corridors program for CY 2015.  *See* Exs. 44 to 53.

169.    On June 18, 2014, HHS sent to U.S. Senator Sessions and U.S. Representative Upton identical letters stating that, "As established in statute, … [QHP] plans with allowable costs at least three percent higher than the plan's target amount will receive payments from HHS to offset a percentage of those losses."  Letter from Sylvia M. Burwell, Secretary, HHS, to U.S.

Senator Jeff Sessions (June 18, 2014), attached hereto at Exhibit 78.

170.    In July 2014, October 2014, and May 2015, in reliance on the Government's statutory, regulatory and contractual obligations and inducements and assurances described above, Plaintiffs executed their respective CY 2015 QHP Agreements, committing to the California, Florida, Michigan, New Mexico, Ohio, Texas, Utah, Washington, and Wisconsin ACA Exchanges for CY 2015.  *See* Exs. 15 to 23.

171.    In proposed rulemaking on November 26, 2014, HHS repeated to QHPs that "a shortfall in the 2016 benefit year" is an "unlikely event."  79 FR 70673, 70676 (Nov. 26, 2014), attached hereto at Exhibit 79.  HHS also repeated that "we anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments," and that "*HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers.*"  Id. at 70700.  So confident was HHS about the collections potential for the risk corridors program, that in its November 26, 2014 proposed rulemaking, HHS discussed its "propos[al] that if, for the 2016 benefit year, cumulative risk corridors collections exceed cumulative risk corridors payment requests, we would [adjust certain parameters] to pay out all collections to QHP issuers."  *Id.*  No detailed plan was expressed for a scenario in which collections were insufficient to satisfy all payment requests.

172.    On January 1, 2015, Molina began offering plans on the CY 2015 California, Florida, Michigan, New Mexico, Ohio, Texas, Utah, Washington, and Wisconsin ACA Exchanges, pursuant to its commitments with and attestations to the Government.

173.    On February 27, 2015, HHS' implementation of a final rule regarding HHS Notice of Benefit and Payment Parameters for 2016 (80 FR 10749), finalized the proposed policy that HHS planned to implement if cumulative risk corridors collections exceed cumulative

payment obligations by CY 2016, and further confirmed that "HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers.  In the unlikely event that risk corridors collections, including any potential carryover from the prior years, are insufficient to make risk corridors payments for the 2016 program year, HHS will use other sources of funding for the risk corridors payments, subject to the availability of appropriations." 80 FR 10749, 10779 (Feb. 27, 2015), attached hereto at Exhibit 80.

174.   On April 14, 2015, CMS published a timeline for QHPs regarding "Key Dates in 2015," which stated that "Remittance of Risk Corridors Payments and Charges" would occur from "9/2015 – 12/2015."  Bulletin, CMS, "Key Dates in 2015: QHP Certification in the Federally-Facilitated Marketplaces; Rate Review; Risk Adjustment, Reinsurance, and Risk Corridors" (Apr. 14, 2015), attached hereto at Exhibit 81.

175.   Between March 2015 and July 2015, in reliance on the Government's statutory, regulatory and contractual obligations and inducements described above, Plaintiffs executed and submitted their CY 2016 Attestations.  *See* Exs. 54 to 63.  Unlike in previous years, however, the CY 2016 attestation forms created by the Government and submitted by Molina FL, Molina MI, Molina OH, Molina TX, Molina UT, and Molina WI omitted any attestations regarding QHPs' adherence to the risk corridors program for CY 2016.  Nevertheless, the CY 2016 attestation forms submitted by Molina NM and Molina WA still contained attestations regarding their adherence to the risk corridors program for CY 2016.

176.   CMS' letter to state insurance commissioners on July 21, 2015, stated in boldface text that "**CMS remains committed to the risk corridor program.**"  Letter from Kevin J. Counihan, CEO of Health Insurance Marketplaces, CMS, to State Insurance Commissioners (July 21, 2015), attached hereto at Exhibit 82.

177.    In July 2015, September 2015, and April 2016, in reliance on the Government's statutory, regulatory and contractual obligations and inducements described above, Plaintiffs executed their respective CY 2016 QHP Agreements, committing to the CY 2016 ACA Exchanges in California, Florida, Michigan, New Mexico, Ohio, Texas, Utah, Washington, and Wisconsin for the final year of the risk corridors program.  *See* Exs. 24 to 32.

178.    On or about July 31, 2015, Plaintiffs submitted their CY 2014 risk corridors data to CMS per 45 C.F.R. § 153.530(d).

179.    On October 1, 2015, HHS and CMS announced the severe shortfall in the CY 2014 risk corridors program, yet confirmed the Government's intention to make annual payments under the risk corridors program by stating that "HHS will begin collection of risk corridors charges in November, 2015, and will begin remitting risk corridors payments to issuers starting December, 2015."  Bulletin, CMS, "Risk Corridors Payment Proration Rate for 2014" (Oct. 1, 2015), attached hereto at Exhibit 83.

180.    As detailed further below, Molina made its CY 2014 risk corridors charge remittances in November 2015, and HHS and CMS began their piecemeal CY 2014 risk corridors payments to Molina in December 2015, continuing into 2016.

181.    On November 19, 2015, CMS issued a public announcement further confirming that "HHS recognizes that the Affordable Care Act requires the Secretary to make *full payments* to issuers," and adding that "HHS *is recording those amounts that remain unpaid* following our 12.6% payment this winter *as fiscal year 2015 obligation* [sic] of the United States Government for which *full payment is required*."  Bulletin, CMS, "Risk Corridors Payments for the 2014 Benefit Year" (Nov. 19, 2015) (emphasis added), attached hereto at Exhibit 84.

182.    On January 1, 2016, Plaintiffs began offering plans on the CY 2016 California,

Florida, Michigan, New Mexico, Ohio, Texas, Utah, Washington, and Wisconsin ACA

Exchanges, pursuant to their commitments with and attestations to the Government.

183.    CMS' written presentation to insurers on June 7, 2016 represented to Molina and

other QHPs that "CMS will begin making [CY 2015] RC [risk corridor] payments to issuers" in

"December 2016," supporting HHS and CMS's continued intention to make annual risk

corridors payments.  *See* CMS, *Completing the Risk Corridors Plan-Level Data Form for the*

*2015 Benefit Year* at 7 (June 7, 2016), attached hereto at Exhibit 85.

184.    On or about July 31, 2016, Plaintiffs submitted their CY 2015 risk corridors data

to CMS per 45 C.F.R. § 153.530(d).

185.    On September 9, 2016 – after several lawsuits had been filed by other QHPs in

the U.S. Court of Federal Claims that, like this lawsuit, seek monetary relief from the United

States for breaches of the Government's risk corridors payment obligations – CMS publicly

confirmed that "HHS recognizes that the Affordable Care Act requires the Secretary to make full

payments to issuers," and that "HHS will record risk corridors payments due as an obligation of

the United States Government for which full payment is required."  Bulletin, CMS, "Risk

Corridors Payments for 2015" (Sept. 9, 2016), attached hereto at Exhibit 86.  CMS confirmed its

full risk corridors obligation to QHPs, despite revealing that "based on our preliminary analysis,

HHS anticipates that all 2015 benefit year collections will be used towards remaining 2014

benefit year risk corridors payments, and no funds will be available at this time for 2015 benefit

year risk corridors payments," and that "[c]ollections from the 2016 benefit year will be used

first for remaining 2014 benefit year risk corridors payments, then for 2015 benefit year risk

corridors payments, then for 2016 benefit year risk corridors payments."  *Id.*

186.    Most recently, in its November 18, 2016 announcement of the severe risk

corridors shortfall for CY 2015, CMS again confirmed the annual payment structure of the risk

corridors program, stating that "if risk corridors collections for a particular year are insufficient

to make full risk corridors *payments for that year*, risk corridors *payments for the year* will be

reduced pro rata to the extent of any shortfall," and also that "HHS is collecting 2015 risk

corridor charges in November 2016, and will begin remitting risk corridors payments to issuers

in December 2016, as collections are received."  Bulletin, CMS, "Risk Corridors Payment and

Charge Amounts for the 2015 Benefit Year" (Nov. 18, 2016) (emphasis added), attached hereto

at Exhibit 87.

187.    HHS' and CMS' direct statements to Molina have further unequivocally

confirmed the agencies' position that full annual risk corridors payments are owed to Plaintiffs

and are a binding obligation of the United States.

188.    On or about October 2015 or November 2015, Molina received a letter from CMS

stating, "I wish to reiterate to you that the Department of Health and Human Services (HHS)

recognizes that the Affordable Care Act *requires* the Secretary to make *full payments* to

issuers[.]"  Letter from Kevin J. Counihan, CEO of Health Insurance Marketplaces, CMS, to

Molina (Oct./Nov. 2015) (emphasis added).  The letter further stated that "HHS is recording

those amounts that remain unpaid following our 12.6% payment this winter as fiscal year 2015

obligations of the United States Government for which full payment is required."  *Id.*

189.    The CMS official who signed the letter, Kevin Counihan, listed his title as "Chief

Executive Officer, Health Insurance Marketplaces," and "Director, Center for Consumer

Information & Insurance Oversight."  *Id.*  More specifically, CMS's job description for Mr.

Counihan states that "[i]n his role as Marketplace CEO, Kevin is responsible and accountable for

leading the federal Marketplace, managing relationships with state marketplaces, and running the

Center for Consumer Information and Insurance Oversight (CCIIO), which regulates health insurance at the federal level." CMS Leadership, Center for Consumer Information and Insurance Oversight, Kevin Counihan, https://www.cms.gov/About-CMS/Leadership/cciio/Kevin-Counihan.html (last visited Jan. 12, 2017), attached hereto at Exhibit 88.

