# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MOLINA HEALTHCARE OF CALIFORNIA, INC.,  )
MOLINA HEALTHCARE OF FLORIDA, INC.,  )
MOLINA HEALTHCARE OF MICHIGAN, INC.,  )
MOLINA HEALTHCARE OF NEW MEXICO, INC.,  )
MOLINA HEALTHCARE OF OHIO, INC.,  )
MOLINA HEALTHCARE OF TEXAS, INC.,  )
MOLINA HEALTHCARE OF UTAH, INC.,  )
MOLINA HEALTHCARE OF WASHINGTON, INC.,  )
and MOLINA HEALTHCARE OF WISCONSIN, INC., )   No. 17-97C
           )   Judge Wheeler
    Plaintiffs,     )
           )
v.           )
           )
THE UNITED STATES OF AMERICA,    )
           )
    Defendant.     )
_____)

## REPLY IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO THE UNITED STATES' CROSS-MOTION TO DISMISS

Lawrence S. Sher (D.C. Bar No. 430469)

**REED SMITH LLP**
1301 K Street NW
Suite 1000-East Tower
Washington, DC 20005
Telephone: 202.414.9200
Facsimile: 202.414.9299
Email: lsher@reedsmith.com

*Of Counsel:*

Kyle R. Bahr (D.C. Bar No. 986946)
Conor M. Shaffer (PA Bar No. 314474)
**REED SMITH LLP**
Reed Smith Centre
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Telephone: 412.288.3131
Facsimile: 412.288.3063
Email: kbahr@reedsmith.com
      cshaffer@reedsmith.com

*Counsel for the Molina Plaintiffs*

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................ 1

MOTION TO DISMISS STANDARDS ...................................................................... 3

ARGUMENT ............................................................................................................... 4

I.   THIS COURT HAS PREVIOUSLY REJECTED DEFENDANT'S IDENTICAL 12(B)(1) JURISDICTION AND RIPENESS ARGUMENTS ............................ 4

    A.   Defendant's 12(b)(1) Motion Does Not Challenge Jurisdiction Regarding Molina's Counts II-V ............................................................. 4

    B.   Five Judges of This Court Have Correctly Rejected Defendant's Identical Jurisdictional Challenge to Molina's Count I ............................................. 5

    C.   Molina's Claims Are Ripe Because Risk Corridors Payments Are Due Annually Under Section 1342 and the Contracts ...................................... 6

II.  CONGRESS EXERCISED ITS POWER OF THE PURSE BY CREATING IN SECTION 1342 A STATUTORY PAYMENT OBLIGATION FOR FULL RISK CORRIDORS PAYMENTS WITHOUT APPROPRIATIONS LIMITATIONS ............. 12

    A.   This Court Is Not Constrained By the Appropriations Clause ............... 13

    B.   Congress Did Not Make Section 1342 "Subject to Appropriations" ...................... 19

    C.   This Court Ruled in *Moda* That the Appropriations Riders Did Not Vitiate Section 1342's Payment Obligation ........................................................ 22

III. THE GOVERNMENT ALTERNATIVELY BREACHED AN IMPLIED-IN-FACT CONTRACT BY NOT FULLY PAYING RISK CORRIDORS EACH YEAR .............. 28

    A.   This Court's Contractual Liability Determination in *Moda* Is Supported by Precedent ............................................................................................... 30

    B.   The Supreme Court's Two-Step Test Set Forth in *Nat'l R.R. Passenger Corp.* Supports This Court's Implied-In-Fact Contract Determination in *Moda* .......................................................................................................... 31

IV.  BECAUSE A CONTRACT EXISTS, COUNTS IV AND V MUST SURVIVE ............. 37

V.   COUNT II STATES A VALID BREACH OF EXPRESS CONTRACT CLAIM ........... 37

VI.  MOLINA'S REQUEST FOR DECLARATORY RELIEF INCIDENTAL OF AND COLLATERAL TO A POTENTIAL MONEY JUDGMENT IS PROPER ..................... 38

CONCLUSION .......................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. United States*,
   391 F.3d 1212 (Fed. Cir. 2004)..............................................................................18

*Army & Air Force Exch. Serv. v. Sheehan*,
   456 U.S. 728 (1982).................................................................................................30

*ARRA Energy Co. I v. United States*,
   97 Fed. Cl. 12 (2011)..........................................................................................31-32

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................................................4

*Barlow & Haun, Inc. v. United States*,
   118 Fed. Cl. 597 (2014)..........................................................................................12

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...................................................................................................4

*Blue Cross and Blue Shield of N.C. v. United States*,
   --- Fed. Cl. ----, 2017 WL 1382976 (Apr. 18, 2017) ........................................*passim*

*Bowen v. Mass.*,
   487 U.S. 879 (1988).................................................................................................31

*Brandt v. Hickel*,
   427 F.2d 53 (9th Cir. 1970) ......................................................................................1

*Brooks v. Dunlop Mfg. Inc.*,
   702 F.3d 634 (Fed. Cir. 2012)..............................................................................33-35

*Caraway v. United States*,
   123 Fed. Cl. 527 (2015).............................................................................................3

*CBY Design Builders v. United States*,
   105 Fed. Cl. 303 (2012)..............................................................................................9

*Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)................................................................................................10

*Cincinnati Soap Co. v. United States*,
   301 U.S. 308 (1937)................................................................................................14

*Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs*,
464 F.3d 1306 (Fed. Cir. 2006) ................................................................. 9

*Coast Fed. Bank, FSB v. United States*,
323 F.3d 1035 (Fed. Cir. 2003) ............................................................... 38

*Collins v. United States*,
15 Ct. Cl. 22 (Dec. Term, 1879) ....................................................... *passim*

*Dist. of Col. v. United States*,
67 Fed. Cl. 292 (2005) .......................................................................... 13

*Eastport S.S. Corp. v. United States*,
372 F.2d 1002 (Ct. Cl. 1967) ................................................................. 15

*Engage Learning, Inc. v. Salazar*,
660 F.3d 1346 (Fed. Cir. 2011) ........................................................... 3, 5

*Fed. Crop Ins. Corp. v. Merrill*,
332 U.S. 380 (1947) .............................................................................. 30

*First Priority Life Ins. Co. v. United States*,
No. 16-587C, ECF No. 32 (Apr. 7, 2017) ............................................... 25

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005) ............................................................... 3

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998) .............................................................................. 31

*Geddes v. United States*,
38 Ct. Cl. 428 (1903) ............................................................................ 17

*Gibney v. United States*,
114 Ct. Cl. 38 (1949) ....................................................................... 13, 18

*Greenlee Cnty. v. United States*,
487 F.3d 871 (Fed. Cir. 2007) ........................................................... 3, 20

*Health Rep. Ins. Co. v. United States*,
129 Fed. Cl. 757 (2017) ................................................................. *passim*

*Hercules, Inc. v. United States*,
516 U.S. 417 (1996) .............................................................................. 36

*Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States*,
48 F.3d 1166 (Fed. Cir. 1995) ............................................................... 13

*HPHC Ins. Co., Inc. v. United States*,
No. 17-87C, ECF No. 18 (May 15, 2017) ......................................................17, 25

*Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*,
525 F.3d 1299 (Fed. Cir. 2008)..........................................................................5

*Kentucky ex rel. Cabinet for Human Resources v. United States*,
16 Cl. Ct. 755 (1989) ...................................................................................30-31

*King v. Burwell*,
135 S. Ct. 2480 (2015).................................................................................8, 34

*Knote v. United States*,
95 U.S. 149 (1877)...........................................................................................14

*Land of Lincoln Mut. Health Ins. Co. v. United States*,
129 Fed. Cl. 81 (2016) .............................................................................*passim*

*Land of Lincoln Mut. Health Ins. Co. v. United States*,
No. 2017-1224, ECF No. 140 (Fed. Cir. May 30, 2017)....................................1

*Maine Cmty. Health Options v. United States*,
No. 16-967C, 2017 WL 1021837 (Mar. 9, 2017) .......................................5, 8, 10, 24

*Marchena v. United States*,
128 Fed. Cl. 326 (2016) .....................................................................................5

*Mastrolia v. United States*,
91 Fed. Cl. 369 (2010) .......................................................................................3

*Mendez v. United States*,
121 Fed. Cl. 370 (2015) .....................................................................................5

*Mid Continent Nail Corp. v. United States*,
846 F.3d 1364 (Fed. Cir. 2017)........................................................................11

*Moda Health Plan, Inc. v. United States*,
130 Fed. Cl. 436 (2017), *appeal docketed*, No. 2017-1994 (Fed. Cir. May 9, 2017).........*passim*

*Moda Health Plan, Inc. v. United States*,
No. 16-649C, ECF No. 14 (Dec. 9, 2016) ......................................................30

*Mont. Health CO-OP v. United States*,
No. 16-1427C, ECF No. 25 (Feb. 23, 2017)....................................................24

*N. Calif. Power Agency v. United States*,
122 Fed. Cl. 111 (2015) .....................................................................................4

*N.Y. Airways, Inc. v. United States,*
    369 F.2d 743 (Ct. Cl. 1966) ........................................................................*passim*

*Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.,*
    470 U.S. 451 (1985) ..............................................................................28, 32-34

*Nevada v. Dep't of Energy,*
    400 F.3d 9 (D.C. Cir. 2005) ...............................................................13, 14, 21-22

*Ponder v. United States,*
    117 F.3d 549 (Fed. Cir. 1997) ...............................................................................4

*Prairie Cnty. v. United States,*
    782 F.3d 685 (Fed. Cir. 2015) ...................................................................13, 19-20

*Pucciariello v. United States,*
    116 Fed. Cl. 390 (2014) .........................................................................................5

*Radium Mines, Inc. v. United States,*
    153 F. Supp. 403 (Ct. Cl. 1957) .........................................................................29

*Rep. Airlines, Inc. v. U.S. Dep't of Transp.,*
    849 F.2d 1315 (10th Cir. 1988) ..........................................................................14

*Reynolds v. Army & Air Force Exch. Serv.,*
    846 F.2d 746 (Fed. Cir. 1988) ...............................................................................3

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974) ...............................................................................................3

*Star-Glo Associates, LP v. United States,*
    414 F.3d 1349 (Fed. Cir. 2005) ....................................................................13, 21

*Thomas Jefferson Univ. v. Shalala,*
    512 U.S. 504 (1994) .............................................................................................11

*Timex V.I., Inc. v. United States,*
    157 F.3d 879 (Fed. Cir. 1998) .............................................................................10

*Todd v. United States,*
    386 F.3d 1091 (Fed. Cir. 2004) .............................................................................6

*Totes-Isotoner Corp. v. United States,*
    594 F.3d 1346 (Fed. Cir. 2010) .............................................................................3

*United States v. Dickerson,*
    310 U.S. 554 (1940) .............................................................................................13

*United States v. Langston,*
118 U.S. 389 (1886) ..................................................................13, 24

*United States v. Mitchell,*
109 U.S. 146 (1883) .............................................................13, 23, 24

*United States v. Testan,*
424 U.S. 392 (1976) ......................................................................14

*United States v. Will,*
449 U.S. 200 (1980) ......................................................................13

*Wetsel-Oviatt Lumber Co. v. United States,*
38 Fed. Cl. 563 (1997) ...................................................................13

*Wolfchild v. United States,*
101 Fed. Cl. 54 (Fed. Cl. 2011) .......................................................17