190.    CMS also stated in an email transmitting Mr. Counihan's letter to Molina that the "letter from CMS reiterat[es] that risk corridors payments *are an obligation of the U.S. Government*." Email from Counihan, CMS, to Molina (Oct./Nov. 2015) (emphasis added).

### The United States' Failure to Honor its Obligations

191.    Beginning in 2014, after Molina (which had executed the CY 2014 QHP Agreement with CMS in September 2013) had already agreed to participate in and offer QHPs on the CY 2014 California, Florida, Michigan, New Mexico, Ohio, Texas, Utah, Washington, and Wisconsin ACA Exchanges in reliance upon the Government's risk corridors payment obligations, the Government announced that the United States would not honor those payment obligations.

192.    On March 11, 2014, HHS stated in a final rule in the Federal Register that "HHS intends to implement this [risk corridors] program in a budget neutral manner." 79 FR 13743, 13829 (Mar. 11, 2014), Ex. 74.

193.    This announcement was directly contrary to HHS' prior statement – made exactly one year earlier in the Federal Register, March 11, 2013 – which stated: "The risk corridors program is not statutorily required to be budget neutral. Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the Affordable Care Act." 78 FR 15409, 15473 (Mar. 11, 2013), Ex. 64.

194.    The American Academy of Actuaries stated in April 2014 that the proposed "new budget neutrality policy … would change the basic nature of the risk corridor program retroactively"  and "changes the nature of the risk corridor program from one that shares risk between issuers and CMS to one that shares risk between competing issuers."  Am. Acad. of Actuaries, Comment to HHS on Proposed Rule, Exchange and Insurance Market Standards for 2015 and Beyond at 3 (Apr. 21, 2014), attached hereto at Exhibit 89.

195.    HHS' "budget neutral" statement of March 11, 2014, was also contrary to Congress' intent for the Government to share risk with insurers, and Congress' direction to model the ACA risk corridors program on the Medicare Part D program, which is not required to be budget neutral.  *See* 42 C.F.R. § 423.336, attached hereto at Exhibit 90; U.S. Gov't Accountability Office Report, *Patient Protection and Affordable Care Act: Despite Some Delays, CMS Has Made Progress Implementing Programs to Limit Health Insurer Risk*, GAO-15-447 (2015), attached hereto at Exhibit 91 ("For the Medicare Advantage and Medicare Part D risk mitigation programs, the payments that CMS makes to issuers are not limited to issuer contributions."); Am. Acad. of Actuaries, Comment to HHS on Proposed Rule, Exchange and Insurance Market Standards for 2015 and Beyond at 2 (Apr. 21, 2014), Ex. 89, ("The Part D risk corridor program is not budget neutral and has resulted in net payments to the Centers for Medicare and Medicaid Services (CMS).  Similarly, the design of the ACA risk corridor program does not guarantee budget neutrality.").

196.    HHS' statement was also contrary to the CBO's February 2014 published projections that the risk corridors program would net the Government $8 billion in positive revenue.  *See* CBO, "The Budget and Economic Outlook: 2014 to 2024" at 110 n. 6 (Feb. 2014), Ex. 71.

197.    The fundamental change in position by HHS and CMS to declare that the risk corridors program would be "budget neutral" apparently was motivated by political considerations, not statutory or regulatory ones.

198.    After the President released his Proposed Budget for FY 2015 on March 4, 2014, it was publicly reported that approximately $5.5 billion had been requested to cover expenses related to the risk corridors program.  *See, e.g.*, Brianna Ehley, *$5.5 Billion for Obama's Contested Risk Corridors*, The Fiscal Times, Mar. 4, 2014, attached hereto at Exhibit 92; Alex Wayne, *Insurers' Obamacare Losses May Reach $5.5 Billion in 2015*, Bloomberg, Mar. 4, 2014, attached hereto at Exhibit 93.

199.    A week later, on March 11, 2014, HHS and CMS published the final rule formalizing their about-face on the budget-neutrality requirements for the risk corridors program.

200.    The lack of reasoned decision-making by the agencies regarding budget neutrality is further exposed by the proposed rule of December 2, 2013, which did not contain any proposal by HHS or CMS to implement the risk corridors program in a budget neutral manner.  *See generally* 78 FR 72322, 72379 (Dec. 2, 2013), Ex. 73.  Therefore, the budget neutrality position adopted in the March 11, 2014 final rule was not the product of notice-and-comment rulemaking.

201.    A month later, on April 11, 2014, HHS and CMS issued a bulletin entitled "Risk Corridors and Budget Neutrality," stating that:

> We anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments.  ***However, if risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall.***  Risk corridors collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and will then be used to fund current year payments.  If, after obligations for the previous year have been met, the total amount of collections available in the current year is

insufficient to make payments in that year, the current year payments will
be reduced pro rata to the extent of any shortfall.  If any risk corridors
funds remain after prior and current year payment obligations have been
met, they will be held to offset potential insufficiencies in risk corridors
collections in the next year.

Bulletin, CMS, "Risk Corridors and Budget Neutrality" (Apr. 11, 2014) (emphasis added), Ex.

75.

202.    The April 11, 2014 Bulletin was the first instance in which HHS and CMS

publicly suggested that risk corridors charges collected from QHPs would be less than the

Government's full mandatory risk corridors payment obligations owed to QHPs.

203.    Only one month earlier, on March 11, 2014, HHS and CMS had publicly

announced that "we believe that the risk corridors program as a whole will be budget neutral or,

[sic] will result in net revenue to the Federal government in FY 2015 for the 2014 benefit year."

79 FR 13743, 13829 (Mar. 11, 2014), Ex. 74.

204.    Nevertheless, CMS' April 11, 2014 Bulletin recognized that risk corridors

payments are due annually, and lacked any express or implied statement that risk corridors

payments for any year would not be due until sometime after the end of the risk corridors

program in 2017.

205.    HHS' and CMS' change in position to call for "budget neutrality" in the risk

corridors program caused the CBO to update its projections for risk corridors payments and

charges in April 2014.  See CBO, "Updated Estimates of the Effects of the Insurance Coverage

Provisions of the Affordable Care Act, April 2014" (Apr. 2014), attached hereto at Exhibit 94.

CBO stated that it "believes that the Administration has sufficient flexibility to ensure that

payments to insurers will approximately equal payments from insurers to the federal

government, and thus that the program will have no net budgetary effect over the three years of

its operation.  (Previously, CBO had estimated that the risk corridor program would yield net budgetary savings of $8 billion.)" *Id.* at 18.  Despite this revision, CBO's Table 3 continued to project that risk corridors payments would be made annually, rather than sometime after the end of the program in 2017. *See id.* at 10.

206.    On December 16, 2014 – after Molina had committed to the CY 2015 ACA Exchanges – Congress enacted the Cromnibus appropriations bill for fiscal year 2015, the "Consolidated and Further Continuing Appropriations Act, 2015" (the "2015 Appropriations Act").  Pub. L. 113-235.

207.    In the 2015 Appropriations Act, Congress specifically targeted the Government's existing, mandatory risk corridors payment obligations owed to QHPs, including Plaintiffs, under Section 1342 of the ACA, limiting appropriations for those payment obligations from three large funding sources by including the following text at Section 227 of the 2015 Appropriations Act:

> ***None of the funds*** made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services—Program Management" account, ***may be used for payments under section 1342(b)(1) of Public Law 111-148 (relating to risk corridors)***.

128 Stat. 2491 (emphasis added), attached hereto at Exhibit 95.

208.    Section 1342(b)(1) of Public Law 111-148 – referenced immediately above – is the ACA's prescribed methodology for the Government's mandatory risk corridors payments to QHPs.

209.    Congress' failure to appropriate sufficient funds for risk corridors payments due for CY 2014, without modifying or repealing Section 1342 of the ACA, did not defeat or otherwise abrogate the United States' statutory obligation created by Section 1342 to make full and timely risk corridors payments to QHPs, including Plaintiffs.

210.     On October 1, 2015, after collecting risk corridors data from QHPs for CY 2014,

and after receiving Molina's and other QHPs' commitments to the CY 2016 ACA Exchanges,

HHS and CMS announced that it intended to prorate the risk corridors payments owed to QHPs,

including Plaintiffs, for CY 2014, stating that:

> Based on current data from QHP issuers' risk corridors submissions,
> issuers will pay $362 million in risk corridors charges, and have submitted
> for $2.87 billion in risk corridors payments for 2014.  **At this time,**
> **assuming full collections of risk corridors charges, this will result in a**
> **proration rate of 12.6 percent.**

Bulletin, CMS, "Risk Corridors Payment Proration Rate for 2014" (Oct. 1, 2015), Ex. 83.

211.     HHS and CMS further announced on October 1, 2015, that they would be

collecting full risk corridors charges from QHPs in November 2015, and would begin making the

prorated risk corridors payments to QHPs starting in December 2015.  *See id.*

212.     This December 2015 risk corridors payment schedule was consistent with an

earlier payment schedule that CMS had provided to QHPs on April 14, 2015, before any CY

2014 risk corridors payments were due, specifically stating that the Government's "Remittance

of Risk Corridors Payments and Charges" would be made on "9/2015 – 12/2015."  Bulletin,

CMS, "Key Dates in 2015: QHP Certification in the Federally-Facilitated Marketplaces; Rate

Review; Risk Adjustment, Reinsurance, and Risk Corridors" (Apr. 14, 2015), Ex. 81.

213.     The risk corridors payment schedule that CMS announced was also consistent

with its June 2015 presentations to insurers stating that in December 2015, "CMS will begin

making RC [risk corridor] payments to issuers" for CY 2014.  Presentation, CMS, "Completing

the Risk Corridors Plan-Level Data Form 2014" (June 1, 2015), attached hereto at Exhibit 96.