**Statutes**

20 U.S.C. §§ 237(a) & 240(c) .......................................................25

31 U.S.C. § 1341(a)(1)(B) ............................................................15

31 U.S.C. § 6906 ........................................................................19

42 U.S.C. § 280k(a) .....................................................................20

42 U.S.C. § 293k-2(e) ..................................................................20

42 U.S.C. § 300hh-31(a) ...............................................................20

42 U.S.C. § 1396b(a) ...................................................................31

42 U.S.C. § 1397m-1(b)(2)(A) .......................................................20

42 U.S.C. § 18062 ..................................................................19, 23

42 U.S.C. § 18122 ......................................................................23

**Rules**

RCFC 8(a)(2) ..............................................................................4

RCFC 12(b)(1) ....................................................................*passim*

RCFC 12(b)(6) ....................................................................*passim*

RCFC 12(d) ...............................................................................3

**Regulations**

77 FR 17219, 17238 (Mar. 23, 2012) ........................................................11

77 FR 73118, 73121 (Dec. 7, 2012) ...........................................................8

78 FR 15409, 15473 (Mar. 11, 2013) ........................................................11

**Other Authorities**

U.S. Const. Article I, § 7, cl. 2 ................................................................14

U.S. Const. Article I, § 9, cl. 7 ................................................................12

161 Cong. Rec. S8420-21 (daily ed. Dec. 3, 2015) .................................26

Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. H, Title II, § 223,
    ____ Stat. ____, ____ (May 5, 2017) ..................................................7

HHS, FY 2018 Budget in Brief at 70 (May 23, 2017), *available at*
    https://www.hhs.gov/sites/default/files/fy2018-budget-in-brief.pdf ........7

Pub. L. 113-235, § 227, 128 Stat. 2491 ...................................................23

Pub. L. 114-113, § 225, 129 Stat. 2624 ...................................................23

Pub. L. 106-387, § 810(e) ........................................................................21

**INTRODUCTION**

Defendant's Opposition brief and cross-motion to dismiss (ECF No. 13) in response to

the Molina Plaintiffs' Motion for Partial Summary Judgment (ECF No. 7) relegates to a single

footnote this Court's well-reasoned denial of Defendant's motion to dismiss and accompanying

entry of summary judgment against the Government on liability for breach of its statutory and

contractual risk corridors payment obligations in *Moda Health Plan, Inc. v. United States*, 130

Fed. Cl. 436 (2017) (Wheeler, J.), *appeal docketed*, No. 2017-1994 (Fed. Cir. May 9, 2017).[1]

*See* Defendant's Opposition ("Def.'s Opp.") at 14 n.10.  Defendant all but ignores this Court's

admonition in *Moda* that:

> There is no genuine dispute that the Government is liable to Moda.  Whether
> under statute or contract, the Court finds that the Government made a promise in
> the risk corridors program that it has yet to fulfill.  Today, the Court directs the
> Government to fulfill that promise.  After all, "to say to [Moda], 'The joke is on
> you.  You shouldn't have trusted us,' is hardly worthy of our great government."

*Moda* at 466 (citing *Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970)).  In fact, Defendant

merely retells the humorless "joke" at Molina's expense—currently over $50 million—by

continuing to assert in its Opposition the identical jurisdictional and liability defenses that it

raised—and that this Court expressly considered and rejected—in *Moda*.  Although it has

appealed *Moda*, Defendant did not heed this Court's forewarning that it "wanted to avoid"

Defendant briefing, in essence, a motion for reconsideration of its loss in *Moda*.  Tr. at 9:23-

10:2, ECF No. 12 (Mar. 23, 2017).  Regrettably, that is what Defendant has done in its

Opposition.

Defendant does not even attempt to address this Court's holdings that the Government is

---

[1]     On May 30, 2017, the Federal Circuit approved Moda's and Land of Lincoln's motions to consider their respective appeals as companion cases and to assign them to the same merits panel.  *See* Order, *Land of Lincoln Mut. Health Ins. Co. v. United States*, No. 2017-1224, ECF No. 140 (Fed. Cir. May 30, 2017).

required to make full annual risk corridors payments under Section 1342 of the ACA and its implementing regulations and, alternatively, under an implied-in-fact contract. *See, e.g.*, *Moda* at 466. Rather, Defendant ignores this Court's detailed findings and well-reasoned analysis in *Moda*, and repeats its refrain that the Government has no obligation, under statute or contract, to pay any risk corridors amounts to any health insurer, including Molina, in excess of risk corridors charge collections that HHS may have received from certain profitable QHPs during the life of the program. *See generally* Def.'s Opp. at 14-50. The Court already rejected Defendant's identical arguments, which are belied by the text, nature, structure and purpose of Section 1342 and the risk corridors program, as well as longstanding binding precedent. *See Moda* at 450-66; Molina's Motion ("Molina's Mot.") at 23-50.

None of Defendant's arguments overcome this Court's previous dispositive holdings in *Moda* on the identical issues. In this case, as in *Moda*, "the Government made a promise in the risk corridors program that it has yet to fulfill." *Moda* at 466. The Court in this case should apply the same reasoning to the same claims arising under the identical risk corridors program as it did in *Moda*, and "direct[] the Government to fulfill that promise" to Molina. *Id.* Accordingly, for the reasons set forth in Molina's Motion and as further supported below, because no genuine dispute exists that the United States is liable to Molina under Section 1342 and its implementing regulations, and alternatively under an implied-in-fact contract, to make full annual risk corridors payments to Molina, and the Government has failed to make these payments in full and on time, this Court should find—as it did in *Moda*—that Molina is entitled to summary judgment in its favor on Counts I and III in the amount of $52,372,197.75. And, as further demonstrated below, Defendant's cross-motion to dismiss the entire Complaint should be denied, because Molina has

pled cognizable claims for relief that are ripe, and over which this Court has jurisdiction.[2]

## MOTION TO DISMISS STANDARDS

Although the Court's analyses under 12(b)(1) and 12(b)(6) are different,[3] "on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

"A court deciding a motion under 12(b)(1) must determine whether jurisdiction is proper and must not reach the merits." *Caraway*, 123 Fed. Cl. at 529 (citing *Greenlee Cnty. v. United States*, 487 F.3d 871, 876 (Fed. Cir. 2007)).[4] Although a plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence," *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988), a "[p]laintiff need only make a *prima facie* showing of jurisdictional facts in order to survive a motion to dismiss." *Mastrolia v. United States*, 91 Fed. Cl. 369, 376 (2010); *see Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*).

To withstand a Rule 12(b)(6) motion, a plaintiff need only "provide 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Totes-*

---

[2]     Defendant suggests in a footnote that the Court should convert its motion to dismiss Count I into one for summary judgment under RCFC 12(d).  *See* Def.'s Opp. at 18 n.13.  The Court should not do so, because Defendant elected not to move for summary judgment itself.  If the Court determines it should make an RCFC 12(d) conversion, then Molina "must be given a reasonable opportunity to present all the material that is pertinent to the motion."  RCFC 12(d).

[3]     "When considering motions under RCFC 12(b)(1) and 12(b)(6), the court must distinguish between its inquiries into jurisdiction and the merits."  *Caraway v. United States*, 123 Fed. Cl. 527, 529 (2015) (citing *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011); *see also Moda* at 449 (12(b)(1) standard) and at 454 (12(b)(6) standard).

[4]     *See also Scheuer* at 236 (holding that a court's 12(b)(1) "task is necessarily a limited one," and "[t]he issue is not whether a plaintiff will ultimately prevail but whether [it] is entitled to offer evidence to support the claims").

*Isotoner Corp. v. United States*, 594 F.3d 1346, 1354 (Fed. Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see* RCFC 8(a)(2). Thus, a 12(b)(6) motion must be denied when the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *N. Calif. Power Agency v. United States*, 122 Fed. Cl. 111, 115 (2015) (Wheeler, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plaintiff meets the facial plausibility requirement by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal* at 678). Granting a motion under Rule 12(b)(6) is thus "appropriate only when it is beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle[ ] him to relief." *Id..* (quoting *Ponder v. United States*, 117 F.3d 549, 552-53 (Fed. Cir. 1997)).

## ARGUMENT[5]

I.    **THIS COURT HAS PREVIOUSLY REJECTED DEFENDANT'S IDENTICAL 12(B)(1) JURISDICTION AND RIPENESS ARGUMENTS**

Defendant's 12(b)(1) motion to dismiss Molina's claims only addresses Count I of Molina's Complaint, and fails to overcome this Court's previous holding in *Moda* that the Court has subject-matter jurisdiction over these identical risk corridors claims and that they are ripe for adjudication now. As Molina demonstrated in its Motion regarding Counts I and III, this Court should deny Defendant's 12(b)(1) motion for the same reasons it denied Defendant's identical motion in *Moda*. *See Moda* at 449-54; Molina's Mot. at 23-28.

A.    **Defendant's 12(b)(1) Motion Does Not Challenge Jurisdiction Regarding Molina's Counts II-V**

Although Defendant asserts "the Court lacks jurisdiction to consider Molina's *claims*," Def.'s Opp. at 17 (emphasis added), Defendant's RCFC 12(b)(1) argument addresses only

---

[5]    Defendant does not dispute any of the facts set forth in Molina's Motion. *Compare* Molina's Mot. at 6-22, *with* Def.'s Opp. at 3-14.

Molina's Count I, ignoring Molina's four other Counts. *See id.* at 14-17.[6]  Should Defendant's

reply brief raise any specific alleged jurisdictional arguments regarding Counts II-V,[7] Molina

will seek leave to file a sur-reply brief on that issue.

**B.      Five Judges of This Court Have Correctly Rejected Defendant's Identical Jurisdictional Challenge to Molina's Count I**

Five Judges of this Court, including your Honor, have each rejected Defendant's identical

12(b)(1) jurisdictional challenges to the statutory and regulatory claims that Molina alleges in

Count I.  Judges Lettow,[8] Sweeney,[9] Bruggink[10] and Griggsby[11] and this Court[12] have all

concluded the Court has subject-matter jurisdiction under the Tucker Act to hear insurers' claims

that the Government violated Section 1342 and its implementing regulations; and all have agreed

that the statute and regulations are clearly "money-mandating."  Defendant does not dispute in its

---

[6]      There is no question that the Court has Tucker Act jurisdiction over Plaintiffs' contract claims.  *See Land of Lincoln Mut. Health Ins. Co. v. United States*, 129 Fed. Cl. 81, 98-99 (2016) (Lettow, J.) (finding jurisdiction over equivalent contract claims); *Blue Cross and Blue Shield of N.C. v. United States* ("*BCBSNC*"), --- Fed. Cl. ----, 2017 WL 1382976, at *13 (Apr. 18, 2017) (Griggsby, J.) (same); *Marchena v. United States*, 128 Fed. Cl. 326, 331 (2016) (recognizing that a "low threshold requirement" exists to establish jurisdiction over contract claims); *Mendez v. United States*, 121 Fed. Cl. 370, 379-380 (2015) (citing *Engage Learning*, 660 F.3d at 1355) (holding a plaintiff need not prove "the *actual existence* of a contract" because that "is not a jurisdictional matter but rather a decision on the merits of the case."); Molina's Mot. at 24-25 (setting forth Court's jurisdiction over Count III); *see also* Compl. Exs. 06 to 32 (Molina's express contracts).