214.     HHS and CMS advised Molina by letter on or about October 2015 or November

2015, that the Government "will not know the total loss or gain for the [temporary risk corridors]

program until the fall of 2017 …. In the event of a shortfall for the 2016 program year, HHS will explore other sources of funding for risk corridors payments, subject to the availability of appropriations. This includes working with Congress on the necessary funding for outstanding risk corridors payments." Letter from Counihan, CMS, to Molina (Oct./Nov. 2015).

215.    On December 18, 2015, Congress enacted the Omnibus appropriations bill for fiscal year 2016, the "Consolidated Appropriations Act, 2016" (the "2016 Appropriations Act"). Pub. L. 114-113.

216.    In the 2016 Appropriations Act, Congress again specifically targeted the Government's existing, mandatory risk corridors payment obligations owed to QHPs, including Plaintiffs, under Section 1342 of the ACA, limiting appropriations for those payment obligations from three large funding sources by including the following text at Section 225 of the 2016 Appropriations Act:

> ***None of the funds*** made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services—Program Management" account, ***may be used for payments under section 1342(b)(1) of Public Law 111-148 (relating to risk corridors)***.

129 Stat. 2624 (emphasis added), attached hereto at <u>Exhibit 97</u>.

217.    Again, Section 1342(b)(1) of Public Law 111-148 is the ACA's prescribed methodology for the Government's mandatory risk corridors payments to QHPs.

218.    Congress' failure to appropriate sufficient funds for risk corridors payments due for CY 2014 and CY 2015, without modifying or repealing Section 1342 of the ACA, did not defeat or otherwise abrogate the United States' statutory obligation created by Section 1342 to make full and timely risk corridors payments to QHPs, including Plaintiffs.

219.    On April 1, 2016, CMS reaffirmed in a letter to another QHP that – although

"remaining risk corridor claims will be paid" – the amounts owed would be delayed and contingent upon the Government's receipt of sufficient risk corridors charges/collections for CY 2015 and/or CY 2016.  Letter from Kevin J. Counihan, CEO of Health Insurance Marketplaces, CMS, to Highmark Health (Apr. 1, 2016), attached hereto at <u>Exhibit 98</u>.

220.    Further delay in the Government's full payment of the CY 2014 and CY 2015 risk corridors amounts owed to Molina was announced on September 9, 2016, when CMS published a bulletin stating that "HHS anticipates that all 2015 benefit year collections will be used towards remaining 2014 benefit year risk corridors payments, and … [c]ollections from the 2016 benefit year will be used first for remaining 2014 benefit year risk corridors payments, then for 2015 benefit year risk corridors payments, then for 2016 benefit year risk corridors payments." Bulletin, CMS, "Risk Corridors Payments for 2015" (Sept. 9, 2016), <u>Ex. 86</u>.

221.    In an announcement of November 18, 2016, CMS confirmed "that all 2015 benefit year risk corridors collections will be used to pay a portion of balances on 2014 benefit year risk corridors payments," and that no timely CY 2015 risk corridors payments would be made to QHPs like Molina.  Bulletin, CMS, "Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year" (Nov. 18, 2016), <u>Ex. 87</u>.

222.    Although the November 18, 2016 announcement did not specify the total amount of CY 2015 risk corridors collections versus payments nationwide amongst all QHPs, by calculating the data provided in the announcement's tables, it appears that QHPs requested CY 2015 risk corridors payments of $5,821,439,995.74 from the Government versus CY 2015 risk corridors collections of $95,315,092.84.

223.    In total, for the first two years of the risk corridors program, the Government owes QHPs CY 2014 and CY 2015 risk corridors payments of approximately $8.69 billion,

versus QHPs owing the Government CY 2014 and CY 2015 risk corridors collections of approximately $457 million, a shortfall of over $8 billion.

224.    It is unrealistic to expect that CY 2016 risk corridors collections will exceed CY 2016 risk corridors payments by $8 billion, sufficient to make up the accumulated risk corridors shortfall.

225.    Responding to this Court's questioning in open court in another risk corridors case, in which the Court asked, "So, they're [HHS and CMS] never going to make payment?," the Government replied, "[U]nless collections are sufficient or Congress appropriates money for the agency to do so, then the agency has no obligation to pay anything additional, anything beyond collections."  Transcript of Oral Argument at 25:6-13, *Moda Health Plan, Inc. v. United States*, No. 16-649C (Jan. 13, 2017), attached hereto as Exhibit 99.

226.    Just four months prior, CMS Acting Administrator Andy Slavitt, testifying before the House Energy and Commerce Committee, had responded to Rep. Morgan Griffith's question of, "Does CMS take the position that insurance plans are entitled to be made whole on risk corridor payments even though there's no appropriation to do so?  And I took your answer as a 'yes,' am I correct?," by stating, "Yes, this is an obligation of the federal government."  *The Affordable Care Act on Shaky Ground: Hearing Before the H. Comm. on Energy & Commerce*, 114th Cong. (Sept. 14, 2016) (testimony of Andy Slavitt, CMS Acting Administrator), https://www.youtube.com/watch?v=rjqWpYTYiJI&t=1h57m25s (1:57:25 to 1:57:37).  Mr. Slavitt's affirmation was consistent with CMS' September 9, 2016 announcement that "HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers," and that "HHS will record risk corridors payments due as an obligation of the United States Government for which full payment is required."  Bulletin, CMS, "Risk Corridors Payments for

2015" (Sept. 9, 2016), Ex. 86.

227.    The Government has thus left Molina, and other QHPs owed past-due risk

corridors payments, to guess when—if ever—the United States will make the full CY 2014, CY

2015, and after CMS analyzes the data in the second half of CY 2017, CY 2016 risk corridors

payments owed to Plaintiffs.

228.    HHS and CMS failed to provide Plaintiffs with any statutory authority for their

unilateral decision to make only partial, prorated risk corridors payments for CY 2014, to

withhold delivery of full risk corridors payments for CY 2014 beyond CY 2015, and to make no

risk corridors payments for CY 2015 by the end of CY 2016.

229.    Recognizing that the United States was acting in contravention of its statutory and

regulatory payment obligations, on or about October 2015 or November 2015, HHS and CMS

sent a letter to Molina stating that:

> I wish to reiterate to you that the Department of Health and Human
> Services (HHS) recognizes that the Affordable Care Act requires the
> Secretary to make full payments to issuers, and that HHS is recording
> those amounts that remain unpaid following our 12.6% payment this
> winter as fiscal year 2015 obligations of the United States government for
> which full payment is required.

Letter from Counihan, CMS, to Molina (Oct./Nov. 2015).

230.    HHS and CMS made the same acknowledgement in a public bulletin on

November 19, 2015, regarding CY 2014 risk corridors payments:

> HHS recognizes that the Affordable Care Act requires the Secretary to
> make full payments to issuers, and HHS is recording those amounts that
> remain unpaid following our 12.6% payment this winter as fiscal year
> 2015 obligation [sic] of the United States Government for which full
> payment is required.

Bulletin, CMS, "Risk Corridors Payments for the 2014 Benefit Year" (Nov. 19, 2015), Ex. 84.

231.    By stating that the remaining 87.4% of Molina's risk corridors payments for CY

2014 would be recorded "as fiscal year 2015 obligations of the United States government for which full payment is required," HHS and CMS admitted that full payment for CY 2014 was due and owing in 2015 – not at some future indeterminate date after CY 2016.

232.    Likewise, in the September 9, 2016 announcement that no CY 2015 risk corridors payments would be paid on time, HHS and CMS admitted that full payment for CY 2015 was due and owing in 2016 by stating that "HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers," and that "HHS will record risk corridors payments due as an obligation of the United States Government for which full payment is required." Bulletin, CMS, "Risk Corridors Payments for 2015" (Sept. 9, 2016), Ex. 86.

233.    The Government's written acknowledgement of its risk corridors payment obligations for CY 2014 and CY 2015, however, is an insufficient substitute for full and timely payment of the amounts owed as required by statute, regulation, contract, and HHS' and CMS' previous statements.

**Molina's Risk Corridors Payment and Charge Amounts for CY 2014**

234.    In a report released on November 19, 2015, HHS and CMS publicly announced QHPs' risk corridors charges and payments for CY 2014, and emphasized that "**Risk corridors charges payable to HHS are not prorated, and the full risk corridors charge amounts are noted in the chart below.  Only risk corridors payment amounts are prorated.**"  Bulletin, CMS, "Risk Corridors Payment and Charge Amounts for Benefit Year 2014" (Nov. 19, 2015) ("CY 2014 Risk Corridors Report"), attached hereto at Exhibit 100.

235.    Molina FL's losses in the ACA Florida Individual Market for CY 2014 resulted in the Government being required to pay Molina FL a risk corridors payment of $39,035.74.  *See* CY 2014 Risk Corridors Report at Table 10 – Florida, Ex. 100.

236.    The Government announced, however, that it would pay Molina FL a prorated amount of only $4,925.48 for Molina FL's losses in the ACA Florida Individual Market for CY 2014.  *See id.*

237.    The amount of Molina MI's gains in the ACA Michigan Individual Market for CY 2014 resulted in Molina MI being required to remit a risk corridors charge to the Secretary of HHS in the amount of $33,005.69.  *See* CY 2014 Risk Corridors Report at Table 23 – Michigan, Ex. 100.

238.    The amount of Molina NM's gains in the ACA New Mexico Individual Market for CY 2014 resulted in Molina NM being required to remit a risk corridors charge to the Secretary of HHS in the amount of $628,432.85.  *See* CY 2014 Risk Corridors Report at Table 32 – New Mexico, Ex. 100.

239.    The amount of Molina OH's gains in the ACA Ohio Individual Market for CY 2014 resulted in Molina OH being required to remit a risk corridors charge to the Secretary of HHS in the amount of $59,275.67.  *See* CY 2014 Risk Corridors Report at Table 36 – Ohio, Ex. 100.