[7]      There is also no question that the Court has jurisdiction over Plaintiffs' takings claim in Count V.  *See Lincoln* at 99 (finding jurisdiction over equivalent takings claim); *BCBSNC* at *13 (same).  The Federal Circuit has confirmed that "[i]t is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction."  *Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008); *see also Pucciariello v. United States*, 116 Fed. Cl. 390, 402 (2014).

[8]      *See Lincoln* at 95-98.

[9]      *See Health Rep. Ins. Co. v. United States*, 129 Fed. Cl. 757, 770-72 (2017) (Sweeney, J.).

[10]     *See Maine Cmty. Health Options v. United States*, No. 16-967C, 2017 WL 1021837, at *2 (Mar. 9, 2017) (Bruggink, J.).

[11]     *See BCBSNC* at *11-13.

[12]     *See Moda* at 450.

Opposition Molina's assertion that Section 1342 is a money-mandating statute. *See* Molina's Mot. at 23. Rather than attempt to distinguish those decisions, Defendant simply re-hashes the same jurisdictional and ripeness arguments in its Opposition that all of these Judges already have rejected. *See* Def.'s Opp. at 14-17.

In *Moda*, this Court correctly rejected Defendant's attempt to create a new "presently due" subject-matter jurisdiction requirement based on the inapplicable case of *Todd v. United States*, 386 F.3d 1091 (Fed. Cir. 2004), aptly characterizing Defendant's assertion as "a ripeness argument in disguise." *Moda* at 450 (citing *Health Rep.* at 772); *see also BCBSNC* at *12 (rejecting Defendant's "presently due" argument). Yet Defendant dons that same disguise here, re-arguing that *Todd* should preclude Tucker Act jurisdiction because Molina's statutory claim is, Defendant reasserts, "not presently due." Def.'s Opp. at 17; *see id.* at 15-17. This Court already has distinguished *Todd* and concluded it has jurisdiction over statutory risk corridors claims, such as Molina's, because they are "non-frivolous allegations" under a "shall pay" statute, that the Court found were "clearly money-mandating," and, unlike *Todd*, are not dependent on the plaintiff first obtaining "prior equitable relief." *Moda* at 450-51 (citing *Todd*, 386 F.3d at 1093-94); *accord BCBSNC* at *12. Defendant's identical jurisdictional arguments should be rejected here as well.

### C. Molina's Claims Are Ripe Because Risk Corridors Payments Are Due Annually Under Section 1342 and the Contracts

Recognizing the weakness of its 12(b)(1) ripeness challenge, Defendant relegates its entire ripeness argument to a single footnote. *See* Def.'s Opp. at 17 n.11. Because Defendant's "presently due" argument is "a ripeness argument in disguise" (*Moda* at 450), the Court may look beyond that footnote to address Defendant's broader ripeness contentions including its so-called "three-year payment framework" argument and its assertion that Section 1342 "does not

require HHS to *pay* those calculated [risk corridors] amounts on an annual basis." Def.'s Opp. at 15-17 (emphasis in original).

Turning first to Defendant's footnote, it is astounding, in light of the *$8.3 billion* in risk corridors payments that the Government still owes to insurers for CY 2014 and CY 2015—let alone what likely will be owed for CY 2016—for Defendant to suggest that CY 2016 collections will cover all of the United States' debts "in full." Def.'s Opp. at 17 n.11. As this Court properly recognized, it would take "a miracle" for CY 2016 collections to satisfy the Government's full payment obligations. *Moda* at 457. HHS recently announced that it expects a paltry $103 million of risk corridors collections in FY 2018, for what Defendant calls the "final payment" in the "final payment cycle."[13] Furthermore, it strains credulity for Defendant to suggest the same Congressional majority that continues to insist on propagating the appropriations riders preventing HHS from honoring the Government's risk corridors obligations[14] would have a sudden change of heart and "pay all risk corridors amounts as calculated under section 1342(b)." Def.'s Opp. at 17 n.11. These insupportable claims by Defendant are pure folly, but they expose Defendant's concession that Molina's claims are ripe if full risk corridors payments are not made. *See id.*

As this Court recognized in *Moda*,[15] Judge Sweeney recognized in *Health Republic*,[16] and

---

[13]  Def.'s Opp. at 16; *see* HHS, FY 2018 Budget in Brief at 70 (May 23, 2017), *available at* https://www.hhs.gov/sites/default/files/fy2018-budget-in-brief.pdf (listing "Risk Corridor Collections" of $103 million for FY 2018).

[14]  *See, e.g.*, Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. H, title II, § 223, ___ Stat. ____, ____ (May 5, 2017) (repeating identical limitation of funds for risk corridors payments as found in FY 2015 and FY 2016 appropriations acts).

[15]  *See Moda* at 451-54.

[16]  *See Health Rep.* at 772-78.

Judge Bruggink recognized in *Maine*,[17] the ripeness question does not concern *full* payments, but whether Congress intended under Section 1342 for risk corridors payments to be made *annually*. The Court correctly found in each of those cases that Section 1342's text, as well as its nature and purpose, requires annual payments. *See* Molina's Mot. at 27-28. Further, both this Court and Judge Sweeney rightly found that HHS itself interpreted Section 1342 as requiring annual payments. *See Moda* at 453-54; *Health Rep.* at 776-78; Molina's Mot. at 28.

Defendant's assertions in its Opposition that the risk corridors program is "a self-funded program to distribute gains and losses between insurers," Def.'s Opp. at 1, and "amounts collected from profitable insurers are used to fund payments to unprofitable insurers," *id.* at 6, are completely contradicted by the plain text of Section 1342 and the undisputed, stated purposes of the risk corridors program, including to "permit[] the Federal government and QHPs to share in profits or losses resulting from inaccurate rate setting from 2014 to 2016." 77 FR 73118, 73121 (Dec. 7, 2012); *see also* Def.'s Opp. at 5 (conceding risk corridors were meant to "mitigate the pricing risk and incentives for adverse selection arising from" the ACA Marketplaces). Defendant concedes the ACA was "designed to expand coverage," Def.'s Opp. at 3 (citing *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015)), but its strained construction of Section 1342 defeats that purpose by significantly limiting coverage, which has caused some insurers to withdraw from the Exchanges. *See Health Rep.* at 779 ("It is thus nonsensical to suggest that Congress, in enacting provisions meant to ensure the success of the Affordable Care Act, drafted those provisions to cause the opposite effect").

Second, the question that "goes to the merits of th[e] case," is whether Section 1342 requires *full* payments to be made at the time that payments are due under the statute. *Moda* at

---

[17]     *See Maine* at *2.

453. "For ripeness purposes, separating the 'when' from the 'whether' is a necessary step," *id.* at

453 n.10, because "ripeness [is] treated as a jurisdictional question" that does not go to the merits

of the claims. *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 331 n.22 (2012) (Wolski,

J.) (citing *Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs*, 464 F.3d

1306, 1316 (Fed. Cir. 2006)).

The minority of the Court's Judges who have found no annual payment obligation under

Section 1342 incorrectly failed to separate the "annual" and "full" questions, and accordingly

their decisions should not be followed. *See* Def.'s Opp. at 15 (citing *Lincoln* at 107, and

*BCBSNC* at *14). For example—as this Court observed in *Moda*—Judge Lettow combined "'the

merits of whether and when [Plaintiff] is entitled to recover money under the statute.'" *Moda* at

453 n.10 (quoting *Lincoln* at 98 n.16). He thus incorrectly gave *Chevron* deference to HHS'

interpretation of the question of "whether Congress intended for HHS to make *full* payments

*annually* under Section 1342." *Lincoln* at 103 (emphasis added). This was "puzzling," because

in all risk corridors cases including *Lincoln* and here,[18] Defendant has only requested *Chevron*

deference to the timing of risk corridors payments—the "annual" payment question—yet Judge

Lettow *sua sponte* deferred on the "full" payment question. *Moda* at 456. By conflating the

questions, the Court arrived at an erroneous conclusion.

Judge Griggsby similarly conflated the annual and full payment issues and erroneously

dismissed the plaintiff's claims under 12(b)(6), finding that the risk corridors payments were

"not 'presently due,'" even while she simultaneously found that all of the plaintiff's risk

corridors claims were "ripe." *Compare BCBSNC* at *13 (finding "unavailing" Defendant's

argument "that Blue Cross's claims are unripe, because no money is *presently due* to Blue Cross

---

[18]    *See* Def.'s Opp. at 40 n.25.

under Section 1342"), *with id.* at *17; *cf.* Def.'s Opp. at 17 n.12 (encouraging this Court to alternatively dismiss Molina's Complaint on the merits on the assertion that additional risk corridors payments "are not presently due").

Further, Judge Griggsby, in contrast to the findings of this Court and Judges Sweeney and Bruggink, and based solely on what she described as "[a] plain reading" of Section 1342, found Section 1342 "*silent* and, thus, *ambiguous* with respect to the timing of the Risk Corridors Program Payments," and immediately moved to "step two" of the familiar *Chevron* analysis to discern whether HHS' actions were "reasonable." *BCBSNC* at *15-16 (emphasis added). Under Supreme Court and Federal Circuit precedent, however, Judge Griggsby's analysis under "step one" of *Chevron* was flawed and incomplete, because *Chevron*'s "step one" requires more than simply reading the express statutory text to determine whether a statute is ambiguous.[19] Had Judge Griggsby properly considered the *Chevron* "step one" factors before jumping to "step two" and determining whether HHS' own interpretation of Section 1342 was "reasonable," the only conclusion the Court could have reached is that Congress intended risk corridors payments to be made annually as Judge Sweeney, this Court, and Judge Bruggink correctly determined. *See Health Rep.* at 773-76; *Moda* at 451-53; *Maine* at *2.

Judge Griggsby's *Chevron* "step two" analysis also was erroneous. *See BCBSNC* at *15-17. In "step two" of the *Chevron* analysis, the Court must examine whether an agency's interpretation of ambiguous provisions in a governing statute is reasonable. *Chevron*, 467 U.S.

---

[19]     *See Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998) ("If … the statute's text does not explicitly address the precise question, we do not at that point simply defer to the agency. Our search for Congress's intent must be more thorough than that."); *Health Rep.* at 773-74 (stating that "the court must read [Section 1342] in the context of the entire statutory scheme of the [ACA]," and cataloguing precedential cases in support).

at 842-43. Courts also "must give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citation omitted).

Judge Griggsby failed to properly apply these standards in numerous respects. First, unlike Judge Sweeney or this Court, she never analyzed whether HHS itself had determined if risk corridors payments were due annually. *See Health Rep.* at 778 (concluding that "there can be no dispute that HHS construes its regulations to require annual risk corridors payments"); *Moda* at 453-54. Second, in her "reasonableness determination," Judge Griggsby entirely ignored HHS' statements from prior to 2014 regarding payment deadlines and budget neutrality.[20] *See, e.g.*, 77 FR 17219, 17238 (Mar. 23, 2012); 78 FR 15409, 15473 (Mar. 11, 2013); *Moda* at 454 (finding it "significant that HHS (through CMS) indicated repeatedly that it would make payments every year" and concluding that "HHS interpreted Section 1342 and its own regulations as requiring annual risk corridors payments to insurers"). Third, by giving selective deference only to the agency's 2014 statements, Judge Griggsby violated Federal Circuit and Supreme Court precedent requiring an agency to explain why it is rejecting its own earlier interpretation of a statute, or else the court should not defer to the later interpretation. *See Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1382 (Fed. Cir. 2017) ("[U]nder *Chevron*, an agency can only reject a prior interpretation of an ambiguous statute if it explains why it is doing so."). Judge Griggsby also ignored the April 11, 2014 bulletin's statements by HHS, which acknowledge that annual payments are due. Compl. Ex. 75 at 1 (HHS using terms like "all risk corridors payments for that year," "reimbursed in full for the previous year," "current year payments," "obligations for the previous year," "make payments in that year," and "prior and current year payment obligations"). Finally, she ignored the fact that HHS actually

---

[20]    Defendant urges this Court to make the same mistake here, by omitting any substantive discussion of HHS' pre-2014 statements. *See generally* Def.'s Opp. at 3-14.

made payments annually.  *See Health Rep.* at 778 ("Indeed, HHS has, in actual practice, … made annual risk corridors payments to insurers."); *Moda* at 454 ("For the 2014 plan year, HHS actually paid insurers, albeit in prorated amounts."); *see also* Def.'s Opp. at 14 (admitting that "HHS has made two annual payments").[21]

Although Defendant's ripeness arguments are clearly aimed only at Count I,[22] and do not mention Molina's contract[23] and takings claims,[24] should Defendant's reply brief raise any specific alleged ripeness arguments regarding Counts II-V, Molina will seek leave to file a sur-reply brief on that issue.