240.    The amount of Molina TX's gains in the ACA Texas Individual Market for CY 2014 resulted in Molina TX being required to remit a risk corridors charge to the Secretary of HHS in the amount of $421,460.88.  *See* CY 2014 Risk Corridors Report at Table 44 – Texas, Ex. 100.

241.    The amount of Molina UT's gains in the ACA Utah Individual Market for CY 2014 resulted in Molina UT being required to remit a risk corridors charge to the Secretary of HHS in the amount of $34,983.73.  *See* CY 2014 Risk Corridors Report at Table 45 – Utah, Ex. 100.

242.     The amount of Molina WA's gains in the ACA Washington Individual Market for CY 2014 resulted in Molina WA being required to remit a risk corridors charge to the Secretary of HHS in the amount of $1,376,733.58.  *See* CY 2014 Risk Corridors Report at Table 48 – Washington, Ex. 100.

243.     The amount of Molina WI's gains in the ACA Wisconsin Individual Market for CY 2014 resulted in Molina WI being required to remit a risk corridors charge to the Secretary of HHS in the amount of $2,294,384.22.  *See* CY 2014 Risk Corridors Report at Table 50 – Wisconsin, Ex. 100.

244.     Molina was required to remit 100% of the amount of these charges to HHS before the close of CY 2015, as it had affirmatively attested it would do.  *See, e.g.*, CY 2014 Risk Corridors Report, Ex. 100; CY 2014 Attestations, Exs. 34 to 43.

245.     Plaintiffs' risk corridors payments and charges, and the Government's announced prorated payment amounts, for CY 2014 are summarized as follows:

| Plaintiff | State / Market | Risk Corridors Amount | Prorated Amount | Percent Pro Rata |
|-----------|----------------|-----------------------|-----------------|------------------|
| Molina FL | FL / Individual | $39,035.74 | $4,925.48 | 12.6% |
| Molina MI | MI / Individual | ($33,005.69) | ($33,005.69) | 100% |
| Molina NM | NM / Individual | ($628,432.85) | ($628,432.85) | 100% |
| Molina OH | OH / Individual | ($59,275.67) | ($59,275.67) | 100% |
| Molina TX | TX / Individual | ($421,460.88) | ($421,460.88) | 100% |
| Molina UT | UT / Individual | ($34,983.73) | ($34,983.73) | 100% |
| Molina WA | WA / Individual | ($1,376,733.58) | ($1,376,733.58) | 100% |
| Molina WI | WI / Individual | ($2,294,384.22) | ($2,294,384.22) | 100% |

246.     In total, the Government is required to pay Molina FL risk corridors payments for CY 2014 of $39,035.74, but the Government announced that it would only make prorated payments to Molina FL equal to 12.6% of the amounts owed ($4,925.48).

247.     Molina was required to pay the Government 100% of its CY 2014 Michigan, New Mexico, Ohio, Texas, Utah, Washington, and Wisconsin Individual Market risk corridors charges ($4,848,276.62) – not some unilaterally determined fraction thereof – and to do so

promptly.

248.    Molina made its full and timely remittance of CY 2014 risk corridors charges to the Government on November 20, 2015.  *See* November 2015 Financial Transaction Report for Molina MI, CMS Marketplace Payments (Nov. 30, 2015), attached hereto at Exhibit 101 (showing "RCCHG" – Risk Corridors Charge – of $33,005.69 paid on EFT date of 11/20/2015); November 2015 Financial Transaction Report for Molina NM, CMS Marketplace Payments (Nov. 30, 2015), attached hereto at Exhibit 102 ("RCCHG" of $628,432.85); November 2015 Financial Transaction Report for Molina OH, CMS Marketplace Payments (Nov. 30, 2015), attached hereto at Exhibit 103 ("RCCHG" of $59,275.67); November 2015 Financial Transaction Report for Molina TX, CMS Marketplace Payments (Nov. 30, 2015), attached hereto at Exhibit 104 ("RCCHG" of $421,460.88); November 2015 Financial Transaction Report for Molina UT, CMS Marketplace Payments (Nov. 30, 2015), attached hereto at Exhibit 105 ("RCCHG" of $34,983.73); November 2015 Financial Transaction Report for Molina WA, CMS Marketplace Payments (Nov. 30, 2015), attached hereto at Exhibit 106 ("RCCHG" of $1,376,733.58); November 2015 Financial Transaction Report for Molina WI, CMS Marketplace Payments (Nov. 30, 2015), attached hereto at Exhibit 107 ("RCCHG" of $2,294,384.22).

249.    The Government made some prorated annual risk corridors payments to Molina FL for CY 2014 on December 21, 2015, January 27, 2016, February 25, 2016, March 25, 2016, and October 25, 2016, totaling $4,868.52.  This amount represents only approximately 12.47% of CY 2014 risk corridors payments that the Government owes to Molina FL — even less than the 12.6% pro-rata amount that the Government stated it would pay Molina FL for CY 2014 risk corridors payments.

250.    The Government finally surpassed the 12.6% level on December 22, 2016, when

Molina received payment of $939.12 from the Government's pro-rata distribution of the CY 2015 risk corridors charge collection.  Nevertheless, the combined risk corridors payments from the Government to Molina as of the date of this filing ($5,807.64) represents only 14.88% of CY 2014 risk corridors payments that the Government owes to Plaintiffs.

251.   The Government announced on November 18, 2016 that, based on CY 2015 risk corridors collections, it will pay Molina FL $1,296.70 in CY 2014 risk corridors payments owed. *See* Bulletin, CMS, "Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year" (Nov. 18, 2016) at 4, Ex. 87.  The Government's December 22, 2016 risk corridors payment to Molina of $939.12, leaves $357.58 still owing on the prorated amount that the Government promised to pay Molina FL for CY 2014 from CY 2015 risk corridors collections, as of the date of this filing.

252.   HHS lacks the authority, under statute, regulation or contract, to unilaterally withhold full and timely CY 2014 risk corridors payments from QHPs such as Molina FL.

**Molina's Risk Corridors Payment and Charge Amounts for CY 2015**

253.   In a report released on November 18, 2016, HHS and CMS publicly announced QHPs' risk corridors charges and payments for CY 2015, stating that "all 2015 benefit year risk corridors collections will be used to pay a portion of balances on 2014 benefit year risk corridors payments," and that "HHS intends to collect the full 2015 risk corridors charge amounts indicated in the tables" printed in the report.  Bulletin, CMS, "Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year" (Nov. 18, 2016) ("CY 2015 Risk Corridors Report"), Ex. 87.

254.   Molina CA's losses in the ACA California Individual Market for CY 2015 resulted in the Government being required to pay Molina CA a risk corridors payment of

$1,784,227.07. *See id.* at 3.

255.    Molina FL's losses in the ACA Florida Individual Market for CY 2015 resulted in the Government being required to pay Molina FL a risk corridors payment of $25,417,985.09. *See id.* at 4.

256.    Molina UT's losses in the ACA Utah Individual Market for CY 2015 resulted in the Government being required to pay Molina UT a risk corridors payment of $3,557,849.34. *See id.* at 12.

257.    Molina WA's losses in the ACA Washington Individual Market for CY 2015 resulted in the Government being required to pay Molina WA a risk corridors payment of $238,552.08. *See id.* at 13.

258.    Molina WI's losses in the ACA Wisconsin Individual Market for CY 2015 resulted in the Government being required to pay Molina WI a risk corridors payment of $21,340,461.88. *See id.*

259.    The amount of Molina MI's gains in the ACA Michigan Individual Market for CY 2015 resulted in Molina MI being required to remit a risk corridors charge to the Secretary of HHS in the amount of $239,138.47. *See id.* at 7.

260.    The amount of Molina NM's gains in the ACA New Mexico Individual Market for CY 2015 resulted in Molina NM being required to remit a risk corridors charge to the Secretary of HHS in the amount of $107,005.94. *See id.* at 9.

261.    The amount of Molina OH's gains in the ACA Ohio Individual Market for CY 2015 resulted in Molina OH being required to remit a risk corridors charge to the Secretary of HHS in the amount of $508,729.76. *See id.* at 10.

262.    The amount of Molina TX's gains in the ACA Texas Individual Market for CY

2015 resulted in Molina TX being required to remit a risk corridors charge to the Secretary of

HHS in the amount of $672,399.95.  *See id.* at 12.

263.    Molina was required to remit 100% of the amount of these charges to HHS before

the close of CY 2016, as it had affirmatively attested it would do.  *See, e.g.*, *id.*; CY 2015

Attestations, <u>Exs. 44 to 53</u>.

264.    Plaintiffs' risk corridors payments and charges for CY 2015 are summarized as

follows:

| Plaintiff | State / Market | Risk Corridors Amount |
|---|---|---|
| Molina CA | CA / Individual | $1,784,227.07 |
| Molina FL | FL / Individual | $25,417,985.09 |
| Molina MI | MI / Individual | ($239,138.47) |
| Molina NM | NM / Individual | ($107,005.94) |
| Molina OH | OH / Individual | ($508,729.76) |
| Molina TX | TX / Individual | ($672,399.95) |
| Molina UT | UT / Individual | $3,557,849.34 |
| Molina WA | WA / Individual | $238,552.08 |
| Molina WI | WI / Individual | $21,340,461.88 |

265.    In total, the Government is required to pay Molina risk corridors payments for CY

2015 of $52,339,075.46, but the Government announced that it will not make any payments to

Plaintiffs until the CY 2014 risk corridors shortfall – currently about $2.4 billion – has been

corrected.

266.    Molina was required to pay the Government 100% of its CY 2015 Michigan, New

Mexico, Ohio, and Texas Individual Market risk corridors charges ($1,527,274.12) – not 0% of it

– and to do so promptly.  Molina made its full and timely remittance of CY 2015 risk corridors

charges to the Government on November 22, 2016.