## II. CONGRESS EXERCISED ITS POWER OF THE PURSE BY CREATING IN SECTION 1342 A STATUTORY PAYMENT OBLIGATION FOR FULL RISK CORRIDORS PAYMENTS WITHOUT APPROPRIATIONS LIMITATIONS

Defendant asserts money-mandating statutes cannot legally bind the United States absent an appropriation, because the Appropriations Clause states that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7; *see* Def.'s Opp. at 23 (citing Appropriations Clause).  Molina does not question Congress' power of the purse, but disagrees with Defendant's assertion that Congress' power is limited.  *See, e.g.,* Def.'s Opp. at 31 ("[A] direction to pay does not, standing alone, create an obligation of the

---

[21]     This begs the question why HHS would make annual payments if it was not *required* to do so, a question Judge Griggsby failed even to consider, let alone answer.

[22]     Like its subject-matter jurisdiction arguments, Defendant's ripeness challenge vaguely attacks "Molina's claims" without appreciating that different causes of action carry different measures of ripeness.  *See, e.g., Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597, 615-19 (2014) (clarifying that contract claims and takings claims deserve different ripeness analyses); *Lincoln* at 100-02 (applying different ripeness analyses to insurer's statutory, contractual, and takings claims).

[23]     Molina's contract claims ripened at the end of, respectively, CY 2015 and CY 2016, when the United States breached the parties' agreements to make the CY 2014 and CY 2015 risk corridors payments in full and on time.  *See, e.g.,* Compl. ¶¶ 228, 282-283.

[24]     Molina's takings claim ripened on April 1, 2016, when the Government's Response Letter confirmed that the Government would not timely pay any QHPs the CY 2014 risk corridors amounts admittedly due.  *See, e.g.,* Compl. ¶¶ 270-271, 291-292.

government.").  With over 130 years of precedent on its side, Molina maintains that Congress'

power of the purse is broad and a money-mandating act of Congress *alone* can obligate the

Government,[25] *unless* Congress itself expressly limits that obligation to appropriations or to a

statutory cap,[26] or later clearly amends that underlying statutory payment obligation in another

statute (such as an appropriations act)[27]—none of which occurred regarding Section 1342.[28]  As

this Court recognized in *Moda*,[29] binding precedent supports Molina's position that Congress'

power of the purse is broad, not limited as Defendant now urges.  *See Moda* at 455-62.

Summary judgment therefore should be entered for Molina on Count I.

### A.    <u>This Court Is Not Constrained By the Appropriations Clause</u>

Although the Appropriations Clause constrains the amount *an agency* has in its "purse"

to pay an obligation of the United States, it is not a concern for this Court in determining whether

*the Government* is legally obligated in the first place.  Molina is not suing HHS or CMS—it is

---

[25]     *See, e.g.*, *Prairie Cnty. v. United States*, 782 F.3d 685, 688-91 (Fed. Cir. 2015); *N.Y. Airways, Inc. v. United States*, 369 F.2d 743, 745-51 (Ct. Cl. 1966); *Gibney v. United States*, 114 Ct. Cl. 38, 44-51 (1949); *United States v. Langston*, 118 U.S. 389, 390-94 (1886); *Collins v. United States*, 15 Ct. Cl. 22, 23-40 (Dec. Term, 1879) (*en banc*); *see also Dist. of Col. v. United States*, 67 Fed. Cl. 292, 335 (2005); *Wetsel-Oviatt Lumber Co. v. United States*, 38 Fed. Cl. 563, 571 (1997) (quoted in Molina's Mot. at 37 n. 51).

[26]     *See, e.g.*, *Prairie Cnty.*, 782 F.3d 685 at 688-91; *Star-Glo Associates, LP v. United States*, 414 F.3d 1349, 1354-55 (Fed. Cir. 2005); *Nevada v. Dep't of Energy*, 400 F.3d 9, 10-15 (D.C. Cir. 2005).

[27]     *See, e.g.*, *Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States*, 48 F.3d 1166, 1168-70 (Fed. Cir. 1995); *United States v. Will*, 449 U.S. 200, 207-224 (1980); *United States v. Dickerson*, 310 U.S. 554, 554-55 (1940); *United States v. Mitchell*, 109 U.S. 146, 149-50 (1883).

[28]     As this Court found in *Moda*, Section 1342 contains no limitation on the "shall pay" obligation, and Congress did not repeal or amend its existing, underlying statutory obligation in Section 1342 by passing the appropriations riders in 2015 and 2016.  *See Moda* at 455-62.

[29]     *See Moda* at 455 (finding that Section 1342's "directive that the Secretary 'shall pay' unprofitable plans these specific amounts of money is unambiguous and overrides any discretion the Secretary otherwise could have in making 'payments out' under the program").  Defendant in its Opposition does not dispute—and therefore concedes—this point, which Molina raised in its Motion.  *See* Molina's Mot. at 29 & 44.

suing the United States for damages owed under a payment obligation created by an act of Congress.[30]  This case concerns Congress' ability to create binding statutory obligations that are legally enforceable "without further congressional action in the appropriations process."  Def.'s Opp. at 2.  Congress created exactly that with Section 1342.

Since at least 1879, the Appropriations Clause has been recognized as having no bearing on this Court or its predecessors:

> **That provision of the Constitution** is exclusively a direction to the officers of the Treasury, who are intrusted with the safekeeping and payment out of the public money, **and** *not* **to the courts of law**; the courts and their officers can make no payment from the Treasury under any circumstances.
>
> **This court**, established for the sole purpose of investigating claims against the government, ***does not deal with questions of appropriations***, **but with the legal liabilities incurred by the United States under contracts, express or implied, the laws of Congress**, or the regulations of the executive departments.  (Rev. Stat., § 1059.)  That **such liabilities may be created where there is no appropriation of money to meet them** is recognized in section 3732 of the Revised Statutes.

*Collins v. United States*, 15 Ct. Cl. at 35 (emphasis added).  Statutory payment obligations can exist independent of appropriations, because the Appropriations Clause expressly limits the *executive branch's* power to spend, but not the *legislative branch's* power to make laws obligating the United States' purse strings.[31]  Defendant cannot dispute this Court's purpose under the Tucker Act is to determine whether the obligations created by Congress have been breached.  *See, e.g.*, *United States v. Testan*, 424 U.S. 392, 400 (1976) ("[T]he asserted

---

[30]  Unlike certain cases relied upon by Defendant, which were filed in a U.S. District Court and sought to challenge or compel agency action—those holdings are not applicable here.  *See, e.g.*, *Rep. Airlines, Inc. v. U.S. Dep't of Transp.*, 849 F.2d 1315 (10th Cir. 1988); *Nevada*, 400 F.3d 9 at 10-15.

[31]  *Cf.* U.S. Const. art. I, § 7, cl. 2 (Congress' lawmaking power); *Knote v. United States*, 95 U.S. 149, 154 (1877) (the President's power "cannot touch moneys in the treasury of the United States, except expressly authorized by act of Congress"); *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) ("[Art. I, § 9] was intended as a restriction upon the disbursing authority of the Executive department, and is without significance here.").

entitlement to money damages depends upon whether **any federal statute** 'can fairly be interpreted as **mandating compensation** by the Federal Government for the damage sustained.'") (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1009 (Ct. Cl. 1967)) (emphasis added).

The statute referenced in *Collins* (Rev. Stat. § 3732) was a precursor to the modern Anti-Deficiency Act ("ADA"), which provides in relevant part that "[a]n *officer or employee* of the United States Government … may not … involve [the U.S.] government in a contract or *obligation* for the payment of money before an *appropriation* is made *unless authorized by law*." 31 U.S.C. § 1341(a)(1)(B) (emphasis added).[32]  The ADA constrains the *executive's* authority to obligate the public fisc,[33] but does not constrain *Congress'* power to "authorize[] by law" any *obligation*.  *Id.*

In *Collins*, Congress passed a statute on March 3, 1879, "for the relief of" a retired Army officer, Major Collins, after he had mustered out from the Army on January 1, 1871, but had not received his military pension.  *Collins*, 15 Ct. Cl. at 23-24.  The statute authorized the President to reinstate and retire Major Collins retroactive to January 1, 1871, so that he could receive his back pay for that period, totaling $21,487.83.  *See id.* at 24, 26, 32.  The President acted to reinstate and retire Major Collins, and subsequently sent a nomination to the Senate.  *See id.* at 24-25, 30.  The Senate did not act on the nomination, which the President withdrew, and Major Collins was never paid the "relief" provided by the statute, although he was "paid his current salary" from his reinstatement onward.  *Id.* at 26, 30, 32.  He subsequently sought relief in the Court of Claims for his back pay.  Analyzing the statutory text, the Court of Claims found that

---

[32]    The statute in *Collins* (Rev. Stat. § 3732) similarly stated in relevant part, "no contract or purchase on behalf of the United States shall be made, unless the same is authorized by law, or is made under an appropriation adequate to its fulfillment …."  15 Ct. Cl. at 35.

[33]    *See also* Def.'s Opp. at 27 (arguing that "the agency" was limited by the ADA).

there was a statutory payment obligation irrespective of appropriations, determining it was "the intention of Congress … that [Major Collins] should receive the pay of a retired officer from the date as of which he was to be retired [*i.e.*, January 1, 1871]," and that Congress "intended to confer upon him an immediate benefit" for his back pay. *Id.* at 34.

Defendant argued in *Collins* – as it does now[34] – that the Appropriations Clause foreclosed payment, claiming the statute of March 3, 1879 lacked "[t]he familiar language expressive of legislative intent to take money from the Treasury, '*and the Secretary of the Treasury is hereby authorized out of any moneys not otherwise appropriated*,' &c." *Collins*, 15 Ct. Cl. at 28 (Defendants' statement) (emphasis in original); *see, e.g.*, Def.'s Opp. at 30 ("[S]ection 1342 does not authorize appropriations in the first place, nor does it provide any other budget authority for risk corridors payments."). The *Collins* Court rejected Defendant's argument, which is now firmly proscribed by binding precedent. While Congress had not specifically appropriated funds for Major Collins' back pay, the Court explained the Appropriations Clause has no impact on the Court:

> It is clear that the Executive … without legislative authority, cannot create a liability on the part of the United States to pay [a public officer] a salary for the time he was not in service; **but Congress, the legislative branch of the government, may by law create such liability**, and may allow back pay to any public officer in consideration of past services or for any other cause which they deem sufficient.
>
> * * *
>
> The officers of the Treasury have no authority to pay such compensation until appropriations therefor are made[.] … ***The liability, however, exists independently of the appropriation*, and may be enforced by proceedings in this court**.