267.    HHS lacks the authority, under statute, regulation or contract, to unilaterally

withhold full and timely CY 2015 risk corridors payments from QHPs such as Molina.

268.    Combined, the United States has recognized and repeatedly admitted that it is

obligated to make risk corridors payments to Molina in the total amount of $52,378,111.20 for

CY 2014 and CY 2015, but as of the date of this filing the Government has only made risk

corridors payments to Molina totaling $5,807.64, which is just 0.01% of the total amount owed

to Plaintiffs.  Molina demands full and immediate payment from the United States.

**Molina's and Other QHPs' Efforts to Resolve Issues Out of Court**

269.    Since learning of HHS' and CMS' decision not to make the full risk corridors

payments owed to Plaintiffs in a timely manner, Molina and other similarly situated QHPs have

made significant efforts to resolve the issue.  Unfortunately, their efforts to persuade HHS and

CMS to honor the Government's statutory, regulatory and contractual obligations to make full

and timely risk corridors payments have been unsuccessful to date.

270.    On March 17, 2016, another QHP that is owed risk corridors payments for CY

2014 sent a formal demand letter to HHS and CMS.  *See* Letter from Highmark to HHS and

CMS (March 17, 2016), attached hereto at <u>Exhibit 108</u>.

271.    The Government responded to the QHP's March 17, 2016 demand letter on April

1, 2016, affirming that "2014 risk corridor payments … will be paid," but repeating the

Government's plan to make such payments out of CY 2015 risk corridors collections, and if

necessary, CY 2016 collections – a position that is without support in Section 1342 or its

implementing regulations.  Letter from Kevin J. Counihan, CEO of Health Insurance

Marketplaces, CMS, to Highmark Health (Apr. 1, 2016) ("Response Letter"), <u>Ex. 98</u>.

272.    Since becoming aware of its liability from the CY 2014 risk corridors shortfall,

the Government has taken the extraordinary position that no risk corridors payments are due until

some indeterminate date in 2017 or later, after the end of the risk corridors program, when,

according to the Government, total risk corridors charges and payments for all three years can be

tallied and any balances due can be reconciled. *See* Letter from Counihan, CMS, to Molina (Oct./Nov. 2015) ("[W]e will not know the total loss or gain for the program until the fall of 2017, when the data from all three years of the program can be analyzed and verified.").

273. In other words, the Government now contends that, despite the fact that the ACA indicates – and HHS' and CMS' guidance, communications and pronouncements to QHPs since its enactment substantiate – that risk corridors payment amounts mandated by Section 1342 are to be calculated and submitted to CMS annually, and paid to and received by QHPs annually, the United States is not obligated to make *any* risk corridors payments until some indeterminate time *after* all three years of the risk corridors program have expired.

274. There is no support for the Government's extraordinary position in Section 1342 of the ACA, 45 C.F.R. Part 153, the QHP Agreements, any other express or implied-in-fact agreements, or anywhere else in the ACA or its implementing regulations.

275. The Government's current position on when it is obligated to pay the risk corridors amounts due to QHPs for each year is contrary to the nature, purpose, intent, and language of Section 1342 and its implementing regulations, as well as the risk corridors program's role within the ACA as a temporary program designed to mitigate the potentially significant risks posed *each year* within the first three years of the ACA Exchanges and smooth out *annual* premiums.

276. HHS' and CMS' original and statutorily consistent position – not the Government's current, *post hoc* litigation interpretation – was that full risk corridors payments due would be made annually.

277. Indeed, Section 1342(b)(1) provides that the Secretary "shall pay to the plan" a certain amount if the plan's allowable costs "for any plan year" exceed the targeted amount by a

certain threshold.  42 U.S.C. § 18062(b)(1), <u>Ex. 04</u>.  Section 1342(a) also directs that this

payment schedule must apply annually in "calendar years 2014, 2015, and 2016."  42 U.S.C. §

18062(a).

278.    CMS and HHS' guidance in the Federal Register in 2011 and 2012 stated that,

just like the deadline for QHPs to remit risk corridors charges to the Government, HHS should

make risk corridors payments to QHPs "within a 30-day period after HHS determines that a

payment should be made to the QHP issuer."  76 FR 41929, 41943 (July 15, 2011), <u>Ex. 02</u>; 77

FR 17219, 17238 (Mar. 23, 2012), <u>Ex. 01</u>.

279.    Even CMS' April 11, 2014 Bulletin regarding "Risk Corridors and Budget

Neutrality" acknowledged that risk corridors payments are due annually.  *See* Bulletin, CMS,

"Risk Corridors and Budget Neutrality" (Apr. 11, 2014), <u>Ex. 75</u>.  The CBO's budget projections

published both before and after the Government's politically motivated "budget neutral"

announcement in March 2014 expressed an understanding that risk corridors payments would be

made annually.  *See* CBO, "The Budget and Economic Outlook: 2014 to 2024" at 109-110 (Feb.

2014), <u>Ex. 71</u>; CBO, "Updated Estimates of the Effects of the Insurance Coverage Provisions of

the Affordable Care Act, April 2014" at 10, 18 (Apr. 2014), <u>Ex. 94</u>.

280.    HHS asserted to the GAO in May 2014 that although "[t]o date, HHS has not

made or received any payments under section 1342 of PPACA[,] HHS intends to begin

collections and payments in fiscal year 2015."  Letter from William B. Schultz, General Counsel,

HHS, to Julia C. Matta, Assistant General Counsel, GAO (May 20, 2014), <u>Ex. 77</u>.

281.    In April 14, 2015, before any CY 2014 risk corridors payments were due, CMS

provided QHPs with written timelines, such as CMS' "Key Dates in 2015" specifically stating

that the Government's "Remittance of Risk Corridors Payments and Charges" would be made on

"9/2015 – 12/2015."  Bulletin, CMS, "Key Dates in 2015: QHP Certification in the Federally-Facilitated Marketplaces; Rate Review; Risk Adjustment, Reinsurance, and Risk Corridors" (Apr. 14, 2015), Ex. 81.

282.    In June 2015, CMS stated in presentations to insurers that in December 2015, "CMS will begin making RC [risk corridors] payments to issuers" for CY 2014.  Presentation, CMS, "Completing the Risk Corridors Plan-Level Data Form 2014" (June 1, 2015), Ex. 96.

283.    The Government then actually did make partial CY 2014 risk corridors payments at the end of CY 2015, in the first quarter of CY 2016, and in the last quarter of CY 2016, demonstrating that the Government understands and acknowledges that risk corridors payments are due and owing annually.

284.    Even after asserting its *post hoc* litigation position that no risk corridors payments are owed until 2017 or later, CMS' statements to Molina and other QHPs have undercut its stance.

285.    CMS told QHPs in two presentations in June 2016 that "CMS will begin making RC [risk corridors] payments to insurers" for CY 2015 in "December 2016."  CMS, *Completing the Risk Corridors Plan-Level Data Form for the 2015 Benefit Year* at 7 (June 7, 2016), Ex. 85.

286.    CMS' September 9, 2016 Bulletin reaffirmed CMS' true belief that an annual payment schedule is required, stating that "remittance of risk corridors payments" for CY 2015 will be made "on the same schedule as last year."  Bulletin, CMS, "Risk Corridors Payments for 2015" (Sept. 9, 2016), Ex. 86.

287.    CMS' November 18, 2016 announcement also confirmed the annual payment structure of the risk corridors program, stating that "HHS is collecting 2015 risk corridor charges in November 2016, and will begin remitting risk corridors payments to issuers in December

2016, as collections are received."  Bulletin, CMS, "Risk Corridors Payment and Charge

Amounts for the 2015 Benefit Year" (Nov. 18, 2016), Ex. 87.

288.    These inconsistencies from CMS' statements and conduct belie the *post hoc*

nature of the Government's current litigation position.

289.    Confirming that HHS and CMS interpreted their risk corridors payment obligation

to be an annual one for *each* of the three years of the temporary program, CMS officially booked

its CY 2014 risk corridors shortfall obligation amount as a FY 2015 obligation – not as an FY

2017 obligation.  *See, e.g.*, Bulletin, CMS, "Risk Corridors Payments for the 2014 Benefit Year"

(Nov. 19, 2015), Ex. 100 ("HHS recognizes that the Affordable Care Act requires the Secretary

to make full payments to issuers, and HHS is recording those amounts that remain unpaid

following our 12.6% payment this winter as fiscal year 2015 obligation of the United States

Government for which full payment is required.").

290.    Additionally, CMS' September 9, 2016 Bulletin regarding CY 2015 risk corridors

charges and payments states that "HHS will record risk corridors payments due as an obligation

of the United States Government for which full payment is required."  Bulletin, CMS, "Risk

Corridors Payments for 2015" (Sept. 9, 2016), Ex. 86.

291.    The Government's Response Letter of April 1, 2016, states Defendant's final

position regarding its refusal to fully and timely pay risk corridors payments owed for CY 2014

to QHPs, including Molina.  *See* Ex. 98.

292.    To the extent required, Plaintiffs have exhausted their non-judicial avenues to

remedy the Government's failure to provide the full and timely mandated risk corridors

payments required by statute, regulation and contract.

**COUNT I**
**Violation of Federal Statute and Regulation**
**(Asserted by All Plaintiffs)**

293.    Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

294.    Section 1342(b)(1) of the ACA mandates compensation, expressly stating that the Secretary of HHS "shall pay" risk corridors payments to QHPs in accordance with the payment formula set forth in the statute.

295.    HHS' and CMS' implementing regulation at 45 C.F.R. § 153.510(b) also mandates compensation, expressly stating that "when" QHPs' allowable costs exceed the 3 percent risk corridors threshold, HHS "will pay" risk corridors payments to QHPs in accordance with the payment formula set forth in the regulation, which formula is mathematically identical to the formula in Section 1342(b)(1) of the ACA.