---

[34]    *See, e.g.*, Def.'s Opp. at 28 ("Section 1342 alone did not create a payment obligation."). On the contrary, HHS itself has repeatedly recognized that "full" risk corridors payments are owed to QHPs, including Molina, that suffered annual losses on the ACA exchanges in excess of the statutory targets. *See, e.g.*, Compl. ¶¶ 166, 171, 173, 181, 185, 188, 229-230 (HHS statements); *Moda* at 457 ("[HHS] has never conflated its inability to pay with the lack of an obligation to pay.").

*Collins*, 15 Ct. Cl. at 34-35 (emphasis added).[35]  The Court recognized that, under the scheme then in effect for the payment of judgments—which today continues in the form of the permanent appropriation of the Judgment Fund[36]—"[w]hen this court gives judgment against the United States, the constitutional prohibition referred to [*i.e.*, the Appropriations Clause] applies to the judgment as it did to the claim upon which it is founded.  The officers of the Treasury cannot pay *the judgment* unless there is an appropriation *therefor* …. So we are in no way brought in conflict with that provision of the Constitution."  *Id.* at 36 (emphasis added).

The Government has argued in at least one other risk corridors case that *Collins* should be distinguished, because in 1879 there was no Judgment Fund and therefore Congress knew "it was not required to consider the appropriations question because a specific appropriation was still required before the plaintiff would be paid."  *HPHC Ins. Co., Inc. v. United States*, No. 17-87C, ECF No. 18 at 9 (May 15, 2017).  Defendant's current position conflicts with its express recognition in this case and others that the Court should *not* even consider the existence of the Judgment Fund in determining liability, because Defendant asserts "it has no bearing on the threshold question of liability."  Def.'s Opp. at 34.  Thus this Court can decide whether the Government is liable for its statutory obligations, separate and distinct from the source of the

---

[35]     *See also Geddes v. United States*, 38 Ct. Cl. 428, 444 (1903) (holding that "[a]n appropriation constitutes the means for discharging **the legal debts** of the Government" created by Congress, and that the sources and amounts of appropriations "are questions which are **vital for the accounting officers**, but which **do not enter into the consideration of a case in the courts**") (emphasis added).

[36]     *See Moda* at 461-62 ("[T]here is an appropriation here.  The Judgment Fund pays plaintiffs who prevail against the Government in this Court, and it constitutes a separate Congressional appropriation.").  Defendant's footnote regarding pre-1956 money judgments (*see* Def.'s Opp. at 31 n.21) is not entirely accurate because the payment of all judgments have always required an appropriation.  From 1863 until 1956, when Congress enacted the Judgment Fund statute, general appropriations for the payment of the Court of Claims' judgments were regularly passed by Congress.  *See, e.g.*, *Wolfchild v. United States*, 101 Fed. Cl. 54, 84 (Fed. Cl. 2011) (describing history).

funds available to pay for that legally enforceable obligation. *See, e.g.*, *Moda* at 462. As this Court correctly concluded in *Moda*, Congress intended to create a judicially enforceable obligation with Section 1342's "shall pay" money-mandating statutory payment obligation. *See id.* at 455-57.

While *Collins* was not discussed in *Moda*, two later precedential cases that expressly recognize Congress' power to create statutory payment obligations irrespective of appropriations have been addressed favorably by this Court: *Gibney* and *New York Airways*. *See Moda* at 458-60. The Court of Claims in *Gibney* held, for example, that "[w]e know of no case in which any of the courts have held that a simple limitation on an appropriation bill of the use of funds has been held to suspend **a statutory obligation**." *Gibney*, 114 Ct. Cl. at 53 (emphasis added). In *New York Airways*, the Court of Claims further held that:

> It has long been established that the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government **obligation created by statute**. … The failure to appropriate funds to meet **statutory obligations** prevents the accounting officers of the Government from making disbursements, **but such rights are enforceable in the Court of Claims**.

369 F.2d at 748 (citations omitted and emphasis added). Even the Federal Circuit's *Adams v. United States* opinion, relied upon by Defendant in its Opposition, expressly supports the principle that Congress can create a "statutory obligation to pay money." Def.'s Opp. at 50 (quoting *Adams v. United States*, 391 F.3d 1212, 1225 (Fed. Cir. 2004)).

Defendant's cases actually support, rather than contradict, the fundamental principle enunciated in *Collins* regarding Congress' power to create statutory payment obligations regardless of appropriations. In *Prairie County,* a precedential case that was not addressed in *Moda* and upon which Defendant mistakenly relies in its Opposition, *see* Def.'s Opp. at 24 & 29-30, the Federal Circuit affirmed that Congress can create payment obligations that are

enforceable in this Court irrespective of appropriations. The *Prairie County* Court held that,

absent "congressional intent to limit the government's liability," a money-mandating statute

"imposes **a statutory obligation** to pay the full amounts according to the statutory formulas

regardless of appropriations by Congress." *Prairie Cnty.*, 782 F.3d at 690 (emphasis added).

The bedrock principle stated in *Collins* is no anachronism, and it equally applies to the payment

obligation created in Section 1342.[37]

### B.    Congress Did Not Make Section 1342 "Subject to Appropriations"

*Prairie County* also illustrates an exception to the general rule that Congress can create

statutory obligations irrespective of appropriations, which Defendant erroneously argues should

be applied here. *See* Def.'s Opp. at 24 & 29-30. *Prairie County* supports Molina's—and not

Defendant's—arguments, because it is a prime example of a case where the Federal Circuit held

Congress had limited its statutory "shall pay" obligation by expressly making payment subject to

the availability of appropriations, which Congress plainly did *not* do in Section 1342. *See* 42

U.S.C. § 18062.[38]

The *Prairie County* Court found that the statute at issue in that case—the Payment in

Lieu of Taxes Act ("PILT")—expressly included a clause—*not present in Section 1342*—stating

that "[a]mounts are available *only* as provided in appropriation laws." *Prairie Cnty.*, 782 F.3d at

690 (quoting 31 U.S.C. § 6906 (2006)) (Federal Circuit's emphasis). The Court held that "[t]he

inclusion of the word 'only' limits the availability of PILT payments to appropriations," and thus

---

[37]    Even Judge Lettow recognized this, stating that "Section 1342 and the implementing regulations ... *mandate payment from HHS*[.] … HHS's obligation to make risk-corridors payments when certain conditions are met represents the agency's independent authority *and obligation as directed by Congress*." *Lincoln* at 111-12 (emphasis added).

[38]    Nowhere in its Opposition does Defendant dispute that the term "budget neutral" is not found anywhere in Section 1342 or its implementing regulations (*see* Molina's Mot. at 30), and that HHS itself did not believe that Section 1342 was a budget-neutral statute (*see id.* at 35 and 35 n.49). Defendant thus concedes these points.

ruled that "the statute reflects congressional intent to limit the government's liability for PILT payments," rather than "impos[ing] a statutory obligation to pay the full amounts according to the statutory formulas regardless of appropriations by Congress." *Id.*[39]

Unlike the PILT, Section 1342 is completely silent regarding appropriations, and specifically lacks language limiting the Government's risk corridors payment obligation to appropriations.[40] Defendant asserts that Congress' silence regarding appropriations means that there is no obligation to pay, despite the "shall pay" money-mandating language in Section 1342. *See* Def.'s Opp. at 30. But this would violate the general rule announced in *Collins* and recently echoed in *Prairie County*. The omission of words limiting Section 1342's "shall pay" obligation to the availability of appropriations is even more instructive here, because Congress did in fact choose to include such limiting language in at least four other sections of the ACA.[41] Had Congress intended Section 1342's obligation to be similarly limited, it would have said so in the statute.

For Congress to have "reserved its full budget authority over the amount of risk corridors

---

[39] Defendant is correct in highlighting the Federal Circuit's comment that "if Congress had intended to obligate the government to make full … payments, it could have used different statutory language" in the PILT. Def.'s Opp. at 29 (quoting *Prairie Cnty.*, 782 F.3d at 691). For example, Congress could have omitted the "only" clause. *Prairie Cnty.* at 690. According to the Federal Circuit, using this different statutory language would have "impose[d] a statutory obligation to pay the full amounts according to the statutory formulas regardless of appropriations by Congress." *Id.*

[40] The Federal Circuit provided examples of such limiting language in *Greenlee County v. United States*, 487 F.3d 871, 878 (Fed. Cir. 2007) ("We see little functional difference between saying that amounts are 'subject to the availability of appropriations' and saying that amounts are 'available only as provided in appropriations laws,' and we conclude that the language of 6906 limits the government's liability under PILT to the amount appropriated by Congress.").

[41] *See, e.g.*, 42 U.S.C. § 280k(a) ("The Secretary…shall, subject to the availability of appropriations, …"); 42 U.S.C. § 300hh-31(a) ("Subject to the availability of appropriations, the Secretary…shall establish"); 42 U.S.C. § 293k-2(e) ("The provision of such payments shall be … subject to the availability of appropriations for the fiscal year involved"); 42 U.S.C. § 1397m-1(b)(2)(A) ("Subject to the availability of appropriations…").

payments," or made the risk corridors payments subject to the availability of appropriations, as

Defendant now contends, Def.'s Opp. at 39-41, those words would have had to appear in the

statute. Following the Federal Circuit's reasoning in *Prairie County*, because Section 1342

contains no express limitation regarding appropriations, Congress "impose[d] *a statutory*

*obligation* to pay the full amounts according to the statutory formulas *regardless of*

*appropriations*." *Id.* (emphasis added).[42]

Two other new authorities Defendant relies on similarly show that the exception to the

general rule does not apply here. First, in *Star-Glo*, the Federal Circuit held that Congress'

express limitation, written in the underlying statute, on payments available under a statutory

program compensating citrus growers for destroyed citrus groves—"[t]he Secretary of

Agriculture shall use $58,000,000 of the funds of the Commodity Credit Corporation to carry out

this section, to remain available until expended"—was intended as a "statutory cap" based on the

plain language of the statute itself and its legislative history. *Star-Glo*, 414 F.3d at 1354-55

(quoting Pub. L.. 106-387, § 810(e) (2000)). No such language exists in Section 1342, making

*Star-Glo* inapposite here.