296.    HHS' and CMS' regulation at 45 C.F.R. § 153.510(d) requires a QHP to remit charges to HHS within 30 days after notification of such charges.

297.    HHS' and CMS' statements in the Federal Register on July 15, 2011, and March 23, 2012, state that risk corridors "payment deadlines should be the same for HHS and QHP issuers."  76 FR 41929, 41943 (July 15, 2011), Ex. 02; 77 FR 17219, 17238 (Mar. 23, 2012), Ex. 01.

298.    Plaintiffs voluntarily applied to become, were certified by CMS as, committed themselves to be, and in fact were, QHPs on, respectively, the California, Florida, Michigan, New Mexico, Ohio, Texas, Utah, Washington, and Wisconsin ACA Exchanges in CY 2014 and CY 2015, *see* Exs. 06 to 23, and were qualified for and entitled to receive mandated risk corridors payments from the Government for CY 2014 and CY 2015.

299.    Plaintiffs are entitled under Section 1342(b)(1) of the ACA and 45 C.F.R. § 153.510(b) to recover full and timely mandated risk corridors payments from the Government for CY 2014 and CY 2015.

300.    In the CY 2014 Risk Corridors Report, HHS and CMS acknowledged and published the full risk corridors payment amount, totaling $39,035.74, that the Government concedes it owes Molina for CY 2014.  *See* Ex. 100.

301.    In the CY 2015 Risk Corridors Report, HHS and CMS acknowledged and published the full risk corridors payment amount, totaling $52,339,075.46, that the Government concedes it owes Molina for CY 2015.  *See* Ex. 87.

302.    The United States has failed to make full and timely risk corridors payments to Molina for CY 2014 and CY 2015, despite the Government repeatedly confirming in writing that Section 1342 mandates that the Government make risk corridors payments.

303.    Instead, the Government arbitrarily has paid Molina only a pro-rata share of the total amount due for CY 2014, and has not paid any of the total amount due for CY 2015, asserting that full payment to Molina is limited by available appropriations, even though no such limits appear anywhere in the ACA or its implementing regulations or in Molina's contracts with the Government.

304.    Congress' failure to appropriate sufficient funds for risk corridors payments due for CY 2014 and CY 2015, without modifying or repealing Section 1342 of the ACA, did not defeat or otherwise abrogate the United States' statutory obligation created by Section 1342 to make full and timely risk corridors payments to QHPs, including Plaintiffs.

305.    The Government's failure to make full and timely risk corridors payments to Molina for CY 2014 and CY 2015 constitutes a violation and breach of the Government's

mandatory payment obligations under Section 1342(b)(1) of the ACA and 45 C.F.R. § 153.510(b).

306.     As a result of the United States' violation of Section 1342(b)(1) of the ACA and 45 C.F.R. § 153.510(b), Molina has been damaged in the amount of at least $52,378,111.20, less any prorated payments made by the Government, together with interest, costs of suit, and such other relief as this Court deems just and proper.

### COUNT II
**Breach of Express Contract
(Asserted by Molina FL, Molina MI, Molina NM,
Molina OH, Molina TX, Molina UT, and Molina WI)**

307.     Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

308.     Molina FL, Molina MI, Molina NM, Molina OH, Molina TX, Molina UT, and Molina WI entered into valid written QHP Agreements with CMS:  the CY 2014 CMS QHP Agreements and the CY 2015 CMS QHP Agreements.  *See* Exs. 06 to 12, 15 to 21.

309.     The CY 2014 CMS QHP Agreements and the CY 2015 CMS QHP Agreements were executed or ratified by representatives of the Government who had express or implied actual authority to bind the United States, and were entered into with mutual assent and consideration by both parties.

310.     The CY 2014 CMS QHP Agreements and the CY 2015 CMS QHP Agreements obligated CMS to "undertake all reasonable efforts to implement systems and processes that will support [QHP] functions," and required that "[i]n the event of a major failure of CMS systems and/or processes, CMS will work with [Plaintiff] in good faith to mitigate any harm caused by such failure." Exs. 06 to 12 at § II.d; Exs. 15 to 21 at § III.a.

311.     By agreeing to become and continue to be QHPs, Plaintiffs agreed to provide

health insurance on particular exchanges established under the ACA, and agreed and attested to accept the obligations, responsibilities and conditions the Government imposed on QHPs – subject to the implied covenant of good faith and fair dealing – under the ACA and, *inter alia*, 45 C.F.R. §§ 153.10 *et seq.* and 155.10 *et seq.  See, e.g.*, Exs. 06 to 12; CY 2014 and CY 2015 Attestations, Exs. 35-40, 43, 45-50, 53.

312.    Molina FL, Molina MI, Molina NM, Molina OH, Molina TX, Molina UT, and Molina WI satisfied and complied with their obligations and/or conditions under the CY 2014 CMS QHP Agreements and the CY 2015 CMS QHP Agreements, including, but not limited to, remitting full and timely risk corridors charges owed to the Government for CY 2014.

313.    The CY 2014 CMS QHP Agreements and the CY 2015 CMS QHP Agreements provided that they "will be governed by the laws and common law of the United States of America, including without limitation such regulations as may be promulgated from time to time by the Department of Health and Human Services or any of its constituent agencies …." Exs. 06 to 12, 15 to 21 at § V.g.

314.    The CY 2014 CMS QHP Agreements and the CY 2015 CMS QHP Agreements therefore incorporated the provisions of Section 1342(b)(1) of the ACA and 45 C.F.R. § 153.510(b) into, respectively, the CY 2014 CMS QHP Agreements and the CY 2015 CMS QHP Agreements.

315.    The Government's statutory and regulatory obligations to make full and timely risk corridors payments were significant factors material to the respective agreements by Molina FL, Molina MI, Molina NM, Molina OH, Molina TX, Molina UT, and Molina WI to enter into the CY 2014 CMS QHP Agreements and the CY 2015 CMS QHP Agreements.

316.    The Government's failure to make full and timely risk corridors payments to

Molina FL, Molina UT, or Molina WI is a material breach of CMS' obligation to support those Plaintiffs' functions as QHPs.

317.    The Government's failure to make full and timely risk corridors payments to Molina FL, Molina UT, or Molina WI was a major failure of the Government's systems or processes, but the Government refused to work in good faith with Molina FL, Molina UT, or Molina WI to mitigate the harm caused by such failure despite its contractual obligation to do so.

318.    In the CY 2014 Risk Corridors Report, HHS and CMS acknowledged and published the full risk corridors payment amount, totaling $39,035.74, that the Government concedes it owes Molina FL for CY 2014.  *See* Ex. 100.

319.    In the CY 2015 Risk Corridors Report, HHS and CMS acknowledged and published the full risk corridors payment amount, totaling $50,316,296.31, that the Government concedes it owes Molina FL, Molina UT, and Molina WI for CY 2015.  *See* Ex. 87.

320.    Congress' failure to appropriate sufficient funds for risk corridors payments due for CY 2014 and CY 2015, without modifying or repealing Section 1342 of the ACA, did not defeat or otherwise abrogate the United States' contractual obligation to make full and timely risk corridors payments to Plaintiffs.

321.    The Government's breach of Section 1342(b)(1) of the ACA and 45 C.F.R. § 153.510(b) by failing to make full and timely CY 2014 risk corridors payments to Molina FL is a material breach of the CY 2014 CMS QHP Agreements.

322.    The Government's breach of Section 1342(b)(1) of the ACA and 45 C.F.R. § 153.510(b) by failing to make full and timely CY 2015 risk corridors payments to Molina FL, Molina UT, or Molina WI is a material breach of the CY 2015 CMS QHP Agreements.

323.    As a result of the United States' material breaches of the CY 2014 CMS QHP

Agreements and the CY 2015 CMS QHP Agreements, Molina FL, Molina UT, and Molina WI have been damaged in the combined amount of at least $50,316,296.31, less any prorated payments made by the Government, together with any losses actually sustained as a result of the Government's breach, reliance damages, interest, costs of suit, and such other relief as this Court deems just and proper.

### COUNT III
**Breach of Implied-In-Fact Contract**
**(Asserted by All Plaintiffs)**

324.    Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

325.    Count III is asserted in the alternative by Molina FL, Molina MI, Molina NM, Molina OH, Molina TX, Molina UT, and Molina WI.

326.    The Government knowingly and voluntarily entered into valid implied-in-fact contracts with Plaintiffs regarding the Government's obligation to make full and timely risk corridors payments to Plaintiffs for CY 2014 and CY 2015 in exchange for Plaintiffs' respective voluntary agreements to become QHPs and participate in their respective states' ACA Exchanges for CY 2014 and CY 2015.

327.    Section 1342 of the ACA, HHS' implementing regulations (45 C.F.R. § 153.510), and HHS' and CMS' repeated admissions regarding their obligation to make risk corridors payments were made or ratified by representatives of the Government who had express or implied actual authority to bind the United States (including, but not limited to, Kevin J. Counihan), and constituted a clear and unambiguous offer by the Government to make full and timely risk corridors payments to health insurers, including Plaintiffs, that agreed to participate as QHPs in the CY 2014 and CY 2015 ACA Exchanges and were approved as certified QHPs by

the Government at the Government's discretion.  This offer evidences a clear intent by the Government to contract with Plaintiffs.

328.   Plaintiffs accepted the Government's offer by agreeing to become QHPs and to participate in and accept the uncertain risks imposed by the ACA Exchanges.

329.   By agreeing to become QHPs, Plaintiffs agreed to provide services by offering health insurance on particular exchanges established under the ACA, and to accept the obligations, responsibilities and conditions the Government imposed on QHPs – subject to the implied covenant of good faith and fair dealing – under the ACA and, *inter alia*, 45 C.F.R. §§ 153.10 *et seq.* and 155.10 *et seq*.