Second, in *Nevada v. Dep't of Energy*, the state sought distribution of funds allegedly

owed by the agency under section 302 of the Nuclear Waste Policy Act ("NWPA"). *See* 400

F.3d 9, 10-11 (D.C. Cir. 2005). The D.C. Circuit determined the agency was not liable because

section 302, unlike ACA Section 1342, expressly made the funds "subject to appropriations,"

and Congress did not appropriate such funds. *Id.* at 13. The court observed, however, that while

section 116 of the NWPA "**speaks in mandatory terms, obliging** DOE to grant Nevada

---

[42]     Accordingly, the instances in the ACA cited by Defendant in which Congress expressly
authorized appropriations, *see* Def.'s Opp. at 19 n.14, while perhaps important to those agencies
and to anyone suing those agencies in U.S. District Court to compel payment, are not relevant or
controlling in this Court.

reasonable sums for repository-related expenditures," the statutory text demonstrated that the obligation was only triggered "when Congress appropriates Waste Fund money for general repository-related purposes." *Id.* at 15 (citation omitted and emphasis added). Had the statutory text not contained this express contingency, then the agency may have been liable for the statutory obligation created by Congress regardless of appropriations.[43]

### C. This Court Ruled in *Moda* That the Appropriations Riders Did Not Vitiate Section 1342's Payment Obligation

The general rule in *Collins* is subject to another exception with which this Court is already familiar. If an act of Congress later clearly and manifestly repeals or amends the original statute's underlying payment obligation, then the Government's obligation may no longer be enforceable. *See Moda* at 457-62. Defendant argues here, as it did in *Moda*, that years after Congress originally passed Section 1342, a later Congress "superseded" the obligation through the risk corridors riders in the appropriations acts for FY 2015, FY 2016, and FY 2017. Def.'s Opp. at 25; *see id.* at 22-28.[44]

This Court in *Moda* already rejected Defendant's identical arguments based on the same appropriations riders, finding that the language in those appropriations acts are more like the *Langston*, *Gibney*, *N.Y. Airways* and *District of Columbia* cases relied upon by Molina, than the *Dickerson* and *Will* cases that Defendant again raises here. *See Moda* at 458-62; Molina's Mot. at 35-39; Def.'s Opp. at 25 & 35-38. By their plain terms, the FY 2015 and FY 2016

---

[43] Defendant's reliance on *Nevada* is further misplaced because that suit was filed in U.S. District Court, not this Court, and the agency could not have been compelled to pay without an appropriation. *See Nevada*, 400 F.3d at 13; *cf. Collins*, 15 Ct. Cl. at 35 ("This court … does not deal with questions of appropriations, but with the legal liabilities incurred by the United States under contracts, express or implied, the laws of Congress, or the regulations of the executive.").

[44] Defendant ignores—and therefore concedes—Molina's argument that the later Congress' attempt to amend Section 1342 in the appropriations riders to make the risk corridors program "budget neutral" demonstrated that Section 1342 was not "budget neutral" when it was passed by the earlier Congress in 2010. *See* Molina's Mot. at 36.

appropriations riders merely prohibited certain funding sources from being available for risk corridors payments—but not <u>all</u> funding sources, as this Court correctly held in *Moda*. *See Moda* at 460-61 (analyzing Pub. L. 113-235, § 227, 128 Stat. 2491, and Pub. L. 114-113, § 225, 129 Stat. 2624). For instance, the appropriations riders did not prohibit risk corridors payments to be made from the Health Insurance Reform Implementation Fund, enacted at Section 1005 of the Health Care and Education Reconciliation Act of 2010 amending the ACA, which was appropriated by the same Congress that passed the ACA, which was expressly established "to carry out the [ACA]," and for which Congress appropriated $1 billion "for Federal administrative expenses to carry out" the ACA and any amendments thereto. 42 U.S.C. § 18122. Congress expressly directed the HHS Secretary in Section 1342 to "establish and administer" the risk corridors program in 2014, 2015, and 2016. 42 U.S.C. § 18062(a).

Although Defendant introduces two new cases in its Opposition that were not addressed in *Moda*—*Mitchell* and *Highland Falls*—they similarly fail to support Defendant's argument because Congress included no "earmarks" in the risk corridors riders at issue here.

In *Mitchell*, the Supreme Court found that despite an original statute fixing the salaries of Indian interpreters in Nebraska at $400 per year and also containing "a provision that such compensation should be in full of all emoluments and allowances whatsoever," later appropriations acts passed were "plain upon the[ir] face" in revealing "the intention of congress to fix … the annual salaries of interpreters … at $300 each." *Mitchell*, 109 U.S. at 149-50. Those appropriations acts contained specific earmarks providing "for the purpose of paying the current and contingent expenses of the Indian department …. For the pay of seventy-six interpreters, as follows: … Seven for the tribes in Nebraska … at three hundred dollars per annum, two thousand one hundred dollars," along with "[f]or additional pay of said interpreters,

to be distributed in the discretion of the secretary of the interior, six thousand dollars." *Id.* at

149.  The Supreme Court in *Mitchell* found that this specific *earmark* in the appropriations acts,

setting the precise sum that Congress was appropriating toward the underlying statutory payment

obligation, revealed "[t]he purpose of congress to suspend the law fixing the salaries of

interpreters in Nebraska at $400 per annum." *Id.* at 150.

Discussing *Mitchell* in its *Langston* opinion, the Supreme Court explained that "[t]he

appropriation by those acts of a fixed sum as compensation for certain interpreters during a

prescribed period, followed by the appropriation of a round sum as *additional* pay, to be

distributed among them in the discretion of one of the executive departments, evinced the

intention of congress not to allow further compensation to such appointees during the periods

specified." *Langston*, 118 U.S. at 393.[45]  Comparing the Haiti minister's facts against *Mitchell*,

the Supreme Court in *Langston* found that the appropriations act at issue lacked "an

appropriation of money 'for additional pay,' from which it might be inferred that congress

intended to repeal the act fixing his annual salary at $7,500." *Id.*  Likewise, the risk corridors

appropriations riders contain absolutely no earmarks—no specific sum is stated in the riders—

nor any other language indicating an intent by Congress to repeal Section 1342.[46]  The

---

[45]    Defendant insupportably tries to distinguish this case from *Langston*, claiming that in
Section 1342 "Congress did not merely fail to appropriate sufficient funds for risk corridors
payments, but prohibited HHS from using funds other than collections for such payments."
Def.'s Opp. at 38.  Of course, no such prohibition appears anywhere in Section 1342—if it did,
GAO would have addressed it in its September 20, 2014 opinion.  Molina raised this point in its
Motion (*see* Molina's Mot. at 34), and Defendant did not respond to it in its Opposition.

[46]    Defendant has even conceded in other risk corridors cases that Section 1342's underlying
payment obligation was *not* repealed or otherwise abrogated by the later appropriations riders.
*See, e.g.*, *Me. Cmty. Health Options v. United States*, No. 16-967C, ECF No. 22 at 40 n.23 (Jan.
13, 2017) ("[T]he appropriation riders do not repeal section 1342; the riders merely limit the
United States' liability to make risk corridors payments to the amount of collections."); *Mont.
Health CO-OP v. United States*, No. 16-1427C, ECF No. 25 at 10 (Feb. 23, 2017) ("Congress
did not intend to repeal section 1342 or prohibit risk corridors payments altogether.  Instead,

distinctions between the earmarked appropriations in *Mitchell* and the risk corridors riders thus demonstrate that Congress did not repeal or amend its underlying statutory payment obligation in Section 1342, undermining Defendant's position.

Nor does Section 1342 expressly limit its "shall pay" obligation with language or conditions specifying how QHPs must be paid if there are insufficient appropriations, as occurred in *Highland Falls*, and therefore Defendant cannot credibly rely on this case either. *See* Def.'s Opp. at 24, 26-27. First, *Highland Falls* did not involve a money-mandating statute at all. *Id*. at 1169 (noting the lower court concluded that "the Impact Aid program is not a mandatory spending program"). Unlike Section 1342, the statute did not unequivocally state that the Government "shall" or "will" pay certain amounts. In contrast to Section 1342, the statute in *Highland Falls* specifically allowed Congress to appropriate less funds than necessary to satisfy the Act's entitlements. *Id*. at 1168. Second, the underlying statute there, unlike here, contained a "shall be entitled" payment obligation that expressly directed the Government how to allocate funds if annual appropriations were insufficient to fulfill the statutory payment obligation, and the subsequent appropriations acts specifically "earmarked"[47] the *precise* amount of funds to be used toward the statutory payment obligation. *Id.* at 1168 (quoting 20 U.S.C. §§ 237(a) & 240(c)); *id.* at 1170 ("[W]e have great difficulty imagining a more direct statement of congressional intent than the instructions in the appropriations statutes at issue here.").

---

Congress … merely sought to ensure that only risk corridors collections would be available to make those payments."); *First Priority Life Ins. Co. v. United States*, No. 16-587C, ECF No. 32 at 13 (Apr. 7, 2017) ("Congress did not repeal section 1342 or prohibit risk corridors payments altogether. Instead, Congress … merely ensured that only risk corridors collections would be available to make those payments."); *HPHC Ins. Co., Inc. v. United States*, No. 17-87C, ECF No. 13 at 28 (Apr. 13, 2017) ("Congress neither repealed the risk corridors program nor amended section 1342's direction to HHS to establish and administer the program.").

[47]     Defendant recognized the existence and impact of the earmark in the *Highland Falls* appropriations bill. *See* Def.'s Opp. at 26 ("Congress earmarked certain amounts for entitlements," which Defendant described as a "clear limit on appropriations").

Unlike in *Highland Falls* and *Mitchell*, Section 1342 contains no such limiting language and the appropriations riders contain no earmarks. Defendant's assertion that "the appropriations legislation for risk corridors is materially indistinguishable from the appropriations legislation in *Highland Falls,*" is therefore insupportable. Def.'s Opp. at 27. As this Court correctly found in *Moda*, the appropriations riders indicate no clear intent by the later Congress to amend, repeal, or otherwise abrogate or vitiate Section 1342's underlying risk corridors payment obligation created by the earlier Congress. *See Moda* at 457-62.

Defendant simply ignores that Congress repeatedly considered bills to amend the risk-corridors program, but none of those bills became law. *See* S. 2214, 113th Cong. (2014) (seeking to amend the risk-corridors payments provisions to "ensur[e] budget neutrality."); S. 1726, 113th Cong. (2013) (seeking to eliminate risk-corridors payments); 161 Cong. Rec. S8420-21 (daily ed. Dec. 3, 2015) (Congress considered and rejected during the 2016 budget process an amendment expressly indicating that "Effective January 1, 2016, the Secretary shall not collect fees and shall not make payments under [the risk-corridors program].").

Defendant's attempt to distinguish *New York Airways* by arguing that the statute there "made explicit reference to appropriations" (Def.'s Opp. at 36), is unconvincing because in that case, as here, there was no additional language in the appropriations act at issue reflecting a "clear intent" to repeal, and the evidence of legislative history included conflicting evidence. Therefore the Court of Claims held that the underlying statutory obligation was not abrogated by Congress' mere failure to appropriate sufficient funds. *See Moda* at 459 (quoting *N.Y. Airways*, 369 F.2d at 751). And, contrary to Defendant's assertion (*see* Def.'s Opp. at 37), it is not necessary to examine the ACA's legislative history for Congress to be "aware" that its statutory "shall pay" obligation to pay QHPs specific amounts was binding. *See Moda* at 452. Moreover,

although Defendant tries to distinguish *New York Airways* by asserting that there Congress "understood its risk corridors payments to be contractual" (Def.'s Opp. at 36-37), the Court clearly held the Government liable for breaching both its *statutory* as well as its implied-in-fact contract obligations—thus the Court's holding was not dependent upon the existence of a contract as Defendant suggests. *See, e.g.*, *Moda* at 466 ("Whether under statute or contract, the Court finds that the Government made a promise in the risk corridors program that it has yet to fulfill."). In any event, as this Court held in *Moda*, and as discussed further below, the Government is also alternatively obligated under a similar implied-in-fact contract. *See id*. Finally, *New York Airways* is not distinguishable on the basis that payments in that case "would be made from the general fund of the Treasury," as Defendant contends (Def.'s Opp. at 36), because any judgment in this action would come from the Judgment Fund, which Defendant concedes "has no bearing on the threshold question of liability." *Id*. at 34.