330.   By agreeing to become QHPs, Plaintiffs took on significant additional obligations and subjected themselves to new standards to which they were not previously bound.  Plaintiffs were not obligated to participate as QHPs, to incur Marketplace-related costs and losses, and to provide healthcare benefits to numerous enrollees who had not previously been insured at premiums that were lower than they would have been without the Government's promised risk-sharing.  Plaintiffs' services benefitted the Government by providing affordable health insurance under the ACA to previously non-insured and/or under-insured populations in California, Florida, Michigan, New Mexico, Ohio, Texas, Utah, Washington, and Wisconsin.

331.   Plaintiffs certified their respective agreements by executing the QHP Agreements and the attestations required by the Government, including the attestations regarding risk corridors payments and charges.  *See, e.g.*, Exs. 06 to 23 (CY 2014 and CY 2015 QHP Agreements); Exs. 34 to 53 (CY 2014 and CY 2015 Attestations).

332.   Plaintiffs satisfied and complied with their obligations and/or conditions which existed under the implied-in-fact contracts, including, but not limited to, remitting full and timely

risk corridors charges owed to the Government for CY 2014.

333.    The Government's agreement to make full and timely risk corridors payments was a significant factor material to Plaintiffs' respective agreements to become QHPs and participate in the CY 2014 and CY 2015 ACA Exchanges.

334.    The parties' mutual intent to contract is further confirmed by the parties' conduct, performance and statements, including, but not limited to, the execution by the parties of the CY 2014 CMS QHP Agreements and CY 2015 CMS QHP Agreements expressly incorporating "the laws and common law of the United States of America, including without limitation such regulations as may be promulgated from time to time by the Department of Health and Human Services or any of its constituent agencies," *see* Exs. 06 to 12, 15 to 21 at § V.g., Plaintiffs' execution of attestations including the attestations regarding risk corridors payments and charges, *see* Exs. 34 to 53, and the Government's repeated assurances that full and timely risk corridors payments would be made and would not be subject to budget limitations. *See, e.g.*, 78 FR 15409, 15473 (Mar. 11, 2013), Ex. 64.  The Government's intent to contract can be inferred from these actions.

335.    Each of the implied-in-fact contracts were authorized or ratified by representatives of the Government who had express or implied actual authority to bind the United States (including, but not limited to, Kevin J. Counihan), were clearly founded upon a meeting of the minds between the parties and entered into with mutual assent, and were supported by consideration.

336.    The Government's financial risk-sharing through the risk corridors program to protect against uncertain risk and new market instability was a real benefit that significantly influenced Plaintiffs' respective decisions to agree to become QHPs and participate in the CY

2014 and CY 2015 ACA Exchanges.

337.    Plaintiffs, in turn, provided a real benefit to the Government by agreeing to become QHPs, to offer insurance on, and to participate in the CY 2014 and CY 2015 ACA Exchanges in their respective states, despite the uncertain financial risk.

338.    Adequate insurer participation was crucial to the Government's achieving the overarching goal of the CY 2014 and CY 2015 ACA Exchange programs:  to make affordable health insurance available to individuals who previously did not have access to affordable coverage, and to help to ensure that every American has access to high-quality, affordable health care by protecting consumers from increases in premiums due to health insurer uncertainty.

339.    The Government induced Plaintiffs to participate in the CY 2014 and CY 2015 ACA Exchanges by including the risk corridors program in Section 1342 of the ACA and its implementing regulations, by which Congress, HHS, and CMS committed to help protect health insurers financially against risk selection and market uncertainty.

340.    The Government repeatedly acknowledged its commitments to share risk with QHPs and its obligations to make full and timely risk corridors payments to qualifying QHPs for CY 2014 and CY 2015 through its conduct and statements to the public and to Plaintiffs and other similarly situated QHPs, made or ratified by representatives of the Government who had express or implied actual authority to bind the United States.  *See, e.g.*, 77 FR 17219, 17238 (Mar. 23, 2012), Ex. 01; Letter from Counihan, CMS, to Molina (Oct./Nov. 2015); Response Letter (Apr. 1, 2016), Ex. 98.

341.    The Government also induced QHPs, like Plaintiffs, to commit to the CY 2015 and CY 2016 ACA Exchanges during and after HHS and CMS' announcement in 2014 of their intention to implement the risk corridors program in a budget neutral manner by repeatedly

giving assurances to QHPs that risk corridors collections would be sufficient to cover all of the

Government's risk corridors payments for a calendar year.  *See, e.g.*, Bulletin, CMS, "Risk

Corridors and Budget Neutrality," at 1 (Apr. 11, 2014), Ex. 75 ("We anticipate that risk corridors

collections will be sufficient to pay for all risk corridors payments.").

342.    In the CY 2014 Risk Corridors Report, HHS and CMS acknowledged and

published the full risk corridors payment amount, totaling $39,035.74, that the Government

concedes it owes Molina FL for CY 2014.  *See* Ex. 100.

343.    In the CY 2015 Risk Corridors Report, HHS and CMS acknowledged and

published the full risk corridors payment amount, totaling $52,339,075.46, that the Government

concedes it owes Molina CA, Molina FL, Molina UT, Molina WA, and Molina WI for CY 2015.

*See* Ex. 87.

344.    Congress' failure to appropriate sufficient funds for risk corridors payments due

for CY 2014 and CY 2015, without modifying or repealing Section 1342 of the ACA, did not

defeat or otherwise abrogate the United States' contractual obligation to make full and timely

risk corridors payments to Plaintiffs.

345.    The Government's failure to make full and timely CY 2014 and CY 2015 risk

corridors payments to Plaintiffs is a material breach of the implied-in-fact contracts.

346.    As a result of the United States' material breaches of its implied-in-fact contracts

that it entered into with Plaintiffs regarding the CY 2014 and CY 2015 ACA Exchanges,

Plaintiffs have been damaged in the amount of at least $52,378,111.20, less any prorated

payments made by the Government, together with any losses actually sustained as a result of the

Government's breach, reliance damages, interest, costs of suit, and such other relief as this Court

deems just and proper.

<u>**COUNT IV**</u>
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Asserted by All Plaintiffs)**

347.    Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

348.    A covenant of good faith and fair dealing is implied in every contract, express or implied-in-fact, including those with the Government, and imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.

349.    The express and/or the implied-in-fact contracts entered into between the United States and Plaintiffs regarding the CY 2014 and CY 2015 ACA Exchanges created the reasonable expectations for Plaintiffs that full and timely CY 2014 and CY 2015 risk corridors payments, which Plaintiffs each regarded as an important part of the contract consideration, would be paid by the Government to QHPs, just as the Government expected that any CY 2014 and CY 2015 risk corridors remittance charges owed would be fully and timely paid by QHPs to the Government.

350.    By failing to make full and timely CY 2014 and CY 2015 risk corridors payments to Plaintiffs, the United States has destroyed Plaintiffs' reasonable expectations regarding the fruits of the express and/or the implied-in-fact contracts, in breach of an implied covenant of good faith and fair dealing existing therein.

351.    Despite the Government's failure to honor its contractual obligations, Plaintiffs, in good faith conformance with their express and/or implied-in-fact contractual obligations, submitted their full and timely CY 2014 risk corridors remittance charges of $4,848,276.62 owed

to the Government, and submitted their full and timely CY 2015 risk corridors remittance charges of $1,527,276.12 owed to the Government.

352.    The CY 2014 CMS QHP Agreements and the CY 2015 CMS QHP Agreements allow CMS to "undertake all reasonable efforts to implement systems and processes that will support [QHP] functions," but do not define standards for CMS' implementation of the function-supporting systems and processes.

353.    Where, as here, an agreement affords CMS the power to make a discretionary decision without defined standards, the duty to act in good faith limits the Government's ability to act capriciously to contravene Plaintiffs' reasonable contractual expectations.

354.    CMS is afforded discretion in determining the systems and processes that it will implement to support Plaintiffs' functions as QHPs.

355.    Congress granted HHS with rulemaking authority regarding the risk corridors program in Section 1342(a) of the ACA.  HHS and CMS were permitted to establish charge remittance and payment deadlines that support QHP functions.  HHS and CMS had an obligation to exercise the discretion afforded to them in good faith, and not arbitrarily, capriciously or in bad faith.

356.    The United States breached the implied covenant of good faith and fair dealing by, among other things:

(a)    Inserting in HHS and CMS regulations a 30-day deadline for a QHP's full remittance of risk corridors charges to the Government, but failing to create a similar deadline for the Government's full payment of risk corridors payments to QHPs, despite stating that QHPs and the Government should be subject to the same payment deadline (*see, e.g.*, 77

FR 17219, 17238 (Mar. 23, 2012), Ex. 01);

(b)     Requiring QHPs to fully remit risk corridors charges to the Government, but unilaterally deciding that the Government may make prorated risk corridors payments to QHPs, despite earlier stating that QHPs and the Government should be subject to the same payment deadline (*see, e.g.*, *id.*)

(c)     In Section 227 of the 2015 Appropriations Act, legislatively targeting the Government's risk corridors payment obligations to a small group of QHPs to save the Government money by limiting funding sources for CY 2014 risk corridors payments, after Plaintiffs had undertaken significant expense in performing their obligations as QHPs in their respective states' ACA Exchanges based on Plaintiffs' reasonable expectations that the Government would make full and timely risk corridors payments if Plaintiffs experienced sufficient losses in CY 2014;

(d)     In Section 225 of the 2016 Appropriations Act, legislatively targeting the Government's risk corridors payment obligations to a small group of QHPs to save the Government money by limiting funding sources for CY 2014 and CY 2015 risk corridors payments, after Plaintiffs had undertaken significant expense in performing their obligations as QHPs in their respective states' ACA Exchanges based on Plaintiffs' reasonable expectations that the Government would make full and timely risk corridors payments if Plaintiffs experienced sufficient losses in CY 2014 and CY 2015;

(e)     Making statements regarding risk corridors payments upon which

Plaintiffs relied to agree to become QHPs and participate in the ACA

Exchanges (*see, e.g.*, 78 FR 15409, 15473 (Mar. 11, 2013), <u>Ex. 64</u> ("The

risk corridors program is not statutorily required to be budget neutral.