Based on *New York Airways* and the other precedential decisions detailed above, this Court correctly concluded in *Moda* that the United States was obligated by Section 1342 to make full annual risk corridors payments to QHPs, and that the later-enacted appropriations riders did not remove that statutory obligation. *See Moda* at 455-62. Here, no dispute of fact exists that Molina is owed, but has not been fully paid, risk corridors payments for CY 2014 and CY 2015. *See* Molina's Mot. at 48-50. This Court should find as a matter of law that the United States is liable to Molina under Count I for violation of Section 1342 and its implementing regulations, and should enter summary judgment for Molina in the amount of $52,372,197.75 (less any additional prorated risk corridors payments—if any—made by the Government since the filing of Molina's Motion).[48] Accordingly, Defendant's 12(b)(6) motion to dismiss Count I should be

---

[48]     Notably, Defendant does not dispute Molina's damages amounts or calculations. *See*

denied with prejudice.

**III.    THE GOVERNMENT ALTERNATIVELY BREACHED AN IMPLIED-IN-FACT CONTRACT BY NOT FULLY PAYING RISK CORRIDORS EACH YEAR**

Addressing an implied-in-fact contract claim substantively similar to Plaintiffs' Count III, this Court in *Moda* granted summary judgment to the insurer on the Government's liability for breach of an implied-in-fact contract regarding risk corridors payments, and denied Defendant's 12(b)(6) motion. *See Moda* at 462-66. This Court should do the same here: deny Defendant's virtually identical 12(b)(6) motion against Count III, and find that no genuine issue of material fact exists regarding Molina's implied-in-fact contract claim. Defendant's only attempt to address this Court's dispositive decision in *Moda*, which held the Government liable for breach of its risk corridor payment promises under an implied-in-fact contract, is relegated to a single "*but see*" citation, with an unsubstantiated assertion that the Court's decision is "irreconcilable" with precedents that Defendant asserted in *Moda,* and again asserts here, are "governing." Def.'s Opp. at 45, 47.

In *Moda*, this Court correctly observed that the Government does not always "intend to bind itself whenever it creates a statutory or regulatory incentive program." *Moda* at 462-63 (citing *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985)). Relying on cases also cited by Molina here, *Radium Mines* and *New York Airways*,[49] this Court held the statutory language establishing the ACA's risk corridors program "meets the criteria," as set forth in these cases, to "bind the Government in contract" because: (1) the Government provided "a program that offers specified incentives in return for voluntary performance of private parties" in the "form of an actual undertaking," and (2) the risk corridors

Molina's Mot. at 48-50.

[49]    *See* Molina's Mot. at 41-43.

- 28 -

program's statutory provision is "promissory"—it gave HHS "no discretion to decide whether or not to award incentives to parties who perform." *Id.* at 463-64 (citing *Radium Mines, Inc. v. United States*, 153 F. Supp. 403, 406 (Ct. Cl. 1957), and *N.Y. Airways*, 369 F.2d at 744-46, 751).

This Court found the Government "created an incentive program in the form of the Exchanges on which insurers could voluntarily sell QHPs." *Moda* at 464. "In return for insurers' participation," this Court found that "the Government promised risk corridors payments as a financial backstop" if the insurers were "unprofitable" (*i.e.*, their annual losses on the ACA exchanges exceeded the statutory target set forth in Section 1342). *Id.* This Court determined that because "Section 1342 specifically directs the Secretary of HHS to make risk corridors payments in specific sums," HHS had "no discretion to pay more or less than those sums." *Id.* Additionally, this Court found that the insurers had accepted the Government's unilateral offer through their performance, which included "develop[ing] QHPs that would satisfy the ACA's requirements and then sell[ing] those QHPs to consumers." *Id.* Emphasizing the contractual nature of the QHPs' "actual undertaking," *id.* at 463, this Court concluded that the "[i]nsurers' performance went beyond filling out an application form." *Id.* at 464 ("Here, the Government has promised to make risk corridors payments in return for Moda's performance. Moda accepted this offer through performance. It sold QHPs on the health benefit exchanges while adhering to the ACA's requirements.").

This Court also addressed in *Moda* the other elements necessary to establish a binding implied-in-fact contract against the Government, and determined that both consideration and authority to contract were satisfied in the risk corridors context. *See Moda* at 465. Molina satisfies all of these elements in its Motion. *See* Molina's Mot. at 45-47.

Further, this Court previously considered, and rejected in *Moda*, almost all of the

"governing precedents" that Defendant now contends are "irreconcilable" with this Court's

implied-in-fact contract reasoning and analysis. *See* Def.'s Opp. at 47; *see id.* at 45-49; *Moda* at

462-66.[50] As further demonstrated below, the Court should do the same here.

A. **This Court's Contractual Liability Determination in** *Moda*
    **Is Supported by Precedent**

This Court found in *Moda* that the Government's contractual obligation came solely from

the statute itself: in Section 1342, Congress created a unilateral offer to contract, to be accepted

by an insurer's performance as a QHP. *See Moda* at 462-65. By becoming certified as QHPs,

adhering to the myriad new ACA statutory and regulatory requirements, and offering the new

plans to members on the ACA exchanges, insurers like Molina accepted the Government's offer

and were contractually entitled to receive risk corridors payments in the statutorily-prescribed

amounts, so long as the QHPs satisfied the condition precedent by suffering losses on the ACA

exchanges in excess of the statutory target. *See id.* Case law supports this Court's conclusion,

even when a statute like Section 1342 does *not* contain the word "contract."

Aside from the precedential cases discussed above and relied on by this Court in *Moda*—

*Radium Mines* and *New York Airways*[51]—the Claims Court in *Kentucky ex rel. Cabinet for*

*Human Resources v. United States*, 16 Cl. Ct. 755 (1989), granted summary judgment against the

Government for breach of an implied-in-fact contract found in a statute requiring that HHS "shall

pay" a percentage of a state's expenditures back to the state in enforcing the child support

obligations owed by parents. *Kentucky*, 16 Cl. Ct. at 756, 765. Finding no express promissory

---

[50]     *Compare* U.S.'s Reply Br., *Moda Health Plan, Inc. v. United States*, No. 16-649C, ECF
No. 14 at 24-29 (Dec. 9, 2016), *with* Def.'s Opp. at 45-49. The only new authorities raised by
Defendant here are *Moda*, *BCBSNC*, and *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380 (1947),
which appears in Defendant's current argument regarding authority to contract.

[51]     Both of which are examples of cases "where contracts were inferred from regulations
promising payment." *Army & Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728, 739 n.11 (1982).

words like "contract" in the statute and regulations, the Court nevertheless determined that

"HHS['] assistance in the preparation of the state Title IV-D plan, its approval of the state plan,

and the elaborate administrative procedures developed to determine and implement FFP

payments, *create[d] a contractual relationship and obligate[d] the Government to the terms*

*agreed upon*. These obligations may be enforced in the Claims Court." *Id.* at 756-57, 762

(emphasis added).

Furthermore, the Supreme Court held that a statute that "condition[ed] an offer of federal

funding on a promise by the recipient … *amount[ed] essentially to a contract* between the

Government and the recipient of funds." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274,

286 (1998) (emphasis added). And Justice Scalia, in his dissent in *Bowen v. Massachusetts*,

found that a Medicaid provision, which mandated that "the Secretary (except as otherwise

provided in this section) *shall pay* to each State which has a plan approved under this

subchapter" the amounts specified by statutory formula, "*itself can be analogized to a unilateral*

*offer for contract*—offering to pay specified sums in return for the performance of specified

services and inviting the States to accept the offer by performance." *Bowen v. Mass.*, 487 U.S.

879, 923 (1988) (Scalia, J., dissenting) (quoting 42 U.S.C. § 1396b(a)) (emphasis added).

**B.** **The Supreme Court's Two-Step Test Set Forth in *Nat'l R.R. Passenger Corp.* Supports This Court's Implied-In-Fact Contract Determination in *Moda***

In *Moda*, this Court expressly disagreed with Defendant's reliance on *ARRA Energy Co. I*

*v. United States*, 97 Fed. Cl. 12 (2011)—which Defendant has opted *not* to cite here[52]—finding

that the Court had applied an overly narrow and "literal[]" interpretation of the applicable test

articulated by the Supreme Court in *Nat'l R.R. Passenger Corp. Moda* at 463-64. This Court

disagreed with the *ARRA Energy* Court's reluctance to find a binding contract because the

---

[52]     *See generally* Def.'s Opp. at 45-49.

plaintiff there had not "point[ed] to specific language in" the relevant statute that "specifically require[d] the Government to enter into contracts." *Id.* at 464.[53] This Court emphasized that "[n]either *Radium Mines* nor *New York Airways* turned on the invocation of the magic word 'contract' in the statutes they examined." *Id.* Rather, as this Court did in *Moda* with respect to the risk corridors program, the Courts in both of those cases "examined the *structure* of [the] statutory program[s] and determined … the Government had expressed its intent to contract by using that structure." *Id.* (emphasis in original); *see also N.Y. Airways,* 369 F.2d at 751 ("The actions of the parties support the existence of a contract at least implied in fact. The Board's rate order was, in substance, an offer by the Government to pay the plaintiffs a stipulated compensation for the transportation of mail, and the actual transportation of mail was the plaintiff's acceptance of that offer.").

This Court in *Moda* followed the Supreme Court's two-step test laid out in *Nat'l R.R. Passenger Corp.* for determining "whether a particular statute gives rise to a contractual obligation," which requires a court to "first … examine the language of the statute," and second, to review "the circumstances" surrounding the statute's passage and the conduct of the parties. 470 U.S. at 467-68. The Supreme Court's examination of the surrounding circumstances included the "legitimate expectation[s]" of the parties and whether "Congress would have struck" the bargain under such circumstances. *Id.* at 468-69. After reviewing these two factors in detail, the Supreme Court determined that Congress did not, through passage of the statute at issue, intend to contractually agree *not* to re-impose any rail passenger service responsibilities on

---

[53] This Court observed that while the Court in *ARRA Energy* only analyzed the language of the statute at issue in that case, the Court correctly recited *Nat'l R.R. Passenger Corp.*'s governing two-step analysis, which allows courts to examine either "specific language" in the statute <u>or</u> "*conduct on the part of the government* that allows a reasonable inference that the government intended to enter into a contract." *Moda* at 464 (quoting *ARRA Energy*, 97 Fed. Cl. at 27) (emphasis added); *see also Nat'l R.R. Passenger Corp.*, 470 U.S. at 468.

the freight railroads. *Id*. at 471. Instead, the Court found that the statute did not obligate the Government to "agree[] with anyone to do anything," emphasizing that, by its terms, Congress had "'expressly reserved' its right to 'repeal, alter or amend,'" the statute "'at any time.'" *Id*. at 467.

Further, with respect to surrounding circumstances, the Supreme Court observed that "Congress would have struck a profoundly inequitable bargain" had it agreed to the contractual terms urged by the railroads because, the Court found, Congress would have received little in exchange for a promise *never* to impose rail passenger service obligations on the profitable freight railroads. *Nat'l R.R. Passenger Corp.*, 470 U.S. at 468. The Court also determined that the "circumstances of the Act's passage belie[d] an intent to contract away" the Government's "pervasive" regulation of the freight railroads, which historically included requiring them to undertake such passenger rail service obligations. *Id.* The Court remarked that Congress would not have "nonchalantly shed" its prior "pervasive" regulatory powers and that "the railroads had no legitimate expectation" that Congress would be contractually bound. *Id*. at 468-69.