Regardless of the balance of payments and receipts, HHS will remit

payments as required under section 1342 of the Affordable Care Act.")),

then depriving Plaintiffs of full and timely risk corridors payments after

Plaintiffs had fulfilled their obligations as QHPs by participating in their

respective states' ACA Exchanges and had suffered losses which the

Government had promised would be shared through mandatory risk

corridors payments (*see, e.g.*, 79 FR 13743, 13829 (Mar. 11, 2014), <u>Ex. 74</u>

("HHS intends to implement this [risk corridors] program in a budget

neutral manner."); Am. Acad. of Actuaries, Comment to HHS on

Proposed Rule, Exchange and Insurance Market Standards for 2015 and

Beyond at 3 (Apr. 21, 2014), <u>Ex. 89</u> ("The new budget neutrality policy …

would change the basic nature of the risk corridor program retroactively"

and "changes the nature of the risk corridor program from one that shares

risk between issuers and CMS to one that shares risk between competing

issuers."));

(f)     One year later, beginning in March 2014, adopting an about-face position

regarding budget neutrality without any rulemaking process and without

providing QHPs, including Plaintiffs, any explanation or the opportunity

for notice and comment; and

(g)     Despite repeatedly acknowledging in writing and in testimony before

Congress that the Government is obligated to make full risk corridors payments to QHPs, including Plaintiffs, taking a contrary position before this Court asserting that the Government has no obligation to pay any risk corridors amounts unless it has sufficient risk corridors collections from QHPs or unless Congress makes new specific appropriations for such purposes.

357.    In the CY 2014 Risk Corridors Report, HHS and CMS acknowledged and published the full risk corridors payment amount, totaling $39,035.74, that the Government concedes it owes Molina FL for CY 2014.  *See* Ex. 100.

358.    In the CY 2015 Risk Corridors Report, HHS and CMS acknowledged and published the full risk corridors payment amount, totaling $52,339,075.46, that the Government concedes it owes Molina CA, Molina FL, Molina UT, Molina WA, and Molina WI for CY 2015. *See* Ex. 87.

359.    As a direct and proximate result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs have been damaged in the amount of at least $52,378,111.20, less any prorated payments made by the Government, together with any losses actually sustained as a result of the Government's breach, reliance damages, interest, costs of suit, and such other relief as this Court deems just and proper.

## COUNT V
### Taking Without Just Compensation
### in Violation of the Fifth Amendment to the U.S. Constitution
### (Asserted by All Plaintiffs)

360.    Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

361.    The Government's actions complained of herein constitute a deprivation and

taking of Plaintiffs' property for public use without just compensation, in violation of the Fifth Amendment to the U.S. Constitution.

362.    Plaintiffs have a vested property interest in their contractual, statutory, and regulatory rights to receive statutorily-mandated risk corridors payments for CY 2014 and CY 2015.  Plaintiffs had a reasonable investment-backed expectation of receiving the full and timely CY 2014 and CY 2015 risk corridors payments payable to them under the statutory and regulatory formula, based on their respective QHP Agreements, their implied-in-fact contracts with the Government, Section 1342 of the ACA, HHS' implementing regulations (45 C.F.R. § 153.510), and HHS' and CMS' direct public statements.

363.    The Government expressly and deliberately interfered with and has deprived Plaintiffs of property interests and their reasonable investment-backed expectations to receive full and timely risk corridors payments for CY 2014 and CY 2015.  On March 11, 2014, HHS for the first time announced, in direct contravention of Section 1342 of the ACA, 45 C.F.R. § 153.510(b) and its previous public statements, that it would administer the risk corridors program "in a budget neutral manner."  79 FR 13743, 13829 (Mar. 11, 2014), Ex. 74.

364.    On April 11, 2014, HHS and CMS stated for the first time that CY 2014 risk corridors payments would be reduced pro rata to the extent of any shortfall in risk corridors collections.  *See* Bulletin, CMS, "Risk Corridors and Budget Neutrality" (Apr. 11, 2014), Ex. 75.

365.    Further, in Section 227 of the 2015 Appropriations Act and Section 225 of the 2016 Appropriations Act, Congress specifically targeted the Government's existing, mandatory risk corridors payment obligations under Section 1342 of the ACA, expressly limiting the source of funding for the United States' CY 2014 and CY 2015 risk corridors payment obligations owed to a specific small group of insurers, including Plaintiffs.  *See* 128 Stat. 2491, Ex. 95; 129 Stat.

2624, Ex. 97.  HHS and CMS continue to refuse to make full and timely risk corridors payments to Plaintiffs, and therefore the Government has deprived Plaintiffs of the economic benefit and use of such payments.

366.    In its November 18, 2016 announcement, CMS confirmed that no CY 2015 risk corridors payments would be made by the end of CY 2016, and that past-due CY 2014 risk corridors payments would not be paid in full by the end of CY 2016 – the one-year anniversary of when the CY 2014 risk corridors payments should have been fully and timely paid.  As of the date of this filing, neither the CY 2014 nor the CY 2015 risk corridors payments have been paid in full, and Molina has received only 0.01% of the total risk corridors payments that the United States has repeatedly acknowledged it is obligated to make to Plaintiffs.

367.    The Government's action in withholding, with no legitimate governmental purpose, the full and timely CY 2014 and CY 2015 risk corridors payments owed to Molina constitutes a deprivation and taking of Plaintiffs' property interests and requires payment to Plaintiffs of just compensation under the Fifth Amendment of the U.S. Constitution.

368.    Molina is entitled to receive just compensation for the United States' taking of its property in the amount of at least $52,378,111.20, less any prorated payments made by the Government, together with interest, costs of suit, and such other relief as this Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against the Defendant, the United States of America, as follows:

(1)    For Count I, awarding damages sustained by Plaintiffs, in the amount of at least $52,378,111.20, subject to proof at trial, less any prorated risk corridors payments made by the

Government, as a result of the Defendant's violation of Section 1342(b)(1) of the ACA and of 45 C.F.R. § 153.510(b) regarding the CY 2014 and CY 2015 risk corridors payments;

(2) For Count II, awarding damages sustained by Molina FL, Molina UT, and Molina WI, in the amount of at least $50,316,296.31, subject to proof at trial, less any prorated risk corridors payments made by the Government, together with any losses actually sustained as a result of the Government's breach, and reliance damages, as a result of the Defendant's breaches of the CY 2014 CMS QHP Agreements regarding the CY 2014 risk corridors payments, and of the CY 2015 CMS QHP Agreements regarding the CY 2015 risk corridors payments;

(3) For Count III (which is brought in the alternative by Molina FL, Molina MI, Molina NM, Molina OH, Molina TX, Molina UT, and Molina WI), awarding damages sustained by Plaintiffs, in the amount of at least $52,378,111.20, subject to proof at trial, less any prorated risk corridors payments made by the Government, together with any losses actually sustained as a result of the Government's breach, and reliance damages, as a result of the Defendant's breaches of its implied-in-fact contracts with Plaintiffs regarding the CY 2014 and CY 2015 risk corridors payments;

(4) For Count IV, awarding damages sustained by Plaintiffs, in the amount of at least $52,378,111.20, subject to proof at trial, less any prorated risk corridors payments made by the Government, together with any losses actually sustained as a result of the Government's breach, and reliance damages, as a result of the Defendant's breaches of the implied covenant of good faith and fair dealing that exists in the CY 2014 CMS QHP Agreements and/or the CY 2015 CMS QHP Agreements and/or the implied-in-fact contracts regarding the CY 2014 and CY 2015 risk corridors payments;

(5) For Count V, awarding damages sustained by Plaintiffs, in the amount of at least

$52,378,111.20, subject to proof at trial, less any prorated risk corridors payments made by the Government, as a result of the Defendant's taking of Plaintiffs' property without just compensation in violation of the Fifth Amendment to the U.S. Constitution regarding the CY 2014 and CY 2015 risk corridors payments;

(6)     Should the Court determine, under any Count, that the Government is liable to Plaintiffs for monetary damages for failure to make full and timely risk corridors payments for CY 2014 and/or CY 2015, and thus enter judgment against the United States, Plaintiffs further request that the Court declare, as incidental to that monetary judgment, that based on the Court's legal determinations as to the Government's CY 2014 and/or CY 2015 risk corridors payment obligations, the Government must make full and timely CY 2016 risk corridors payments to Plaintiffs if any of them experience qualifying losses during that year;

(7)     Awarding all available interest, including, but not limited to, post-judgment interest, to Plaintiff;

(8)     Awarding all available attorneys' fees and costs to Plaintiffs; and

(9)     Awarding such other and further relief to Plaintiffs as the Court deems just and equitable.

Dated: January 19, 2017                          Respectfully Submitted,

                                                 s/ Lawrence S. Sher
                                                 Lawrence S. Sher (D.C. Bar No. 430469)
                                                 **REED SMITH LLP**
                                                 1301 K Street NW
                                                 Suite 1000-East Tower
                                                 Washington, DC 20005
                                                 Telephone: 202.414.9200
                                                 Facsimile: 202.414.9299
                                                 Email: lsher@reedsmith.com

*Of Counsel:*

Kyle R. Bahr (D.C. Bar No. 986946)
Conor M. Shaffer (PA Bar No. 314474)
**REED SMITH LLP**
Reed Smith Centre
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Telephone: 412.288.3131
Facsimile: 412.288.3063
Email:  kbahr@reedsmith.com
          cshaffer@reedsmith.com

*Counsel for the Molina Plaintiffs*