Although Defendant relies on *Nat'l R.R. Passenger Corp.* via a Federal Circuit case quoting it,[54] as described above, the statutory text and surrounding circumstances there were dramatically different than those regarding "the structure" of the risk corridors program. *Moda* at 464. This Court's contractual analysis in *Moda* exemplifies this.

First, this Court determined that Section 1342's "shall pay" language was "promissory" in nature, *Moda* at 463, requiring that "the Secretary of HHS 'shall pay' specific sums of money to" QHPs that voluntarily participated in the ACA exchanges and experienced losses in excess of prescribed targets. *Id.* at 455. "HHS ha[d] no discretion to pay more or less than those sums."

---

[54]     *See* Def.'s Opp. at 45-47 (quoting *Brooks*, 702 F.3d 634 (Fed. Cir. 2012), which quotes *Nat'l R.R. Passenger Corp.*).

*Id*. at 464. In Section 1342, unlike in the *Nat'l R.R. Passenger Corp.* statute, Congress did not expressly reserve its right to "repeal, alter or amend" its mandatory risk corridors payment obligation. *See Nat'l R.R. Passenger Corp.* at 468. As this Court concluded, Section 1342's "shall pay" obligation was "unambiguous," non-discretionary, and not contingent on risk corridors collections or any other restrictions. *Moda* at 455.

Second, unlike the historical, pervasive regulation of the freight railroads that previously had required them to undertake rail passenger service obligations, the newly-created ACA exchange markets were unprecedented, uncertain and risky—there had been no prior, long-standing regulatory regime requiring insurers to provide health coverage to existing (much less new) members on the ACA exchanges. *See King v. Burwell*, 135 S. Ct. 2480, 2485 (2015); *cf. Nat'l R.R. Passenger Corp.*, 470 U.S. at 468. Moreover, unlike the freight railroads, the health insurers had a "legitimate expectation" that Congress would be bound to honor its "shall pay" obligation to insurers selling QHPs on the ACA exchanges that suffered losses in excess of the prescribed statutory targets. *See Moda,* at 462-64; *cf. Nat'l R.R. Passenger Corp.* at 469.

Further, unlike the "profoundly inequitable bargain" that Congress would have made by promising to lift the freight railroads' passenger rail service obligations, *Nat'l R.R. Passenger Corp.* at 468, the Government received valuable consideration from insurers participating on the ACA exchanges, which this Court recognized was "[c]entral to" the ACA's infrastructure and furthered the ACA's stated goals of expanding healthcare coverage to millions of new and previously uninsured Americans. *Moda* at 441-42, 465.

The statute at issue in *Brooks v. Dunlop Mfg. Inc.*, 702 F.3d 634, 631 (Fed. Cir. 2012), heavily relied upon by Defendant here,[55] is similarly distinguishable from the risk corridors

---

[55]    *See* Def.'s Opp. at 45-47.

statute and the circumstances surrounding its passage.  In *Brooks*, potential false-patent-marking plaintiffs claimed that a *qui tam* provision in Section 292(a) of the Leahy-Smith America Invests Act created a contract that was breached when the statute was later amended to eliminate the *qui tam* provision.  *See* 702 F.3d at 625.

Applying *Nat'l R.R. Passenger Corp.*'s two-step test, the Federal Circuit held that Congress had not intended to be contractually bound to potential *qui tam* plaintiffs merely by providing them an opportunity to bring a *qui tam* action under the statute's prior version. *Brooks*, 702 F.3d at 630-31.  In the first step, unlike this Court's determination in *Moda*, the Federal Circuit found that the statute lacked any promissory obligation; instead it "simply authorized a *qui tam* action" by providing that "any person may sue for the penalty," and "specified how any penalty would be divided."  *Id*. at 631.  Unlike Section 1342, which obligated the Government to make risk corridors payments once insurers performed by voluntarily offering QHPs on the ACA exchanges and experiencing annual losses that exceeded statutory targets, the *qui tam* provision in *Brooks* did not require a potential false-patent-marking plaintiff to file suit or do anything at all—there was no mutuality, method of acceptance, or consideration.

In the second step, the Federal Circuit examined "the circumstances surrounding the statute's passage," and found no suggestion that Congress had intended to bind itself contractually with potential *qui tam* relators, but instead observed that the *qui tam* provisions' long history demonstrated otherwise, noting that *qui tam* plaintiffs had no "vested right" to receive any award.  *Brooks*, 702 F.3d at 631.  Absent from the *Brooks* statute and surrounding circumstances was the promissory "shall pay" obligation that Congress included in Section 1342, requiring HHS to pay specified sums to QHPs with qualifying losses and specifically inducing insurers to "develop QHPs that would satisfy the ACA's requirements and then" voluntarily "sell

those QHPs to consumers" on the ACA exchanges. *Moda* at 464.

Judge Griggsby's analysis of the implied-in-fact contract claim also cannot help Defendant here. *See BCBSNC* at *18-19; Def.'s Opp. at 45, 47 (citing *BCBSNC*). Judge Griggsby failed to properly follow the *Nat'l R.R. Passenger Corp.* test, and overlooked the conduct upon which BCBSNC (and Molina here) relied. She likewise overlooked that contractual intent can be inferred from the "conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Hercules, Inc. v. United States*, 516 U.S. 417, 424 (1996). Instead, Judge Griggsby applied an impermissibly narrow application of the *Nat'l R.R. Passenger Corp.* test that focused *only* on the "conduct of Congress and the President in enacting and signing that statute." *BCBSNC* at *18.[56] Indeed, if governmental conduct could only be viewed so narrowly in analyzing an implied-in-fact contract claim, then *New York Airways* was wrongly decided, because there the Court of Claims looked to more than just the "conduct of Congress and the President in enacting and signing that statute" in finding that the actions of the parties evidenced an intent to contract. *See N.Y. Airways*, 369 F.2d at 751.

Accordingly, as it did in *Moda*, this Court should deny Defendant's Rule 12(b)(6) motion to dismiss Count III, hold that the Government breached an implied-in-fact contract with Molina "by failing to make full risk corridors payments as promised," and "direct[] the Government to fulfill that promise" by entering summary judgment on liability and damages for Molina. *Moda* at 465-66.

---

[56]     Notably, while Judge Griggsby applied an overly restrictive interpretation of the *Nat'l R.R. Passenger Corp.* test based on her narrow reading of *ARRA* and *Brooks*, she failed to even cite *Nat'l R.R. Passenger Corp.* in her opinion.

## IV.    BECAUSE A CONTRACT EXISTS, COUNTS IV AND V MUST SURVIVE

Defendant asserts if neither of Molina's express or implied-in-fact contract claims survive (Counts II or III), then Molina's implied covenant claim (Count IV) must also be dismissed on 12(b)(6).  *See* Def.'s Opp. at 49.  For the reasons stated above, Molina's Count III not only survives, but the Court should enter summary judgment in Molina's favor. Furthermore, as discussed below, Count II should not be dismissed because it plausibly alleges a breach of contract claim.  Because one or both of Molina's underlying contract claims will survive, it would be improper to dismiss Count IV at this stage.  Defendant's 12(b)(6) motion to dismiss Count IV should thus be denied.

For the same reason—because at least one of Molina's contract claims will survive— Defendant's motion to dismiss Molina's takings claim (Count V) should be denied.  Contrary to Defendant's assertion that "Molina has no contractual right to risk corridors payments," Def.'s Opp. at 50, precedent clearly supports this Court's holding in *Moda* that the Government entered into implied-in-fact contracts with QHPs, like Molina, regarding risk corridors payments, and thus Molina possesses a legally cognizable property interest that was taken by the Government in violation of the Fifth Amendment.  *See Moda* at 465-66.

## V.    COUNT II STATES A VALID BREACH OF EXPRESS CONTRACT CLAIM

Defendant improperly insists that the Court weigh the sufficiency of Molina's evidence regarding Count II rather than construe the Complaint's allegations in Molina's favor, as is required under Rule 12(b)(6).  *See* Def.'s Opp. at 41-45.  Section II.d of the CY 2014 CMS QHP Agreements and Section III.a of the CY 2015 CMS QHP Agreements impose a duty on the Government to "undertake all reasonable efforts to implement systems and processes that will

support QHP[] functions." *See* Compl. Exs. 06-12 & 15-21.[57]  The Complaint's well-pled

allegations show that the Government breached that duty by failing to make full and timely risk

corridors payments.  *See, e.g.*, Compl. ¶¶ 307-323.  Additionally, unlike the facts in the cases

cited by Defendant, § V.g of the CY 2014 and CY 2015 CMS QHP Agreements references more

than the general "laws of the United States."  *See, e.g.*, Compl. ¶ 65.  Because Molina plausibly

alleges all essential elements of the Government's breach of an express contract, Defendant's

12(b)(6) motion should be denied for Count II.

## VI. MOLINA'S REQUEST FOR DECLARATORY RELIEF INCIDENTAL OF AND COLLATERAL TO A POTENTIAL MONEY JUDGMENT IS PROPER

 Defendant questions this Court's authority to declare, after rendering judgment in

Molina's favor for failing to make full and timely CY 2014 and CY 2015 risk corridors

payments, that the Government also must make full and timely CY 2016 risk corridors payments.

*See* Def.'s Opp. at 17.  Defendant's argument does not address—let alone distinguish—the

precedential and persuasive authorities Molina presented in its Motion regarding this Court's

power to provide declaratory relief under these circumstances.  *See* Molina's Mot. at 50-53.

Such an order would avoid Molina, which estimates that it is owed approximately $90 million in

risk corridors payments for CY 2016, burdening the Court with a new complaint after the

identical issues have already been decided for CY 2014 and CY 2015.  *See id.*  This Court should

exercise the powers under its jurisdiction to provide the declaratory relief requested.

---

[57]     The CMS QHP Agreements' plain language—the starting point of contract interpretation, *see Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003)—clearly contemplates more than just electronics, and nothing in, respectively, § II.d or § III.a indicates that surrounding subsections or a "Companion Guide" should be used to interpret their terms.

## **CONCLUSION**

For all of the foregoing reasons, and those stated in Molina's Motion, Molina respectfully requests that this Court grant summary judgment on liability and damages in the amount of $52,372,197.75 on Counts I and III, and deny Defendant's motion to dismiss the Complaint.


Dated:  May 30, 2017

Respectfully Submitted,

s/ Lawrence S. Sher
Lawrence S. Sher (D.C. Bar No. 430469)
**REED SMITH LLP**
1301 K Street NW
Suite 1000-East Tower
Washington, DC 20005
Telephone: 202.414.9200
Facsimile: 202.414.9299
Email: lsher@reedsmith.com

*Of Counsel:*

Kyle R. Bahr (D.C. Bar No. 986946)
Conor M. Shaffer (PA Bar No. 314474)
**REED SMITH LLP**
Reed Smith Centre
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Telephone: 412.288.3131
Facsimile: 412.288.3063
Email: kbahr@reedsmith.com
           cshaffer@reedsmith.com

*Counsel for the Molina Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2017, a copy of the foregoing Reply in Further Support of Plaintiffs' Motion for Partial Summary Judgment and in Opposition to the United States' Cross-Motion to Dismiss were filed electronically with the Court's Electronic Case Filing (ECF) system. I understand that notice of this filing with be sent to all parties by operation of the Court's ECF system.

s/ Lawrence S. Sher
Lawrence S. Sher
Counsel for Plaintiff
