# In the United States Court of Federal Claims

No. 17-97C

(Filed: August 4, 2017)

```
*************************************
                                    *
MOLINA HEALTHCARE OF                *
CALIFORNIA, INC., and               *
MOLINA HEALTHCARE OF FLORIDA,       *
INC., et al.,                       *
                                    *
                   Plaintiffs,      *
                                    *
v.                                  *
                                    *
THE UNITED STATES,                  *
                                    *
                   Defendant.       *
                                    *
*************************************
```

Patient Protection and Affordable Care Act, § 1342; Risk Corridor Program; Presently Due Money Damages; Ripeness; <u>Chevron</u> Deference; Effect of Appropriation Riders Limiting Statutory Obligation; <u>Highland Falls</u>; Judgment Fund; Implied-in-Fact Contract Created by Statute; Express Contract; Fifth Amendment Takings; Declaratory Relief.

*Lawrence S. Sher*, with whom were *Kyle R. Bahr* and *Conor M. Shaffer*, Reed Smith LLP, Washington, D.C., for Plaintiffs.

*Charles E. Canter*, with whom were *Chad A. Readler*, Acting Assistant Attorney General, *Ruth A. Harvey*, Director, and *Kirk T. Manhardt*, Deputy Director, as well as *Terrance A. Mebane*, *Frances M. McLaughlin*, *L. Misha Preheim*, *Marc S. Sacks*, and *Phillip M. Seligman,* Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

Another insurance company has come to this Court seeking payment from the Government under the Patient Protection and Affordable Care Act of 2010 ("ACA"). Plaintiffs Molina Healthcare of California, Inc. and its other state affiliates ("Molina") offer health insurance plans through the Health Benefit Exchanges ("Exchanges") created under the ACA. To encourage insurers to participate in the Exchanges, Congress enacted Section 1342 of the ACA to establish a risk corridor program under which the Government would

pay unprofitable participating insurers and collect payments from profitable participating insurers during the first three years of the ACA's implementation (2014-2016).[1]  Molina of Florida suffered losses during the first year of the ACA's implementation, but received only a small fraction of its 2014 risk corridor payments from the Government.  During the second year of the ACA's implementation, Molina Plaintiffs operating in California, Florida, Utah, Washington, and Wisconsin suffered significant losses, but received no payments whatsoever from the Government.  All other Plaintiffs experienced profits during the first and second year of the program and timely made 100 percent of the required payments they owed to the Government.[2]

Molina seeks payments under the risk corridor program for years 2014 and 2015 – totaling more than $52 million – and a declaration from this Court that the Government must make full 2016 risk corridor payments – estimated at $138 million.  Molina alleges that the Government violated a statutory duty to make full annual risk corridor payments, breached both express and implied-in-fact contracts to make risk corridor payments, breached a corresponding implied covenant of good faith and fair dealing, and caused a taking of Molina's property by not making full risk corridor payments.  Shortly after filing its complaint, Molina filed a motion for partial summary judgment on its statutory and implied-in-fact contract claims.  The Government, in response, moved to dismiss all of Molina's claims on either Rule 12(b)(1) or 12(b)(6) grounds.

This is the second risk corridor opinion issued by the undersigned within the past six months.  See Moda Health Plan, Inc. v. United States, 130 Fed. Cl. 436, appeal docketed, No. 17-1994 (Fed. Cir. May 9, 2017).  In the Moda Health Plan case, the plaintiff also filed a motion for partial summary judgment on its statutory and implied-in-fact contract claims, and the Government moved to dismiss.  The facts and legal issues involved in the two cases are identical.  In Moda Health Plan, the Court granted the plaintiff's motion for partial summary judgment and denied the Government's motion to dismiss.  For the same reasons here, Molina's motion for partial summary Judgment is GRANTED and the Government's motion to dismiss the statutory and implied-in-fact contract claims is DENIED.  However, Molina alleges further violations in its complaint and seeks additional

---

[1]  "Risk corridor program" is an odd term that may be unfamiliar to those outside of the federal healthcare field.  Essentially, the "risk corridor" concept is a way to share the risks between insurers and the Government when embarking upon a new health insurance endeavor.  By sharing the risks, the Government intended to encourage more insurers to participate in the new ACA endeavor.  The Government's promise to reimburse certain revenue losses to insurers would allow the insurers to maintain health insurance premiums for consumers at a lower and more reasonable rate.  The insurance companies voluntarily entered the program based upon the Government's promised terms.

[2]  Substantial inequity is apparent in the case of an entity like Molina whose profitable affiliates made 100 percent of their required payments to the Government, but whose unprofitable affiliates received next to nothing of the Government's promised reimbursement of losses.

declaratory relief.  For reasons to be explained, the Court GRANTS the Government's motion to dismiss Molina's breach of express contract and takings claims, but DENIES the Government's motion to dismiss Molina's breach of implied covenant claim.  The Court also DENIES Molina's request for declaratory relief as premature.

Before moving forward, the Court wishes to highlight one substantive disagreement with a recent risk corridor opinion issued on July 31, 2017.  Maine Community Health Options v. United States, -- Fed. Cl. – 2017 WL 3225050 (July 31, 2017) ("Maine Community II").[3]  In that case, Judge Eric Bruggink granted the Government's Rule 12(b)(6) motion to dismiss an insurer's Section 1342 claim on the grounds that 2015 and 2016 appropriation riders capped the Government's obligation to make risk corridor payments to insurers only to the extent of revenue received from "payments in" under Section 1342.  Id. at * 12.  The undersigned and Judge Bruggink agree on most aspects of these ACA cases, and agree in particular that Congress may expressly limit its payment obligations in appropriations laws.  However, as discussed in more detail below, the main area of disagreement is in determining what type of language Congress must use in its appropriations laws to vitiate a pre-existing statutory obligation.  In Maine Community II, Judge Bruggink held that the appropriations laws "expressly limit[ed]" payments out to payments in, thus making the risk corridor program "budget neutral."  Id.  The Court rules here, following Moda Health Plan, that Congress did not clearly or adequately express an intent to make the program "budget neutral" in the appropriations riders, given the previous unequivocal mandatory obligation undertaken in Section 1342.

The key to resolving this disagreement is a careful analysis of the legal requirements Congress must meet to rescind a statutory promise.  The words "budget neutral" do not appear anywhere in the ACA's Section 1342 or in the appropriation riders.  The insurance companies and the public at large have a right to understand and rely upon the statutory words that Congress uses.  The Court should not add words if they are not there.

## Background[4]

In 2010, Congress passed the ACA in a dramatic overhaul of the nation's healthcare system.  Central to the Act's infrastructure was a network of Exchanges on which insurers would offer Qualified Health Plans ("QHPs") to eligible purchasers.  ACA §§ 1311, 1321,

---

[3] The insurer in Maine Community Health II promptly filed its notice of appeal on August 2, 2017.  Case No. 16-967C, Dkt. No. 39.  The appeal has not yet been docketed with the Federal Circuit.

[4] Since the pertinent facts in this present case are identical to those in Moda Health Plan, the background presented here is largely taken from Moda Health Plan with slight adjustments as necessary for this case.  See Moda Health Plan, 130 Fed. Cl. at 441-449.

42 U.S.C. §§ 18031, 18041 (2012).  The ACA also drastically enlarged the pool of eligible insurance purchasers, expanded Medicaid eligibility, and provided subsidies to low-income insurance purchasers.  ACA § 2001; ACA §§ 1401, 1402; 42 C.F.R. § 155.305(f), (g).  Further, it prohibited insurers from denying coverage, or setting increased premiums, based upon a purchaser's medical history.  ACA § 1201(2)(A); 42 U.S.C. §§ 300gg-1–300gg-5 (2012).

In short, the ACA created a tectonic shift in the nation's health insurance market.  It gave insurers like Molina access to a large new customer base, but insurers also had to comply with the ACA's new rules if they wanted to offer QHPs on the Exchanges.  To help insurers adjust to the Exchanges, Congress included three provisions in the ACA—commonly known as the "3Rs"—that reduced insurers' risk: reinsurance, risk corridor, and risk adjustment.  See ACA §§ 1341–43.  The second of these 3Rs, the risk corridor program, is the subject of this lawsuit.

A.  Congress Creates the Risk Corridor Program.

Section 1342 of the ACA sets out the risk corridor program.  It reads as follows:

(a)  IN GENERAL.--The Secretary shall establish and administer a program of risk corridor for calendar years 2014, 2015, and 2016 under which a qualified health plan offered in the individual or small group market shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums. Such program shall be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act.

(b) PAYMENT METHODOLOGY.--

(1) PAYMENTS OUT.--The Secretary *shall* provide under the program established under subsection (a) that if--

(A) a participating plan's allowable costs for *any plan year* are more than 103 percent but not more than 108 percent of the target amount, *the Secretary shall pay* to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and

(B) a participating plan's allowable costs for *any plan year* are more than 108 percent of the target amount, *the*

4

*Secretary shall pay* to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

(2) PAYMENTS IN.--The Secretary shall provide under the program established under subsection (a) that if--

(A) a participating plan's allowable costs for any plan year are less than 97 percent but not less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to 50 percent of the excess of 97 percent of the target amount over the allowable costs; and

(B) a participating plan's allowable costs for any plan year are less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the excess of 92 percent of the target amount over the allowable costs.

(c) DEFINITIONS.--In this section:

(1) ALLOWABLE COSTS.--

(A) IN GENERAL.--The amount of allowable costs of a plan for any year is an amount equal to the total costs (other than administrative costs) of the plan in providing benefits covered by the plan.

(B) REDUCTION FOR RISK ADJUSTMENT AND REINSURANCE PAYMENTS.--Allowable costs shall [be] reduced by any risk adjustment and reinsurance payments received under section 1341 and 1343.

(2) TARGET AMOUNT.--The target amount of a plan for any year is an amount equal to the total premiums (including any premium subsidies under any governmental program), reduced by the administrative costs of the plan.

ACA § 1342 (codified at 42 U.S.C. § 18062 (2012)) (emphasis added).  Congress did not specifically appropriate funds for the risk corridor program in the ACA, leaving payments as needed to come from the general appropriation of funds to the Department of Health and Human Services ("HHS").

B. Underline: HHS Implements the Risk Corridor Program.

1. HHS Promulgates a Final Rule.

To "establish and administer" the risk corridor program in accordance with Section 1342, HHS began its rulemaking process. After a notice and comment period, HHS published its final rule on March 23, 2012. That rule states, in pertinent part:

> (a) General requirement. A QHP issuer must adhere to the requirements set by HHS in this subpart and in the annual HHS notice of benefit and payment parameters for the establishment and administration of a program of risk corridor for calendar years 2014, 2015, and 2016.

> (b) HHS payments to health insurance issuers. *QHP issuers will receive payment* from HHS in the following amounts, under the following circumstances:

> (1) When a QHP's allowable costs *for any benefit year* are more than 103 percent but not more than 108 percent of the target amount, *HHS will pay the QHP issuer* an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount; and

> (2) When a QHP's allowable costs *for any benefit year* are more than 108 percent of the target amount, *HHS will pay to the QHP issuer* an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

> (c) Health insurance issuers' remittance of charges. QHP issuers must remit charges to HHS in the following amounts, under the following circumstances:

> (1) If a QHP's allowable costs for any benefit year are less than 97 percent but not less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to 50 percent of the difference between 97 percent of the target amount and the allowable costs; and

> (2) When a QHP's allowable costs for any benefit year are less than 92 percent of the target amount, the QHP issuer must

> remit charges to HHS in an amount equal to the sum of 2.5
> percent of the target amount plus 80 percent of the difference
> between 92 percent of the target amount and the allowable
> costs.

Risk Corridor Establishment and Payment Methodology, 77 Fed. Reg. 17,251 (Mar. 23, 2012) (codified at 45 C.F.R. § 153.510) (emphasis added).  In another rule it released that day, HHS added, "[a] QHP issuer must submit to HHS data on the premiums earned with respect to each QHP that the issuer offers in the manner and timeframe set forth in the annual HHS notice of benefit and payment parameters."  Risk Corridor Data Requirements, 77 Fed. Reg. 17,251 (Mar. 23, 2012) (codified at 45 C.F.R. § 153.530(a)).

In the same publication, HHS released an impact analysis of its proposed rules in which it cited the findings of the Congressional Budget Office ("CBO").  As HHS noted, the CBO did not score the risk corridor program in its projections:

> CBO estimated program payments and receipts for reinsurance
> and risk adjustment. . . .  CBO did not score the impact of the
> risk corridor program, but assumed collections would equal
> payments to plans in the aggregate.  The payments and receipts
> in risk adjustment and reinsurance are financial transfers
> between issuers and the entities running those programs.

Impact Analysis, 77 Fed. Reg. 17,220, 17,244 (Mar. 23, 2012).

Furthermore, HHS did not set deadlines in its new rules by which HHS needed to pay insurers, but it indicated that it was considering setting such deadlines:

> We suggested, for example, that a QHP issuer required to make
> a risk corridor payment may be required to remit charges
> within 30 days of receiving notice from HHS, and that HHS
> would make payments to QHP issuers that are owed risk
> corridor amounts within a 30-day period after HHS determines
> that a payment should be made to the QHP issuer.  QHP issuers
> who are owed these amounts will want prompt payment, and
> payment deadlines should be the same for HHS and QHP
> issuers.  We sought comment on these proposed payment
> deadlines in the preamble to the proposed rule.

Id. at 17,237.

    2. <u>CMS Promulgates an Additional Rule Governing the Schedule of the Risk Corridor Program.</u>

    HHS delegated rulemaking authority for the risk corridor program to the Centers for Medicare and Medicaid Services ("CMS"), one of HHS's subsidiary agencies.  <u>See</u> Delegation of Authorities, 76 Fed. Reg. 53,903-04 (Aug. 30, 2011).  Pursuant to that authority, on December 7, 2012 CMS proposed adding language that would give the program an annual schedule.  In its proposed rule's prefatory remarks, CMS noted that "[t]he temporary risk corridor program permits the Federal government and QHPs to share in profits or losses resulting from inaccurate rate setting from 2014 to 2016.  In this proposed rule, we propose . . . an annual schedule for the program and standards for data submissions."  HHS Notice of Benefit and Payment Parameters for 2014, 77 Fed. Reg. 73,118, 73,121 (Dec. 7, 2012).  To that end, CMS proposed a deadline of "July 31 of the year following the applicable benefit year" by which insurers would submit charges to HHS under the risk corridor program.  Risk Corridor Establishment and Payment Methodology, 77 Fed. Reg. 73,164 (proposed Dec. 7, 2012).

    CMS's final rule, issued March 11, 2013, made two changes in HHS's earlier regulations.  First, the rule added the following subsection to 45 C.F.R. § 153.510: "(d) Charge submission deadline.  A QHP issuer must remit charges to HHS within 30 days after notification of such charges."  Risk Corridor Establishment and Payment Methodology, 78 Fed. Reg. 15,531 (Mar. 11, 2013).  It also amended Section 153.530 by adding the following subsection: "(d) Timeframes.  For each benefit year, a QHP issuer must submit all information required under this section by July 31 of the year following the benefit year."  Risk Corridor Data Requirements, 78 Fed. Reg. 15,531 (Mar. 11, 2013).

    On the same day it released its rule governing the schedule of the risk corridor program, CMS addressed several comments it had received about a potential situation in which HHS's required "payments out" could exceed profitable insurers' "payments in" to the program.  CMS responded, "The risk corridor program is *not statutorily required to be budget neutral*.  Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the [ACA]."  78 Fed. Reg. at 15,473 (emphasis added).

    C. <u>Molina Offers QHPs on the Exchanges and HHS Announces the Transitional Policy.</u>

    In July and September 2013, the Molina Plaintiffs executed their respective 2014 QHP Agreements in California, Florida, Michigan, New Mexico, Ohio, Texas, Utah, Washington, and Wisconsin.  <u>See</u> Compl., Exs. 6-14.   In addition, between April 2013 and September 2013, the Molina entities executed and submitted 2014 Attestations

confirming their adherence to the requirements of the risk corridor program for the benefit year.  Id., Exs. 34-43.

Shortly after Molina and other insurers began selling QHPs, it became apparent that some consumers' health insurance coverage would be terminated because it did not comply with the ACA.   To minimize the hardship that these large-scale health insurance terminations would cause, HHS announced a transitional policy in November 2013.[5] Under the transitional policy, health plans in the individual or small group market that were in effect on October 1, 2013 were "not . . . considered to be out of compliance with the [ACA's] market reforms" for the 2014 plan year.  Transitional Policy Letter at 1–2.  This change was significant because consumers with non-compliant healthcare plans now were not required to purchase insurance on the Exchanges from insurers like Molina.   These consumers tended to be healthier, so excluding them from the exchanges left a less healthy (and therefore, potentially more expensive) group of potential insurance buyers.[6]   HHS acknowledged the transitional policy's impact on insurers in its announcement, stating, "Though this transitional policy was not anticipated by health insurance issuers when setting rates for 2014, the risk corridor program should help ameliorate unanticipated changes in premium revenue.   We intend to explore ways to modify the risk corridor program final rules to provide additional assistance."  Id. at 3.   HHS has renewed the transitional policy twice, and it will now extend through October 1, 2017.[7]

Although HHS cited the risk corridor program as an ameliorating force in the Transitional Policy Letter, it noted, for the first time, in further rulemaking on March 11, 2014 - two months after Molina began offering QHPA - that it "intend[ed] to implement

---

[5]  See Ltr. From Gary Cohen, Dr., Ctr. For Consumer Info. and Ins. Oversight ("CCIIO"), to State Ins. Comm'rs (Nov. 14, 2013), https://www.cms.gov/cciio/resources/letters/downloads/commissioner-letter-11-14-2013.pdf ("Transitional Policy Letter").

[6]  See, e.g., HHS 2015 Health Policy Standards Fact Sheet (Mar. 5, 2014) ("Because issuers' premium estimates did not take the transitional policy into account, the transitional policy could potentially lead to unanticipated higher average claims costs for issuers of plans that comply with the 2014 market rules."), https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2014-Fact-sheets-items/2014-03-05-2.html.

[7]  See Gary Cohen, Dir., CCIIO, Insurance Standards Bulletin Series – Extension of Transitional Policy through October 1, 2016, CMS (Mar. 5, 2014), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/transition-to-compliant-policies-03-06-2015.pdf;  Kevin Counihan, Dir., CCIIO, Insurance Standards Bulletin Series – INFORMATION – Extension of Transitional Policy through Calendar Year 2017, CMS (Feb. 29, 2016), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/final-transition-bulletin-2-29-16.pdf

this program in a budget neutral manner."  HHS Notice of Benefit and Payment Parameters for 2015, 79 Fed. Reg. 13,744, 13,787 (Mar. 11, 2014).  It elaborated:

> Our initial modeling suggests that th[e] adjustment for the transitional policy could increase the total risk corridor payment amount made by the Federal government and decrease risk corridor receipts, resulting in an increase in payments.  However, we estimate that even with this change, the risk corridor program is likely to be budget neutral or, will result in net revenue to the Federal government.

Id. at 13,829.

     In adopting budget neutrality as a goal for the risk corridor program, HHS reversed the statement it had made exactly one year earlier.  Compare 79 Fed. Reg. at 13,787 with 78 Fed. Reg. at 15,473.  Furthermore, the CBO apparently disagreed with HHS's budget neutral interpretation.  In February 2014—just before HHS's first statement on budget neutrality—the CBO released a report that addressed the ACA's effects on the federal budget.[8]  Addressing the risk corridor program, the CBO noted:

> By law, risk adjustment payments and reinsurance payments will be offset by collections from health insurance plans of equal magnitudes; those collections will be recorded as revenues.  As a result, those payments and collections can have no net effect on the budget deficit.  In contrast, risk corridor collections (which will be recorded as revenues) will not necessarily equal risk corridor payments, *so that program can have net effects on the budget deficit*.  CBO projects that the government's risk corridor payments will be $8 billion over three years and that its collections will be $16 billion over that same period . . . .

> If insurers' costs exceed [HHS's] expectations, on average, the risk corridor program *will impose costs on the federal budget*; if, however, insurers' costs fall below [HHS's] expectations, on average, the risk corridor program will generate savings for the federal budget.

---

[8]   See The Budget and Economic Outlook: 2014 to 2024 (Feb. 2014), https://www.cbo.gov/sites /default/files/113th-congress-2013-2014/reports/45010-outlook2014feb0.pdf. ("CBO Report").

CBO Report at 59, 110 (emphasis added).  Thus, while the CBO believed the risk corridor program would result in a net gain of $8 billion for the Government, it specifically noted that the program—unlike the risk adjustment and reinsurance programs—was not budget neutral.

       D.   <u>HHS Grapples with Budget Neutrality.</u>

HHS, like CBO, expected that "payments in" to the risk corridor program would equal or exceed "payments out" of the program.  Still, HHS realized that implementing the program in a budget neutral manner, at least hypothetically, might result in a shortfall in risk corridor payments to insurers.  On April 11, 2014, HHS released a two-page memorandum to address such a situation in the form of questions and answers.[9]  HHS stated, in pertinent part:

Q1:    In [prior rulemaking], HHS indicated that it intends to implement the risk corridor program in a budget neutral manner.  What risk corridor payments will HHS make if risk corridor collections for a year are insufficient to fund risk corridor payments for the year, as calculated under the risk corridor formula?

A1:    We anticipate that risk corridor collections will be sufficient to pay for all risk corridor payments.  However, if risk corridor collections are insufficient to make risk corridor payments for a year, all risk corridor payments for that year will be reduced pro rata to the extent of any shortfall.  Risk corridor collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and will then be used to fund current year payments.  If, after obligations for the previous year have been met, the total amount of collections available in the current year is insufficient to make payments in that year, the current year payments will be reduced pro rata to the extent of any shortfall.  If any risk corridor funds remain after prior and current year payment obligations have been met,

---

[9]   <u>See</u> HHS, Risk Corridor and Budget Neutrality (Apr. 11, 2014), <u>https://www.cms.gov/CCIIO</u> /Resources/Fact-Sheets-and-FAQs/Downloads/faq-risk-corridor-04-11-2014.pdf ("Risk Corridor Mem.").

they will be held to offset potential insufficiencies in risk corridor collections in the next year.

*        *        *

Q2:     What happens if risk corridor collections do not match risk corridor payments in the final year of risk corridor?

A2:     We anticipate that risk corridor collections will be sufficient to pay for all risk corridor payments over the life of the three-year program.  However, we will establish in future guidance or rulemaking how we will calculate risk corridor payments if risk corridor collections (plus any excess collections held over from previous years) do not match risk corridor payments as calculated under the risk corridor formula for the final year of the program.

*        *        *

Q4:     In the 2015 Payment Notice, HHS stated that it might adjust risk corridor parameters up or down in order to ensure budget neutrality.  Will there be further adjustments to risk corridor in addition to those indicated in this FAQ?

A4:     HHS believes that the approach outlined in this FAQ is the most equitable and efficient approach to implement risk corridor in a budget neutral manner.  However, we may also make adjustments to the program for benefit year 2016 as appropriate.

Risk Corridor Mem. at 1–2.  Therefore, HHS acknowledged that it would make annual "payments out" to unprofitable QHP issuers, but it would reduce these payments pro rata if "payments in" did not equal HHS's liability for "payments out."

HHS elaborated on its two-page memorandum in further notice and comment rulemaking on May 27, 2014.  It acknowledged that it "intend[ed] to administer risk corridor in a budget neutral way over the three-year life of the program, rather than annually," despite several commenters' concerns that such an approach would violate the intent and language of Section 1342.  Exchange and Insurance Market Standards for 2015 and Beyond, 79 Fed. Reg. 30,240, 30,260 (May 27, 2014).  In light of this concern, HHS recognized its obligation under the ACA to make full risk corridor payments:

12

> [W]e anticipate that risk corridor collections will be sufficient
> to pay for all risk corridor payments.  That said, we appreciate
> that some commenters believe that there are uncertainties
> associated with rate setting, given their concerns that risk
> corridor collections may not be sufficient to fully fund risk
> corridor payments.  In the unlikely event of a shortfall for the
> 2015 program year, *HHS recognizes that the Affordable Care
> Act requires the Secretary to make full payments to issuers*.  In
> that event, HHS will use other sources of funding for the risk
> corridor payments, subject to the availability of appropriations.

Id. (emphasis added).

In sum, HHS decided in 2014 that it would administer the risk corridor program in a budget neutral manner over the three-year life of the program.  It considered a shortfall in "payments in" unlikely, and believed that "payments in" would balance "payments out" of the program.  Importantly, HHS recognized that a shortfall in "payments in" would not vitiate its statutory duty to make full "payments out."

After HHS recognized its obligation to make full "payments out", Molina executed 2015 QHP Agreements in July 2014, October 2014, and May 2015, and submitted 2015 Attestations between May and July 2014.  See Compl., Exs. 15-23, 44-53.  In July 2015, September 2015, and April 2016, Molina executed 2016 QHP Agreements and submitted 2016 Attestations between April and July 2015.  Id., Exs. 24-32, 54-63.

E.   Congress Restricts Appropriations to the Risk Corridor Program.

1.   The GAO Opines on Risk Corridor Funding.

On September 30, 2014, the Government Accountability Office ("GAO") responded to a request from Senator Jeff Sessions and Representative Fred Upton.  See Comp. Gen. B-325630 (Sept. 20, 2014).  These two Congressmen had asked the GAO for an "opinion regarding the availability of appropriations" for risk corridor payments.  Id. The GAO found that the CMS Program Management appropriation for fiscal year 2014 "would have been available" for risk corridor payments.  Id. at 7.  It further found that the "payments in" from profitable insurers under Section 1342(b)(2) of the ACA were available for risk corridor payments because they were "properly characterized as user fees."  Id. at 6.  In other words, profitable QHP issuers who paid into the program were "paying for the certainty that any potential losses related to [their] participation in the Exchanges [were] limited to a certain amount."  Id.  The GAO also noted that HHS itself had not identified the CMS Program Management appropriation as available for risk corridor payments, but that it had identified the "user fees" paid under Section 1342(b)(2).

13

Id.  The GAO concluded that HHS could continue to access user fees from "payments in" in future plan years.  Id.  In contrast, it stated that Congress would need to include similar appropriations language in future CMS Program Management appropriations to allow HHS to continue to access the CMS Program Management account for risk corridor payments. Id. at 7.

> 2.  Congress Restricts Appropriations for Risk Corridor Payments in 2015 and 2016.

In fiscal years 2015 and 2016, Congress made the CMS Program Management account unavailable for risk corridor payments.  On December 16, 2014, Congress enacted the Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130, for the 2015 fiscal year.  In the HHS appropriation, the Act states:

> None of the funds made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services-Program Management" account, may be used for payments under section 1342(b)(1) of [the ACA] (relating to risk corridor).

Id. at div. G, tit. II, § 227, 128 Stat. at 2491.  The Chairman of the House Committee of Appropriations explained this provision as follows:

> In 2014, HHS issued a regulation stating that the risk corridor program will be budget neutral, meaning that the federal government *will never* pay out more than it collects from issuers over the three year period risk corridors are in effect. The agreement includes new bill language to prevent the CMS Program Management appropriation account from being used to support risk corridor payments.

160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014) (emphasis added).

Congress included the same funding restriction in the Consolidated Appropriations Act, 2016, Pub. L. No. 114-113 at div. H, tit. II, § 225, 129 Stat. 2242, 2624.  The 2016 Act also included a further funding provision related to risk corridor:

> In addition to the amounts otherwise available for "Centers for Medicare and Medicaid Services, Program Management", the Secretary of Health and Human Services may transfer up to

14

> $305,000,000 to such account from the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust Fund to support program management activity related to the Medicare program: *Provided*, That except for the foregoing purpose, such funds may not be used to support any provision of [the ACA] or Public Law 111-152 (or any amendment made by either such Public Law) or to supplant any other amounts within such account.

Id. at div. H, tit. II, § 226, 129 Stat. at 2625.  To explain this language, the Senate Committee on Appropriations noted in a June 25, 2015 report that "[t]he Committee continues bill language requiring the administration to operate the Risk Corridor program in a budget neutral manner by prohibiting any funds from the Labor-HHS-Education appropriations bill to be used as payments for the Risk Corridor program."  S. Rep. No. 114-74, at 12.

     F.   HHS Pays Insurers a Small Fraction of Their Risk Corridor Payments Due.

On October 1, 2015, HHS announced that it owed insurers $2.87 billion in risk corridor payments for the 2014 plan year.[10]  Insurers' "payments in" under Section 1342(b)(2), however, were only $362 million.  2014 Proration Notice at 1.  HHS therefore adopted the pro rata payment methodology it had announced in April 2014, which meant that it would only pay insurers 12.6 percent of the amounts they were owed.  Id.  On November 19, 2015, HHS, through CMS, issued a public bulletin reaffirming that the ACA "requires the Secretary to make full payments to issuers, and HHS is recording those amounts that remain unpaid following our 12.6% payment . . . for which full payment is required."  CMS, "Risk Corridor Payments for Benefit Year 2014" (Nov. 19, 2015).  HHS admitted that it owed Molina Healthcare of Florida risk corridor payments of $39,035.74 for 2014 but only paid 12.6 percent of that debt totaling $4,925.48.  Compl., Ex. 100; Pls.' Mot., Decl. ¶¶ 6, 17.  All other Molina Plaintiffs made gains for 2014 and paid the Government $4,848,276.62 in "payments in" under the risk corridor program.  Pls.' Mot., Decl. ¶ 8.

On September 9, 2016, HHS announced that it would not make any payments toward its 2015 risk corridor obligations, and would instead use all money it received from profitable plans in 2015 to offset its obligations for 2014.  CMS, "Risk Corridor Payments for 2015" (Sept. 9, 2016); Compl., Ex. 86.  HHS further stated that all collections from the

---

[10] See CMS, Risk Corridor Payment Proration Rate for 2014 (Oct. 1, 2015), https://www.cms.gov/CCIIO /Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RiskCorridorPaymentProration Ratefor2014.pdf ("2014 Proration Notice").

2016 benefit year would be used first to pay remaining 2014 risk corridor payments, then for 2015 risk corridor payments, before any 2016 collections would be used to pay 2016 risk corridor obligations. Id. In this same bulletin, HHS once again recognized that "the [ACA] requires the Secretary to make full payments to issuers . . . ." Id. The Molina Plaintiffs operating in California, Florida, Utah, Washington, and Wisconsin suffered losses in 2015 entitling them to a total of $52,339,075.46 in total risk corridor payments for that year. Id. To date, Molina has not received any 2015 risk corridor payments. Pls.' Mot., Decl. ¶¶ 14, 18. The Molina Plaintiffs operating in Michigan, New Mexico, Ohio and Texas made gains in 2015 and timely paid to HHS all risk corridor charges of $1,527,274.12 on November 21, 2016. Id., Decl. ¶ 15.

In total, Molina is entitled to $52,378,111.20 in risk corridor payments for the 2014 and 2015 benefit years, but has only received $5,913.45, leaving $52,372,197.75 unpaid. Additionally, Molina estimates that HHS will owe it an additional $138 million in risk corridor payments for 2016. Oral Arg. Tr. 10:8 (July 12, 2017). The exact amount owed will be confirmed after Molina submits its 2016 risk corridor data to CMS by July 31, 2017 in accordance with 45 C.F.R. § 153.530(d).

G. Procedural History

Molina filed its complaint on January 23, 2017, seeking $52,378,111.20 in unpaid risk corridor payments. Compl. at 81-82. Molina alleges it is entitled to these damages on the basis of several legal theories including violation of federal law (Count I), breach of express contract (Count II), breach of implied-in-fact contract (Count III), breach of an implied covenant of good faith and fair dealing (Count IV), and a taking without just compensation in violation of the Fifth Amendment (Count V). Compl. at 65-79.

On February 9, 2017, this Court issued its decision in Moda Health Plan holding that another insurer participating in the risk corridor program, Moda, was entitled to its unpaid risk corridor payments on the grounds that the Government violated a statutory duty to make full annual risk corridor payments or, in the alternative, breached an implied-in-fact contract created by the ACA risk corridor program. Moda Health Plan, 130 Fed. Cl at 466. On March 14, 2017, in response to Moda Health Plan and sixteen days before the Government's answer was due in this case, Molina filed a motion for partial summary judgment as to Counts I and III of its complaint. Dkt. No. 14. On April 28, 2017, the Government filed its cross-motion to dismiss on Rule 12(b)(1) and 12(b)(6) grounds. Dkt. No. 13. The cross-motions were fully briefed on June 16, 2017 and the Court held oral argument on July 12, 2017.

16

History of Risk Corridor Cases before this Court

The U.S. Court of Federal Claims is currently adjudicating 26 claims for payment under the risk corridor program.[11]   Thus far, the Government's defense strategy has been to file motions to dismiss on either Rule 12(b)(1) or 12(b)(6) grounds.   The Government argues that this Court does not have jurisdiction over insurers' claims.   It agrees that Section 1342 is money-mandating, but contends that insurers' claims are not ripe because Section 1342 does not require annual payments.   Alternatively, the Government seeks dismissal on the grounds that insurers fail to state a claim upon which relief can be granted because there is no statutory obligation to pay insurers amounts beyond "payments in" under Section 1342.   See e.g., Gov's Mot. at 14, 18.   Of the risk corridor cases before this Court, five judges have issued opinions on the Government's motion to dismiss.   Blue Cross & Blue Shield of N.C. v. United States, 131 Fed. Cl. 457, appeal docketed, No. 17-2154 (Fed. Cir. June 14, 2017) (Griggsby, J.) ("BCBS"); Maine Community Health Options v. United States, -- Fed. Cl. --, 2017 WL 1021837 (March 9, 2017) (Bruggink, J.) ("Maine Community I"); Moda Health Plan, 130 Fed. Cl. 436, appeal docketed, No. 17-1994 (Fed. Cir. May 9, 2017) (Wheeler, J.); Health Republic Insurance Co. v. United States, 129 Fed. Cl. 757 (2017) (Sweeney, J.); Land of Lincoln Mutual Health Insurance Co. v. United States, 129 Fed. Cl. 81, appeal docketed, No. 17-1224 (Fed. Cir. Nov. 16, 2016) (Lettow, J.).

In all of these cases, the Court denied the Government's Rule 12(b)(1) motion to dismiss.   First, the plain language of Section 1342 stating that "HHS will pay" qualified insurers is clearly money-mandating.   Land of Lincoln, 129 Fed. Cl. at 97; Health Republic, 129 Fed. Cl. at 770; Moda Health Plan, 130 Fed. Cl. at 450; Maine Community I, 2017 WL 1021837 at * 2; BCBS, 131 Fed. Cl. at 472.   Further, the Court has uniformly rejected the Government's argument that the insurers' claims were not ripe.     Three judges held that the risk corridor program mandates annual payments because the statute requires HHS to calculate "payments in" and "payments out" for "any plan year" separately.   Maine Community I, 2017 WL 1021837 at *2 ("There is no indication that the statute means anything other than what it says, namely, that payment will be made on a yearly basis."); Moda Health Plan, 130 Fed. Cl at 454 ("Both Section 1342 and HHS's interpretation of Section 1342 require annual payments to insurers."); Health Republic, 129 Fed. Cl. at 775. Two judges held that since HHS's calculations are done on a year-to-year basis, insurers' claims are ripe as to any year for which HHS has completed those calculations, but did not hold that Section 1342 mandated annual payments.   Since HHS's calculations for 2014 and 2015 are complete, insurers' claims for those years are "neither hypothetical nor in need of further factual development."   BCBS, 131 Fed. Cl. at 474; see also Land of Lincoln, 129 Fed. Cl. at 101 ("[T]he facts underlying Lincoln's claim are fixed . . . .").   In Health

---

[11] This data was provided by the U.S. Court of Federal Claims internal staff and is accurate as of the date of this opinion.

Republic, the Government only sought dismissal on Rule 12(b)(1) grounds. <u>Health Republic</u> is currently stayed while the Federal Circuit considers the appeals in <u>Land of Lincoln</u> and <u>Moda Health Plan</u>. <u>See</u> <u>Health Republic</u>, No. 16-259C, Dkt. No. 62.

Three judges of this Court have granted the Government's Rule 12(b)(6) motion to dismiss. In <u>Land of Lincoln</u>, Judge Lettow issued the first decision in a risk corridor case before this Court and held that HHS reasonably implemented the risk corridor program as budget neutral. <u>Land of Lincoln</u>, 129 Fed. Cl. at 108. Applying <u>Chevron</u> deference, the Court first held that Section 1342 was ambiguous as to Congress's intent to create a budget neutral program because "the 'payments in' and 'payments out' arrangement for risk corridor payments [] does not contain an express authorization for appropriations to make up any shortfall in the 'payments in' to cover all of the 'payments out' that may be due." <u>Id.</u> at 106. Next, the Court held that HHS's May 27, 2014 budget neutral interpretation of the risk corridor program was reasonable because Section 1342 "omits any reference to when payment from HHS is due or how HHS is to fund the program." <u>Id.</u> at 108. Judge Griggsby granted the Government's Rule 12(b)(6) motion to dismiss on similar grounds. <u>BCBS</u>, 131 Fed. Cl. at 475-77.[12] Judge Bruggink granted the Government's Rule 12(b)(6) motion finding that Congress had "expressly limit[ed] payments to [payments in under Section 1342]. Once those funds were exhausted, the government's liability was capped." <u>Maine Community II</u>, 2017 WL 3225050 at *12. Unlike Judges Lettow and Griggsby, Judge Bruggink based his decision solely on the effect of the 2015 and 2016 appropriation riders.

Thus, only <u>Moda Health Plan</u> has denied the Government's motion to dismiss on both Rule 12(b)(1) and 12(b)(6) grounds. <u>Moda Health Plan</u>, 130 Fed. Cl. at 466. In contrast to <u>BCBS</u> and <u>Land of Lincoln</u>, the undersigned found that Section 1342 is not budget neutral on its face because it mandates that HHS pay specific amounts of money and there is no language limiting those payments to "payments in". <u>Id.</u> at 455 (citing 42 U.S.C. § 18062(b), (c)). Further, the Court disagreed with <u>Land of Lincoln</u>'s application of <u>Chevron</u> deference to HHS's May 27, 2014 budget neutral interpretation of the risk corridor program because the bulk of HHS's statements recognize that insurers are owed full payments without limitation. <u>Id.</u> at 457. Moda filed a cross-motion for partial summary judgment in response to the Government's motion to dismiss, which the Court granted. <u>Id.</u> at 466.

---

[12] The plaintiffs in <u>BCBS</u> and <u>Land of Lincoln</u> also brought claims based upon breach of implied-in-fact contract which were dismissed under the 12(b)(6) standard. Under the reasoning in these opinions, since Section 1342 did not commit HHS to making full annual payments by its language, the plaintiffs could not show a congressional intent to contract. <u>BCBS</u>, 131 Fed. Cl. at 479; <u>Land of Lincoln</u>, 129 Fed. Cl. at 112-13.

<u>Discussion</u>

Since the legal arguments, and many of the material facts, in Molina's case are identical to those in <u>Moda Health Plan</u>, it should come as no surprise that the Court will resolve Molina and Moda's claims in the same manner.  <u>Moda Health Plan</u> adequately addressed the issues in this case, and the Court incorporates the substance of those arguments here even if not explicitly discussed.  However, with the benefit of <u>Moda Health Plan</u> and other decisions before them, the parties have introduced new cases and more finely-tuned arguments to support their respective positions.  Thus, while much of this opinion summarizes the holdings of <u>Moda Health Plan</u>, the Court will focus most of its attention on the parties' new arguments and case law.

The Government has moved to dismiss all of Molina's claims on either Rule 12(b)(1) or 12(b)(6) grounds.  The Government does not challenge that Section 1342 is money-mandating or question the Court's subject matter jurisdiction over contract and takings claims against the Government.  Gov.'s Mot. at 14-15.  The heart of the Government's 12(b)(1) motion is that any damages stemming from a violation of statute or a breach of contract are not presently due, and therefore not ripe.  <u>Id.</u> at 15.  Further, the Government challenges this Court's jurisdiction to grant the declaratory relief Molina requests.  <u>Id.</u> at 17.  The remainder of the Government's arguments challenge the sufficiency of Molina's complaint on Rule 12(b)(6) standards.  As this Court did in <u>Moda Health Plan</u>, it will first address the Government's challenges to the Court's jurisdiction and then address the Government's Rule 12(b)(6) arguments together with Molina's motion for partial summary judgment.  130 Fed. Cl. at 449, 454.

A.  <u>The Government's Rule 12(b)(1) Motion to Dismiss</u>

When a defendant moves to dismiss a complaint under Rule 12(b)(1), the Court must "assume all factual allegations to be true and . . . draw all reasonable inferences in plaintiff's favor."  <u>Wurst v. United States</u>, 111 Fed. Cl. 683, 685 (2013) (quoting <u>Henke v. United States</u>, 60 F.3d 795, 797 (Fed. Cir. 1995)).  Still, the plaintiff must support its jurisdictional allegations with "competent proof."  <u>McNutt v. Gen. Motors Acceptance Corp. of Indiana</u>, 298 U.S. 178, 189 (1936).  Accordingly, a plaintiff must establish that jurisdiction exists "by a preponderance of the evidence."  <u>Wurst</u>, 111 Fed. Cl. at 685 (citing <u>Reynolds v. Army & Air Force Exch. Serv.</u>, 846 F.2d 746, 748 (Fed. Cir. 1988)).

Although the Court's jurisdiction over Molina's claims is not in question, it cannot adjudicate those claims if they are not yet ripe for judicial review.  Though Article III courts developed the ripeness doctrine, its principles are equally applicable in this Article I Court.  <u>See</u> <u>CW Gov't Travel, Inc. v. United States</u>, 46 Fed. Cl. 554, 557–58 (2000).  "Ripeness is a justiciability doctrine that prevents the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  <u>Shinnecock Indian</u>

Nation v. United States, 782 F.3d 1345, 1348 (Fed. Cir. 2015) (citations and internal punctuation omitted).  Therefore, "[a] court should dismiss a case for lack of ripeness when the case is abstract or hypothetical . . . .  A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required."  Rothe Dev. Corp. v. Dep't of Def., 413 F.3d 1327, 1335 (Fed. Cir. 2005).

>    1.   As Held in Land of Lincoln, Moda Health Plan, Health Republic, Maine Community I, and BCBS, Count I is Ripe as to 2014 and 2015 Risk Corridor Payments.

The Government's ripeness challenge has been consistent across the risk corridor cases before this Court, as it is here.  According to the Government, Section 1342 merely requires HHS to calculate risk corridor payments on an annual basis, but not to actually make the risk corridor payments on an annual basis.  Section 1342 empowered HHS to administer the risk corridor program, and HHS determined that final risk corridor payments were not due until the end of the program.  Gov.'s Mot. at 15-16.  "Under that framework, additional payments are not presently due, and the Court lacks jurisdiction to consider Molina's claims."  Id. at 17.  Five judges of this Court have already rejected this argument either because payment need not be presently due for a claim to be ripe, BCBS, 131 Fed. Cl. at 474; Land of Lincoln, 129 Fed. Cl. at 10, or because annual payments are due under the plain language of Section 1342, Maine Community I, 2017 WL 1021837 at *2; Moda Health Plan, 130 Fed. Cl at 454; Health Republic, 129 Fed. Cl. at 775.

As a preliminary matter, the Government incorrectly conflates the ripeness requirement with a requirement that all damages be "presently due."  Gov.'s Mot. at 15-16 (citing Todd v. United States, 386 F.3d 1091, 1093-94 (Fed. Cir. 2004)).  In Todd, the matter at issue was not ripe for adjudication because the Court's ability to award monetary relief depended on yet unreceived equitable relief.  Id.  Thus, the fact that money damages were not "presently due" made judicial action untimely.  However, the facts of this case are much different.  Moda Health Plan, 130 Fed. Cl. at 451; Health Republic, 129 Fed. Cl. at 771.  Here, as in all risk corridor cases, any payments that Molina is entitled to are not contingent on equitable relief.  Resolving Molina's statutory and contractual claims is a matter of statutory and contractual interpretation alone – something quite apt for adjudication.

This point has caused some confusion.  "There are two similar but conceptually distinct questions in this case: (1) whether *annual* payments are required, and (2) whether *full* annual payments are required.  The former is a ripeness question, and the latter goes to the merits of this case."  Moda Health Plan, 130 Fed. Cl. at 453.  In Land of Lincoln and BCBS, these two distinct questions were muddied together.  For example, Land of Lincoln evaluated "the merits of whether and when [Plaintiff] is entitled to recover money under

the statute" together.  129 Fed. Cl. at 98.  Similarly, <u>BCBS</u> held that "[P]laintiff's claims seeking to recover the *full* amount of the 2014 Risk Corridor Program Payments are neither hypothetical nor in need of further factual development."  131 Fed. Cl. at 474 (emphasis added).  Distinguishing between these questions is important because even if a Court grants <u>Chevron</u> deference to HHS's interpretation of *when* payments are due, the question of *what* payment is due may warrant a different analysis.  Section 1342 may be ambiguous as to the timing of payments while being clear as to the amount of payments.  In <u>Land of Lincoln</u> and <u>BCBS</u>, the Courts' entanglement of these issues may have resulted in incorrectly applying <u>Chevron</u> deference to both matters.

<u>Health Republic</u> remains the most thorough and instructive discussion of the Government's ripeness arguments.  129 Fed. Cl. at 772-78.  This Court summarized those arguments in <u>Moda Health Plan</u>.  130 Fed. Cl. at 450-454.  The analysis in <u>Health Republic</u> and <u>Moda Health Plan</u> follows three steps.

First, the Court found that the plain language of Section 1342 suggests payments are to be made on an annual basis.  <u>Moda Health Plan</u>, 130 Fed. Cl. at 452; <u>Health Republic</u>, 129 Fed. Cl. at 774.  Congress instructed HHS to calculate "payments in" and "payments out" of the program on the basis of insurers' costs in "any plan year."  18 USC § 18062(b)(1), (b)(2), (c)(1), (c)(2).  Moreover, Section 1342 directs HHS to administer the risk corridor program "for calendar years 2014, 2015, and 2016."  18 U.S.C. § 18062(a).  In both of these statutory references, Congress chose to refer to the individual plan years and not the span of the program.[13]  This statutory language suggests that Congress intended insurers to receive payments annually.

Second, the function of the risk corridor program requires that risk corridor payments be made on an annual basis.  <u>Moda Health Plan</u>, 130 Fed. Cl. at 452; <u>Health Republic</u>, 129 Fed. Cl. at 775-76.  The risk corridor program is one part of the 3Rs trifecta: reinsurance, risk adjustment, and risk corridor.  The trifecta reflected "a concern that insurers' costs would detrimentally exceed premiums collected." <u>Health Republic</u> at 775.  The risk corridor program was specifically designed to act as a safety net for insurers who "underestimated their allowable costs and accordingly set premiums too low."  <u>Id.</u> at 776.  The risk corridor program, therefore, was designed to protect participating insurers from financial harm and also guarantee that enough insurers participated in the Exchanges to make the ACA viable.  <u>Id.</u> (citing 42 U.S.C. § 18091(2)(I)-(J); <u>King v. Burwell</u>, 135 S.Ct. 2480, 2496 (2015)).  If HHS were allowed to delay payments until the end of the program, the purpose of protecting financial loss annually would be thwarted.  In fact, some insurers

---

[13] Section 1342 was also explicitly based on the Medicare Part D program which established a risk corridor payment program based on plan year.  <u>See</u> 18 U.S.C. 18062(a).  The regulations implementing the Medicare Part D Program were issued in 2005 and set out an annual payment schedule on the basis of the statutory language.  42 C.F.R. § 423.336(c) (2009).

have gone bankrupt waiting to receive their risk corridor payments.  See e.g., Land of Lincoln, Case No. 16-744C, Dkt. No. 10, Ex. A. (July 29, 2016).

Finally, even if Section 1342 were ambiguous, HHS interpreted it to require annual risk corridor payments.  Moda Health Plan, 130 Fed. Cl. at 453-54; Health Republic, 129 Fed. Cl. at 776-78.  Applying Chevron deference, the Court should defer to an agency's reasonable interpretation of an ambiguous statute.  Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).  HHS, through its delegation to CMS, indicated repeatedly that it would make annual payments to insurers.  See 77 Fed. Reg. at 17,237 (Mar. 23, 2012) ("QHP issuers who are owed these amounts will want prompt payment, and payment deadlines should be the same for HHS and QHP issuers."); 77 Fed. Reg. 73,121 (Dec. 7, 2012) ("[W]e propose . . . an annual schedule for the program and standards for data submissions."); Risk Corridor Mem. at 1 ("[I]f risk corridor collections are insufficient to make risk corridor payments for a year, all risk corridor payments for that year will be reduced pro rata to the extent of any shortfall.").  None of HHS's pronouncements indicated that it believed it could "choose not to make annual risk corridor payments to insurers."  Health Republic, 129 Fed. Cl. at 778; see also Moda Health Plan, 130 Fed. Cl. at 454.

All of these considerations – the plain language of Section 1342, the function of the risk corridor program, and HHS's interpretation of the program – show that Section 1342 mandates annual payments to insurers.  Therefore, Molina's claims for 2014 and 2015 risk corridor payments are ripe for adjudication.

## 2.  The Court does not have Subject Matter Jurisdiction over Molina's Request for Declaratory Relief.

Molina requests the Court to declare, as incidental to an award of 2014 and 2015 risk corridor payments, that the Government is obligated to pay full annual risk corridor payments to Molina for 2016.  Pls.' Mot. at 50.  Molina must submit its 2016 risk corridor data to the Government by July 31, 2017.  Molina anticipates that the Government will owe it approximately $138 million.  Oral Arg. Tr. 10:8.  The Government argues that the Court lacks jurisdiction to award declaratory relief in this case.  Gov.'s Mot. at 17.

The Tucker Act affords this Court jurisdiction to grant declaratory relief in three circumstances, none of which apply here.  28 U.S.C. § 1491(a)(2) (concerning the restoration of office or position, and the correction of applicable records); §1491(a)(1) (concerning claims that arise under the Contracts Dispute Act); § 1491(b)(2) (concerning equitable relief in bid protests); see also Annuity Transfer, Ltd. v. United States, 86 Fed. Cl. 173, 181 (2009).  For this reason, Land of Lincoln, Health Republic, and BCBS have granted the Government's motion to dismiss requests for declaratory relief.  Land of Lincoln, 129 Fed. Cl. at 99; Health Republic, 129 Fed. Cl at 778-79; BCBS, 131 Fed. Cl at

480-481. This Court agrees with <u>Land of Lincoln</u>, <u>Health Republic</u> and <u>BCBS</u> on the issue of declaratory relief.

It is very likely that the Government will fail to make full and timely 2016 risk corridor payments to Molina. As this Court has noted before, absent appropriations or a "miracle", participating insurers should not expect to receive payments for the 2016 plan year. <u>Moda Health Plan</u>, 130 Fed. Cl. at 457. However, the Court cannot in the same breath find the risk corridor program to be based on three separate annual calculations and annual payments while also declaring that the Government has failed to meet an obligation that has not yet come due. To do so would be premature and inconsistent with the underlying reasons why Molina's claims are ripe as to 2014 and 2015 risk corridor payments. Thus, the Government's motion to dismiss Molina's request for declaratory relief is GRANTED and Molina's motion for partial summary judgment is DENIED as to its request for declaratory relief.

### B. The Government's Rule 12(b)(6) Motion to Dismiss and Molina's Motion for Partial Summary Judgment

Molina has moved for partial summary judgment on its statutory and implied-in-fact contract claims (Counts I and III). A party is entitled to summary judgment under Rule 56(a) if it can show "that there is no genuine dispute as to any material fact and the [party] is entitled to judgment as a matter of law." A court may dispose of statutory interpretation issues and "other matters of law" on a motion for partial summary judgment. <u>Santa Fe Pac. R.R. Co. v. United States</u>, 294 F.3d 1336, 1340 (Fed. Cir. 2002).

The Government has cross-moved to dismiss all of Molina's claims under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Under that rule, a court should dismiss a plaintiff's claims "when the facts asserted by the [plaintiff] do not entitle [it] to a legal remedy." <u>Lindsay v. United States</u>, 295 F.3d 1252, 1257 (Fed. Cir. 2002). The Court also must construe allegations in the complaint favorably to the plaintiff. <u>See</u> <u>Extreme Coatings, Inc. v. United States</u>, 109 Fed. Cl. 450, 453 (2013). Still, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Id.</u> (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citation omitted)).

The Court will first consider the statutory and implied-in-fact contract claims which are the subject of both Molina's motion for partial summary judgment and the Government's motion to dismiss. Since the issues are identical to those in <u>Moda Health Plan</u>, the Court will first provide a summary of the reasoning in <u>Moda Health Plan</u> for each claim and then proceed to address the new case law and arguments raised by the parties.

1.   <u>Section 1342 Requires Full Annual Payments to Insurers.</u>

The Court already has found that HHS is required to make annual risk corridor payments to Molina, but the remaining issue is whether HHS had the discretion to make less than full annual payments.  Molina argues that HHS has no such discretion because Section 1342 mandates full annual payments.  Pls.' Mot. at 28.  The Government argues that Congress designed the risk corridor program to be budget neutral, and thus HHS was only required to make "payments out" as allowed by "payments in."  Gov.'s Mot. at 18-19.

The success of Molina's statutory claim hinges upon appropriations law.  As risk corridor cases have progressed in this Court, the heart of the dispute boils down to two questions: First, does the Government have a statutory duty to make full annual risk corridor payments despite the lack of a specific appropriation in Section 1342?  The Government answers negatively, while Molina answers affirmatively.  Second, if the Government had a duty to pay, did the Congressional 2015 and 2016 appropriations riders vitiate that statutory duty?  The Government answers affirmatively, while Molina answers negatively.  The Court agrees with Molina in both instances.  After first summarizing the <u>Moda Health Plan</u> ruling, the Court will dive deeper into these two questions.  The Court concludes that Section 1342 unequivocally mandated full annual payments to insurers when it was enacted and throughout the life of the program.

a.   <u>Summary of *Moda Health Plan*</u>

i.   <u>Section 1342 is not Budget Neutral.</u>

In <u>Moda Health Plan</u>, the Court held that Section 1342 clearly was not budget neutral on its face:

> The Section states that the Secretary of HHS "shall pay" specific amounts of money to insurance plans.  <u>See</u> 42 U.S.C. § 18062(b)(1).  The amount of money the Secretary must pay is tied to each respective plan's ratio of costs to premiums collected, and the Section gives the Secretary no discretion to increase or reduce this amount.  <u>Id.</u>; § 18062(c).  It is true that Section 1342(a) gives the Secretary the authority to "establish and administer" the risk corridor program, but the later directive that the Secretary "shall pay" unprofitable plans these specific amounts of money is unambiguous and overrides any discretion the Secretary otherwise could have in making "payments out" under the program.  Finally, there is no language of any kind in Section 1342 that makes "payments

out" of the risk corridor program contingent on "payments in" to the program. Instead, Section 1342 simply directs the Secretary of HHS to make full "payments out." Therefore, full payments out he must make.

130 Fed. Cl. at 455. In Moda Health Plan, the Government presented three arguments to overcome the statute's clear mandate that the Secretary of HHS make full payments to qualified insurers.

First, the Government argued that the Medicare Part D program, upon which Section 1342 is based, included the following provision: "This section constitutes budget authority in advance of appropriations Acts and represents the obligation of the Secretary to provide for the payment of amounts provided under this section." Id. (citing 42 U.S.C § 1395(w)-115(a)). According to the Government, the absence of this language in Section 1342 is evidence that Congress intended the risk corridor program to be budget neutral. However, as the common adage goes, absence of evidence is not evidence of absence. While the inclusion of language similar to that in Medicare Part D would be evidence of Congress's intent to impact the national budget, the lack of language specifying that Section 1342 could impact the national budget is not evidence of the lack of Congress's intent to impact the national budget.

Second, the Government argued that the CBO's initial failure to score the risk corridor program is evidence that the program was meant to be budget neutral. But again, "the CBO's failure to speak on Section 1342's budgetary impact was simply a failure to speak" not worthy of any meaningful inferences. Id. When the CBO finally did score the risk corridor program after the enactment of the ACA, it found that "risk corridor collections (which will be recorded as revenues) will not necessarily equal risk corridor payments, so the program can have net effects on the budget deficit." CBO Report at 59. In sum, the CBO's initial failure to score the risk corridor program despite scoring other budget neutral programs, together with its later statement, "suggests that the CBO may never have believed the risk corridor program to be budget neutral." Moda Health Plan, 130 Fed. Cl. at 456.

Finally, the Government argued that since Congress did not specifically appropriate funds for Section 1342, "payments out" must have been limited to "payments in." However, the September 30, 2014 GAO Opinion, upon which the Government relied, identified two sources of funding for risk corridor payments: the $3.6 billion 2014 CMS Program Management appropriation and "payments in" (characterized as "user fees"). Id. (citing Consolidated Appropriations Act, 2014, Pub. L. No. 113-76 div. H, tit. II, 128 Stat. 5, 374 (2014)). "HHS chose not to use the Program Management appropriation for 2014 risk corridor payments, but that appropriation was available for such payments. Therefore,

Congress did not restrict the funding for the risk corridor program to the "payments in" under the program." Id.   Thus, in addition to HHS's general funding, CMS Program Management funds were available to make risk corridor payments.

> ### ii. Later Appropriation Riders did not Vitiate the Government's Obligation to make Full Annual Payments.

Moda Health Plan next considered whether the 2015 and 2016 Congressional appropriations riders vitiated HHS's statutory duty to make full annual risk corridor payments. Id. at 457.   In response to the GAO's opinion, Congress passed an appropriation rider for 2015 and 2016 that read:

> None of the funds made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services-Program Management" account, may be used for payments under section 1342(b)(1) of [the ACA] (relating to risk corridor).

128 Stat. at 2491; 129 Stat. at 2624.   As noted earlier, the 2016 appropriations rider had another funding restriction:

> In addition to the amounts otherwise available for "Centers for Medicare and Medicaid Services, Program Management", the Secretary of Health and Human Services may transfer up to $305,000,000 to such account from the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust Fund to support program management activity related to the Medicare program: Provided, That except for the foregoing purpose, such funds may not be used to support any provision of [the ACA] or Public Law 111-152 (or any amendment made by either such Public Law) or to supplant any other amounts within such account.

Id. at 2625.

In Moda Health Plan, the Court held that an appropriation law does not amend or repeal a substantive law that imposes payment obligations on the Government unless the intent to do so is "clearly manifest[ed]" by the language of the appropriations law itself or its legislative history if the appropriation law is ambiguous.   Id. at 458 (quoting N.Y. Airways, Inc. v. United States, 369 F.2d 743, 749 (Ct. Cl. 1966)); see also United States v.

<u>Langston</u>, 118 U.S. 389, 393 (1886).  "Repealing an obligation of the United States is a serious matter, and burying a repeal in a standard appropriations bill would provide clever legislators with an end-run around the substantive debates that a repeal might precipitate." <u>Id</u>.  Thus, absent "express" words in the appropriation law or "clear and uncontradicted" language in the legislative history if the law is ambiguous, an appropriation law does not repeal a previously undertaken obligation of the Government.  <u>Id</u>. (citing <u>N.Y. Airways</u>, 369 F.2d at 750).  In reaching this conclusion, the Court in <u>Moda Health Plan</u> relied upon four cases which declined to find that an appropriation restriction repealed a prior statutory obligation because it did not clearly manifest Congress's intent to do so.  <u>Id</u>. at 459 (citing <u>Langston</u>, 118 U.S. at 394 (An appropriation law which only allocated part of an ambassador's salary did not contain "words that expressly, or by clear implication modified, or repealed the previous law.")); <u>Gibney v. United States</u>, 114 Ct. Cl. 38, 50 (1949) (An appropriation restriction which foreclosed the use of one fund to pay a pre-existing statutory obligation "was a mere limitation on the expenditure of a particular fund [] and has no other effect."); <u>N.Y. Airways</u>, 369 F.2d at 815 (finding that an obligation to pay for helicopter carriers was binding despite Congress's allocation of insufficient funds in a subsequent appropriation law); <u>District of Columbia v. United States</u>, 67 Fed. Cl. 292, 335 (2005) ("[A]n appropriation with limited funding is not assumed to amend substantive legislation creating a greater obligation" even given some ambiguous legislative history suggestive of Congress's intent to repeal the substantive law.).

In contrast to these four cases, the Court in <u>Moda Health Plan</u> identified two cases in which the U.S. Supreme Court held that an appropriation law repealed a previous statutory obligation.  130 Fed. Cl. at 460.  In <u>United States v. Dickerson</u>, after previously passing a statute which promised an allowance to discharged soldiers who reenlisted, Congress passed an appropriation law that stated "*no part* of *any* appropriation" available during the relevant year could be used to fulfill this promise.  310 U.S. 554, 555 (1940) (emphasis added).  In <u>United States v. Will</u>, several appropriation laws eliminated a statutorily approved pay raise for judges using the language "*[n]o part of the funds appropriated in this Act or any other Act* shall be used to pay the salary" and the raise "*shall not take effect*."  449 U.S. 200, 205-07 (1980) (emphasis added).  In both of these cases, the Supreme Court held that Congress had unequivocally repealed the previous statutory commitment by forbidding *any* appropriations from being used to fulfill them.  <u>Moda Health Plan</u>, 130 Fed. Cl. at 460.

The differences between these two sets of cases is not "merely semantic or historical."  <u>Id</u>. at 461.  Congress knew that language like that used in <u>Dickerson</u> or <u>Will</u> was:

> [a] silver bullet to whatever statutory obligation it targets.
> With that in mind, it is telling that Congress did not use the

> "this or any other act" language . . . .  This omission suggests
> that Congress meant only to prevent HHS from using the CMS
> Program Management account for risk corridor payments, not
> that it meant to bar all other sources of funding for such
> payments.

Id.  Further, the legislative history relevant to the 2015 and 2016 appropriation riders
indicates Congress was aware that it was only foreclosing the use of CMS Program
Management funds for risk corridor payments.  Id. (citing 160 Cong. Rec. H9838; S. Rep.
No. 114-74, at 12).

### iii.  The Judgment Fund is Available for Risk Corridor Payments.

Even though a specific appropriation is not required to make full annual payments,
the Court in Moda Health Plan pointed out that the Judgment Fund acts as an appropriation
for federal liabilities associated with an action against the Government "without being
constrained by concerns of whether adequate funds existed at the agency level to satisfy
the judgment."  Id. at 462 (citing Bath Iron Works Corp. v. United States, 20 F.3d 1567,
1583 (Fed. Cir. 1994)).  The Government argued that the Judgment Fund cannot be
considered as a source of funding for a statutory obligation, but the Court stated:

> In a way, the differences between the statutes in Dickerson and
> Gibney only become significant when one considers the
> availability of the Judgment Fund.  If an appropriations law
> limits funds appropriated "in this or any other Act," for
> example, [the words] "any other Act" includes the Judgment
> Fund appropriation (31 U.S.C. § 1304), so the Government's
> liability in this Court is foreclosed.  In contrast, making funds
> from a specific account unavailable to a specific agency for a
> specific purpose "prevents the accounting officers of the
> Government from making disbursements," but private parties
> may still recover their funds in this Court.  N.Y. Airways, 369
> F.2d at 749.

Id. at 462.

The logic here is instructive and worthy of emphasis.  By an Act of Congress, this
Court has jurisdiction to enforce the Government's promises to pay money.  28 U.S.C. §
1491(a)(1).  By an Act of Congress, the Judgment Fund is the source from which judgments
from this Court will be paid.  31 U.S.C. § 1304.  Thus, the Judgment Fund is generally
available to pay the liabilities of the Government as enforced by this Court.  This is true

even when a money-mandating statute does not specifically refer to the Judgment Fund as the source of funding to pay any future judgments. When a statute, like Section 1342, is money-mandating, the Judgment Fund will always be an appropriation from which the Government's promises can be fulfilled.[14]   Under this framework, the Government was simply wrong to argue that only the 2014 CMS Program Management account and "payments in" were available to make risk corridor payments – a third option, the Judgment Fund, is also an appropriated source of federal funding to make good on the Government's obligations. If Congress wanted to limit "payments out" to "payments in" it should have used express words saying so. Otherwise, the Government's promise to pay insurers full risk corridor payments stands, and the Judgment Fund is a congressionally-created assurance backing up that promise. Slattery v. United States, 635 F.3d 1298, 1303 (Fed. Cir. 2011) ("[T]he Judgment Fund was designed to facilitate the payment by the United States of its obligations . . . .").

Still, the Government insists that because HHS could not have used the Judgment Fund to make risk corridor payments, the Court cannot now consider the Judgment Fund in determining the Government's liability. The Government misreads the holding in Moda Health Plan. The question before this Court is whether the Government is statutorily obligated to make full annual risk corridor payments, not whether money has been appropriated to make those payments. See Collins v. United States, 15 Ct. Cl. 22, 35 (1879) (This court . . . does not deal with questions of appropriations, but with the legal liabilities incurred by the United States . . . ."). This Court has held that the Government is obligated to make payments despite the lack of appropriations language specified in section 1342 and, as shown by the above analysis, it need not rely on the availability of the Judgment Fund in reaching this conclusion. In discussing the Judgment Fund, the Court merely is emphasizing that the Judgment Fund acts as insurance for the Government's now broken promise. The Government claims that "this Court [] reasoned that Congress must have intended to allow insurers to collect full risk corridor payments from the Judgment Fund because the appropriations act did not state that no funds "in this *or any other Act*" are available for risk corridor payments." Gov.'s Mot. at 34 (citing Moda Health Plan, 130 Fed. Cl. at 462). This Court made no such claim in Moda Health Plan. It is highly unlikely that Congress actively contemplated the availability of the Judgment Fund, let alone intended its use to make risk corridor payments. Instead, the Court in Moda Health Plan stated that since Congress did not manifest an intent to bar any and all funds to make risk corridor payments, "the Judgment Fund is the only path Congress has left open" to insurers seeking to enforce the Government's obligation. Moda Health Plan, 130 Fed. Cl. at 462.

---

[14] Of course, HHS could not have used the Judgment Fund to make risk corridor payments. Insurers were forced to seek judicial enforcement of the Government's promise.

   b.  Section 1342 Obligated the Government to Make Full Annual
   Risk Corridor Payments.

   While the ruling in Moda Health Plan identified some funds available to make 2014 risk corridor payments, this finding was not necessary for the holding that the Government is statutorily obligated to make full annual risk corridor payments.  Thus, in the present case, the Government has developed new arguments for the proposition that Section 1342 did not obligate the Government to make full risk corridor payments.

   At first glance, the Government seems to be arguing that a statute requiring the Secretary of HHS to make money payments is not money-mandating.  Gov.'s Reply at 4. According to the Government, a statute that, by its plain language, obligates the Government to pay a certain sum of money does not commit the Government to make any payments unless the statute also identifies the source of payment.  Since Section 1342 did not specifically appropriate funds to make risk corridor payments, "[S]ection 1342 alone did not . . . incur [on behalf of HHS] any financial obligations to make those payments without further congressional action."  Id. at 7.

   As the Government would have it, Congress must do two things to create a statute obligating the Government to pay money: (1) use express language, such as "shall" or "will pay," establishing the commitment and (2) appropriate funds to satisfy that commitment. Oral Arg. Tr. at 56:5-9 ("In general, when [] Congress directs the Government to make payments . . . it does two things: the authorization to make the payment; and then the appropriation.").  This supposed two-pronged test is completely contrary to a mountain of controlling case law holding that when a statute states a certain consequence "shall" follow from a contingency, the provision creates a mandatory obligation.[15]  National Association of Home Builders v. Defenders of Wildlife, 551 U.S. 644 (2007); Lopez v. Davis, 531 U.S. 230, 241 (2001) (noting Congress's "use of a mandatory 'shall' . . . to impose discretionless obligations."); Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."); Gilda Industries, Inc. v. United States, 622 F.3d 1358, 1363 (Fed. Cir. 2010); see also the definition of "shall," Black's Law Dictionary (10th ed. 2014) ("Has a duty to; more broadly is required to . . . This is the mandatory sense that drafters typically intend and the courts typically uphold.").  The test for determining whether a statute obligates the Government does not change simply because the consequence following a contingency is the payment of money.

---

[15] In fact, "not only is it possible for a statute to authorize and mandate payments without making an appropriation, [] GAO has found a prime example in [Section 1342]."  United States House of Representatives v. Burwell, 185 F. Supp. 3d 165, 185 (D.D.C), appeal held in abeyance, 676 F. App'x 1 (D.C. Cir. 2016).

The Government insists that it is not advancing a two-pronged test to determine if a statute obligates the Government to make payments.  Oral Arg. Tr. at 96:8-14.  The Government claims that it is advancing a long-held rule of the Federal Circuit – "statutory language that an agency 'shall pay' amounts calculated under a statutory formula . . . does not, standing alone, create an obligation on the part of the government to provide for full payment."  Gov.'s Mot. at 24.  None of the Federal Circuit cases cited by the Government supports this theory.

Prairie County, Montana v. United States, 782 F.3d 685 (Fed. Cir. 2015), concerned the liability of the Government under the following statute:

> For each of fiscal years 2008 through 2014:
>
> (1) each county or other eligible unit of local government *shall be entitled* to payment under this chapter; and
>
> (2) *sums shall be made available* to the Secretary of the Interior for obligation or expenditure in accordance with this chapter.

31 U.S.C § 6906 (2012) (emphasis added).  The Federal Circuit held that a "shall pay" obligation was relieved when the "plain language" of a statute limits the Government's liability to the amount appropriated by Congress.  782 F.3d at 689.  This holding relied on the fact that the statute, by its own terms, identified the source of funding to meet the Government's obligation.  Id.  Likewise in Greenlee County v. United States, 487 F.3d 871 (Fed. Cir. 2007), an earlier version of the same statute stated that "[n]ecessary amounts may be appropriated to the Secretary of the Interior to carry out this chapter. *Amounts are available only as provided in appropriation laws*."  Id. at 874 (citing 31 U.S.C. § 6906 (2006)) (emphasis added).  The Federal Circuit also held that this express language relieved the Government of its obligation.  Id. at 880.  In Star-Glo Associates, LP v. United States, 414 F.3d 1349 (Fed. Cir. 2005), the Federal Circuit considered a statute requiring the Secretary of Agriculture to pay commercial citrus growers a specified sum per tree affected by certain diseases.  Id. at 1350-51.  The statute provided that "[t]he Secretary of Agriculture shall use $58,000,000 of the funds of the Commodity Credit Corporation to carry out this section, to remain available until expended."  Id. at 1353 (citing Pub. L. 106-387, app., tit. VIII, § 810, 114 Stat. 1549A-52-53).  The Federal Circuit held that this clause acted as a "cap" for the Government's obligation, especially when informed by clearly expressed congressional intent.  Id. ("The Conference Report . . . *leaves no room to doubt* that Congress intended benefits available under section 810 to be capped at $58,000,000.") (emphasis added).

In these cases, the pertinent statutes explicitly limited funds available to make mandatory payments. Prairie County, Greenlee County, and Star-Glo do not hold that "shall pay" language, standing alone, fails to create an obligation for the Government to make payments. The Federal Circuit did not rule that the Government's obligation to make payments *depended* on a reference to a specific appropriation. In fact, the Federal Circuit noted that these decisions were in contrast to the "repeated[] recogni[tion] that the use of the word 'shall' generally makes a statute money-mandating." Greenlee County, 487 F.3d at 877; see also Star-Glo, 414 F.3d at 1355. Instead, these cases stand for the proposition that Congress may cap the Government's payment obligations by use of express words in a statute or, as in Star-Glo, express words in the legislative history of an ambiguous statute. Section 1342 also explicitly capped the Government's liability at a certain percentage of a lossmaking insurer's allowable costs.[16]   42 U.S.C § 18062(b)(1).   Accordingly, the Government must make full payments to insurers up to the amount specified in Section 1342.

Next, the Government argues that this Court misunderstood the plain language of Section 1342. Gov.'s Reply at 4; see also Oral Arg. Tr. at 57. According to Government counsel, the word "shall" used in Section 1342(a) only mandated that the Secretary "establish and administer" a risk corridor program. Id. However, as this argument goes, the force of the Congressional mandate ends there, and the Secretary has discretion to administer the risk corridor program as he chooses. As the Government puts it "there is indeed some discretion for the Secretary. And the Secretary has exercised that discretion with respect to defining terms . . . that actually matter and *affect the amounts* [paid] in both directions." Id. at 57:18-22 (emphasis added).

The Court is not convinced by this alternative reading of Section 1342. Section 1342(b)(1) clearly states "[t]he Secretary *shall provide* under the program" that if a participating insurer's costs exceed a specified allowable percentage "the Secretary *shall pay*" the insurer a specified amount. 42 U.S.C. § 18062(b)(1). Thus, Congress issued three mandates to the Secretary. First, the Secretary must establish and administer a program. Id. at § 18062(a). Second, under that program, the Secretary must make payments to participating insurers that meet certain conditions. Id. at 18062(b)(1). Third, the Secretary must make payments to participating insurers based upon a formula specified by Congress. Id. at 18062(b)(1)(A), (B).   The Court sees no ambiguity in this mandate to HHS, especially not terms that could possibly affect the amount due to insurers. There is no language granting the Secretary any discretion regarding the payment scheme under the risk corridor program.

---

[16] The Government has repeatedly argued that finding for Molina would expose the Government to "uncapped" liability. Gov.'s Mot. at 19; Oral Arg. Tr. at 58:16. This assertion, however, is completely untrue.

Finally, the Government suggests that Section 1342 created no obligation at the time the ACA was enacted because "when you look at [Section] 1342, you cannot abstract the question of obligation from the [] question of when" the obligation takes effect. Oral Arg. Tr. at 61:14-16. This argument was first presented during oral argument on the parties' cross-motions. The Government seems to be saying that, since no insurer would be entitled to payment until 2015 at the earliest, the binding nature of Section 1342 does not take effect until 2015. It is clear why the Government is advancing this argument. If Section 1342's obligatory nature did not take effect until 2015, then Moda Health Plan's holding that later appropriation riders cannot implicitly vitiate a pre-existing obligation to make risk corridor payments would be irrelevant because there would be no pre-existing obligation. See 130 Fed. Cl. at 458. However, this government argument is wholly without merit. Not only is there no authority to support this statutory interpretation, it is contrary to the function of the risk corridor program. Section 1342 was created to provide insurers with some protection against substantial losses while developing their QHPs well before any payment under the risk corridor program would have been expected. Moda Health Plan, 130 Fed. Cl. at 452; Health Republic, 129 Fed. Cl. at 775-76. Under the Government's interpretation, Section 1342 would not have served that function because insurers could only rely on Section 1342 after they had entered the Exchanges.

Thus, the Court reiterates its holding in Moda Health Plan: The Government is obligated to make full annual risk corridor payments under Section 1342 despite the absence of specific appropriations in the statute.

### c. The Holding in *Highland Falls* does not Change the Effect of the Appropriations Riders.

As noted above, an appropriation law does not relieve a statutory obligation to make payments unless the intent to do so is "clearly manifest" in the language of the appropriation law, or the legislative history of an ambiguous appropriations law. N.Y. Airways, 369 F.2d at 749. The Court reached this conclusion in Moda Health Plan through a careful comparison of (a) cases in which Congress clearly expressed an intent to override a prior statutory obligation in an appropriation law with (b) cases in which Congress did not sufficiently express the intent to do so. 130 Fed. Cl. at 457-61. The Court found that the pertinent statutes here were more analogous to those in cases in which Congress did not "clearly manifest" an intent to repeal the Government's obligation to make full annual risk corridor payments. Id. at 460-61. Belatedly, the Government now relies heavily on a Federal Circuit case, Highland Falls-Fort Montgomery Central School District v. United States, 48 F.3d 1166 (Fed. Cir. 1995), to show that this Court was mistaken. However, Highland Falls is distinguishable and of no help to the Government.

In Highland Falls, the Federal Circuit considered a statute created in 1950 designed to provide monetary assistance to school districts that were financially burdened by the Government's ownership of real property in the district.  Id. at 1168.  The statute was intended to provide relief to school districts where the Government paid no taxes on the property it owned.  The statute entrusted the program to the Secretary of the Department of Education ("DOE").  The statute reads, in relevant part:

> (a) [ . . . ] Where the Secretary, *after consultation with any local agency . . . determines* . . .
>
>> (1) that the United States owned Federal property in the school district of such local educational agency, and that such property . . . has been acquired by the United States since 1938 . . . and . . . has an assessed value . . . aggregating 10 per centum or more of the assessed value of all real property in the school district [and]
>>
>> (2) that such acquisition has placed a substantial and continuing financial burden on such agency; and
>>
>> (3) that such agency is not being substantially compensated for the loss in revenue from such acquisition . . .
>
> Then the local educational agency shall be entitled to receive for such fiscal year such amount as, *in the judgment of the Secretary*, is equal to the [financial burden imposed].

20 U.S.C. § 237(a) (emphasis added).  The statute further addressed the possibility that Congress may underfund the Act:

> (c) Adjustments where necessitated by appropriations.
>
>> *If the sums appropriated* for any fiscal year for making payments on the basis of entitlements established under sections 237, 238, and 239 of this title for that year *are not sufficient* to pay in full and total amounts which the Secretary estimates all local educational agencies are entitled to receive under such sections for such year, the Secretary shall allocate such sums among local educational agencies and make payments to such agencies as follows:

> (1)(A) the Secretary shall first allocate to each
> local education agency which is entitled to a
> payment under section 237 of this title an amount
> equal to 100 percentum of the amount to which
> it is entitled as computed under that section for
> such fiscal year . . . .

20 U.S.C. § 240(c) (emphasis added).  The annual appropriation laws for fiscal years 1989 through 1993 did not appropriate enough money to fully fund entitlements under Section 237.  <u>Highland Falls</u>, 48 F.3d at 1169.  Importantly, the relevant appropriation laws specifically earmarked funds for Section 237 entitlements: "$15,000,000 shall be for entitlements under section 2 [§ 237] of said Act."  <u>Id.</u> at 1170 (citing Pub. L. No. 100-436, 102 Stat. 1680, 1701 (1988)).  Since there were not enough funds to make full Section 237 payments under the formula described in Section 240(c)(1)(A), DOE did not make entitlement payments equal to 100 percent.  <u>Id.</u> at 1169.

Applying <u>Chevron</u> deference, the Federal Circuit held that "Congress 'has directly spoken' . . . to the question of whether DOE erred in allocating funds for § 237 entitlements based on the amounts earmarked for that section in the respective appropriations laws instead of funding § 237 entitlements at 100% in accordance with § 240(c)."  <u>Id.</u> at 1172 (citing <u>Chevron</u>, 467 U.S. at 842).  In reaching this conclusion, the Federal Circuit noted that "we have great difficulty imagining a more direct statement of congressional intent than the appropriations statutes at issue here."  <u>Id.</u> at 1170.  The fact that Congress had "specifically" and affirmatively set aside funds for Section 237 payments played a key role in <u>Highland Falls</u>.  <u>Id.</u> at 1171 (noting "specific amounts" that were "specifically earmarked" for Section 237 payments).

The Government believes that <u>Highland Falls</u> dispositively shows that the appropriation laws in this case "capped the government's liability for risk corridor payments at amounts appropriated."  Gov.'s Reply at 11.  The reality is quite the opposite; the reasoning in <u>Highland Falls</u> emphasizes the differences between the appropriations laws at issue in <u>Highland Falls</u> and this case.  The 2014 appropriation law here, in its entirety, reads:

> SEC. 227. None of the funds made available by this Act from
> the Federal Hospital Insurance Trust Fund or the Federal
> Supplemental Medical Insurance Trust Fund, or transferred
> from other accounts funded by this Act to the "Centers for
> Medicare and Medicaid Services—Program Management"
> account, may be used for payments under section 1342(b)(1)
> of Public Law 111–148 (relating to risk corridor).

Pub. L. No. 113-235, div. G, tit. II, § 227, 128 Stat. 2130, 2491 (2014).   Unlike the appropriation laws in <u>Highland Falls</u>, this appropriation does not specifically and affirmatively appropriate any funds whatsoever to satisfy Section 1342(b)(1).   Thus, it simply cannot be said that this appropriation law capped liability "*at amounts appropriated*."   Gov.'s Reply at 11.   The Federal Circuit in <u>Highland Falls</u> could not imagine a "more direct statement of congressional intent" to limit payments under a specific statute when Congress essentially points to specific funds to be used to make payments under that statute.   <u>Highland Falls</u>, 48 F.3d at 1170.   However, in this case, Congress merely pointed to funds which *could not* be used to make risk corridor payments. Therefore, the reasoning in <u>Highland Falls</u> simply does not apply because the appropriation laws at issue are quite different.   If anything, <u>Highland Falls</u> further shows that Congress knew how to supersede the mandate to make full annual risk corridor payments in an appropriation law and chose not to do it.

The Government argues that the Court should rely upon the legislative history of the appropriations laws.   Gov.'s Reply at 17; <u>see also</u> S. Rep. No. 114-74, at 12 (2015) ("The Committee continues bill language requiring the administration to operate the Risk Corridor program in a budget neutral manner . . . .").   However, "it is inappropriate to rely upon legislative history to establish the existence of a statutory cap that is not contained in the text of the statute itself" unless the statutory text is ambiguous.   <u>Star-Glo</u>, 414 F.3d at 1355 (citing <u>Cherokee Nation of Oklahoma v. Leavitt</u>, 543 U.S. 631, 646-47 (2005)).   The Court sees no ambiguity in the appropriation laws at issue here.   Thus, the legislative history of the appropriation law cannot relieve the Government from an obligation specified in codified law.   This is especially true when the mandate to make full annual risk corridor payments is so clearly evident from the language of Section 1342.   A reference to a "budget neutral" program simply does not appear anywhere in the appropriation laws.

This brings the Court to the final important difference between the statutes in this case and in <u>Highland Falls</u>.   The plain language of Section 1342 leaves the Secretary of HHS with no discretion whether to make risk corridor payments and how much those payments should be.   <u>See</u> 42 U.S.C. § 18062.   In contrast, the statute in <u>Highland Falls</u> left significant discretion to the Secretary of DOE.   Section 237(a) allows the Secretary of Education to determine "after consultation" with the school district whether a school district should receive payment and how much payment they should receive.   20 U.S.C. § 237(a)(1)-(3).   The statute instructs the Secretary of DOE to determine if a school district has suffered "substantial and continuing financial burden" without providing a test for making that determination.   <u>Id.</u> at § 237(a)(2).   As such, DOE is left with no choice but to construct its own test.   Further, Section 237(a) explicitly leaves the amount of the

entitlement to "the judgment of the Secretary." There is no analogous language in Section 1342 and no such room for discretion.[17]

Judge Bruggink in <u>Maine Community II</u> carefully evaluated the same case law analyzed in this opinion and <u>Moda Health Plan</u>, but reached a contrary result:

> We recognize that Judge Wheeler arrived at a different conclusion in [<u>Moda Health Plan</u>] after examining the same cases. We respectfully disagree with his conclusion. He relied heavily on a distinction present in the legislation in <u>Dickerson</u> and <u>Will</u>, two cases in which appropriation bars were enforced to thwart the implementation of rights arising from substantive legislation. In both cases, Congress had used, in substance, the phrase, "the appropriation in this or any other Act." I.e., Congress was ensuring that the agencies would not subvert its intent by funding the programs at issue from other sources. Not finding that language in the appropriations riders in the present circumstances, he held that they did not limit the substantive obligation created by section 1342. We disagree. These appropriations provisions were adopted after Congress inquired of GAO concerning available funding for the RCP payments. Congress was presented with two potential pools of money for RCP payments and clearly eliminated one of them, thus expressly limiting payments to the other pool—user fees. Once those funds were exhausted, the government's liability was capped.

<u>Maine Community II</u>, 2017 WL 3225050 at * 12 (internal citations omitted). Judge Bruggink infers the Government's intent using the following logic: Congress believed that only two sources were available for risk corridor payments – the CMS Program Management Fund or "payments in" – and explicitly made the CMS Program Management

---

[17] Molina also argues that the statute at issue in <u>Highland Falls</u> was not money-mandating, further distinguishing it from Section 1342. Oral Arg. Tr. at 29. The only reference to whether Section 237 was money-mandating is the following: "The [Court of Federal Claims] dismissed the complaint after concluding that Highland Falls' entitlement to funds under the Act was not mandatory and that appellants therefore did not have a monetary claim against the government. We affirm." <u>Highland Falls</u>, 48 F.3d at 1167. If taken at its word, the Federal Circuit seems to be affirming that Section 237 does not mandate the payment of money. However, this claim is not further developed in the decision. If the Federal Circuit went so far as to hold that Section 237 never mandated the payment of money, then <u>Highland Falls</u> would be distinguishable on that ground as well.

Fund unavailable through appropriation laws.  Thus, only one payment type was available – the "payments in".  Id.

One important difference between <u>Maine Community II</u> and the undersigned's reasoning is that Judge Bruggink did not address whether Section 1342 was "budget neutral" when it was created.  Judge Bruggink states "Defendant urges that Congress did not intend to obligate any payment of money beyond what is collected under the program and that, in any event, it expressly limited the funds available to make RCP payments in appropriation legislation.  We do not reach the first issue because the answer to the second question is clear."  <u>Id.</u> at *6.

Respectfully, the Court cannot properly resolve the second issue without resolving the first.  Whether Section 1342 did initially commit the Government to make full annual risk corridor payments affects the legal test for determining whether Congress later vitiated that obligation.  Courts should not infer Congress's intent to limit payment obligations to a single fund, or repeal a previous payment obligation, through logical inference.  <u>Posadas v. National City Bank</u>, 296 U.S. 497, 503 (1936) ("The cardinal rule is that repeals by implication are not favored.").  "This rule applies with especial force when the provision advanced as the repealing measure was enacted in an appropriations bill."  <u>Will</u>, 449 U.S. at 222 (citing <u>TVA v. Hill</u>, 437 U.S. 153, 189 (1978)); <u>see</u> <u>also</u> <u>NY Airways</u>, 369 F.2d at 750.  When Congress intends to back out of a pre-existing commitment, it must say so clearly and decisively.  There can be no room for inference when dealing with whether the Government will honor its statutory commitments.  Given that Section 1342 clearly requires the Government to make full annual risk corridor payments, Congress cannot repeal this commitment by foreclosing the use of CMS Program Management funds alone.  The initial and unequivocal obligation created by Section 1342 stands.

In conclusion, the Court reaffirms its holding in <u>Moda Health Plan</u> that insurers participating in the risk corridor program, such as Moda and Molina, are entitled to full annual risk corridor payments under Section 1342.  As a result, the Court GRANTS Molina's motion for partial summary judgment on Count I and DENIES the Government's 12(b)(6) motion to dismiss Count I.

### 2. <u>In the Alternative, the Government Breached an Implied-in-Fact Contract with Molina.</u>

Again as in <u>Moda Health Plan</u>, the Court finds that the undisputed facts show the Government entered into an implied-in-fact contract with Molina and subsequently breached the contract when it failed to make full risk corridor payments.  Importantly, Molina prevails on its argument of breach of an implied-in-fact contract *regardless* of the Government's appropriation law defenses –later appropriation restrictions cannot erase a previously created contractual obligation.

38

The elements of an implied-in-fact contract are identical to those of an express contract. See Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997). To establish liability on a breach of contract claim, the plaintiff seeking summary judgment must show that there is no genuine dispute as to four elements: (1) mutuality of intent to contract, (2) consideration, (3) "lack of ambiguity in offer and acceptance," and (4) that the "[G]overnment representative whose conduct is relied upon [has] actual authority to bind the [G]overnment in contract." Lewis v. United States, 70 F.3d 597, 600 (Fed. Cir. 1995) (citation omitted).

The Government takes issue with Moda Health Plan's finding that there was mutuality of intent to contract. Gov.'s Mot. at 45; Gov.'s Reply at 26; Oral Arg. Tr. at 74-80. According to the Government, this Court "announced a novel rule" for determining whether Congress intended to enter into a contract by enacting a statutory "scheme". Gov.'s Reply at 26 (citing Moda Health Plan, 130 Fed. Cl. at 463-64). Therefore, the Court focuses most of its discussion on the first element: mutuality of intent to contract.

### a. Summary of *Moda Health Plan*

First, Moda Health Plan considered whether Congress intended to bind itself in contract when it passed Section 1342. 130 Fed. Cl. at 463. "[A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature ordains others." Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co., 470 U.S. 451, 465-66 (1985) (citations omitted). A court should look at whether the "circumstances surrounding [a] statute's passage manifested any intent by Congress to bind itself contractually . . . ." Brooks v. Dunlop Mfg. Inc., 702 F.3d 624, 631 (Fed. Cir. 2012) (citing Nat'l R.R., 470 U.S. at 468-70).

When Congress does not explicitly codify its intent to enter into a contract, this Court has used a two-step test to determine whether Congress intended to contract through legislation. First, "the provision must create a program that offers specified incentives in return for the voluntary performance of private parties." Moda Health Plan, 130 Fed. Cl. at 463 (citing Radium Mines, Inc. v. United States, 153 F. Supp. 403, 405-06 (Ct. Cl. 1957)). Second, "the provision must be promissory; in other words, it must give the agency officials administering the program no discretion to decide whether or not to award incentives to parties who perform." Id. (citing Radium Mines, 153 F. Supp. at 406). In short, absent some express declaration of an intent to contract, Congress's creation of a program in which it promises to pay a sum of money in exchange for some specified performance is evidence of an intent to contract.

The Court in Moda Health Plan relied on two prior Court of Claims cases in reaching the conclusion that the Government intended to enter into a contract with Moda. In Radium

<u>Mines</u>, the Government created an incentive program in which it promised to pay private parties a "guaranteed minimum price" for uranium. <u>Id.</u> at 463 (citing <u>Radium Mines</u>, 153 F. Supp. at 404-05). Through other regulations, the Government had restricted private uranium sales so stringently that the Government was the only practicable buyer. The court held that when a private party "complied in every respect with the terms" of the incentive program, agency officials were required to purchase uranium at the "guaranteed minimum price." <u>Radium Mines</u>, 153 F. Supp. at 406. Next, in <u>New York Airways</u>, Congress created a program to subsidize helicopter companies. 369 F.2d at 744. The statute stated "[t]he Postmaster General shall make payments out of appropriations for the transportation of mail by aircraft of so much of the total compensation as is fixed and determined by the Board under this section . . . ." <u>Moda Health Plan</u>, 130 Fed. Cl. at 463 (quoting <u>N.Y. Airways</u>, 369 F.2d at 745). Due to a failure to appropriate sufficient funds, the Government failed to make the required payments under the statute. The court held that "[t]he Board's rate order was, in substance, an offer by the Government to pay the plaintiffs a stipulated compensation for the transportation of mail, and the actual transportation of the mail was the plaintiffs' acceptance of that offer." <u>Id.</u> (quoting <u>N.Y. Airways</u>, 369 F.2d at 751).

Section 1342 meets the <u>Radium Mines</u> test much like the statutes at issue there and <u>New York Airways</u>. The Government created a program to incentivize insurers to participate in the Exchanges – something vitally necessary to the ACA's survival. The Secretary of HHS had no discretion to withhold or decrease payments under that program. Thus, as in <u>Radium Mines</u> and <u>N.Y. Airways</u>, the Government intended to enter into an agreement with participating insurers that has both the structure and substance of a contract. <u>Moda Health Plan</u>, 130 Fed. Cl. at 464.

The remaining elements of an implied-in-fact contract were easily met in <u>Moda Health Plan</u>, as they are in the present case. <u>Id.</u> at 464-65. The Government made an offer in Section 1342, and Moda accepted by voluntarily agreeing to sell QHPs on the Exchanges. <u>Id.</u> at 464. Further, the condition precedent for the Government's payment obligation to mature was met: Moda suffered losses. <u>Id.</u> Consideration is a bargained-for performance or return promise. Restatement (Second) of Contracts § 71. "[T]he Government offered consideration in the form of risk corridor payments under Section 1342. In return, Moda offered performance under the contract by providing QHPs to consumers on the [] Exchanges. Therefore, there was consideration." <u>Moda Health Plan</u>, 130 Fed. Cl. at 465. Finally, the Secretary of HHS has actual authority to contract on the Government's behalf. <u>Id.</u> Section 1342 explicitly authorized the Secretary to "establish and administer" the risk corridor program and make risk corridor payments. <u>Id.</u> Moreover, the Secretary is responsible for administering the ACA generally. <u>Id.</u> (citing §§ 1301(a)(1)(C)(iv), 1302(a)-(b), 1311(c)-(d)). Given that Section 1342 represented an offer by the Government, and the Secretary was charged with overseeing the execution of that contract, the Secretary had authority to contract on the Government's behalf.

For these reasons, the Court in <u>Moda Health Plan</u> found that "the ACA created an implied-in-fact contract with insurers like Moda" and "[t]he Government has breached the contract by failing to make full risk corridor payments as promised." <u>Id.</u> at 465-66.

b.  <u>The Court Applied the Correct Legal Test to Establish Mutuality of Intent to Contract in <em>Moda Health Plan</em>.</u>

The Government now argues that <u>Moda Health Plan</u> improperly relied on <u>Radium Mines</u> and <u>N.Y. Airways</u> to advance a "novel" test which focused, again improperly, on the structure of Section 1342.  Gov.'s Mot. at 47; Gov.'s Reply at 26.  According to the Government, the proper test to determine whether it intended to contract through legislation is "language in the statute expressing an intent to contract, or . . . in the legislative history indicating an intent by Congress to be bound contractually."  Oral Arg. Tr. at 75:20-25; Gov.'s Reply at 27.  The Government insists that there must be textual references to an intent to contract, quite literally "language in the text" referring to a promise or contract. Oral Arg. Tr. at 75:20, 76:22, 77:13, 78:5, 78:20-21, 81:1.  The Government advances form over substance by erroneously insisting that Congress cannot "clear[ly] indicat[e]" an intent to contract without using those words.  <u>Nat'l R.R.</u>, 470 U.S. at 465.

The Government relies on three cases in its criticism of <u>Moda Health Plan</u>.  In <u>Brooks</u>, a plaintiff brought a <em>qui tam</em> false patent marketing claim under 35 U.S.C. § 292(b) which provided that "[a]ny person may sue for [a] penalty, in which event one-half shall go to the person suing and the other to the use of the United States."  702 F.3d at 626. While the claim was being adjudicated, Congress eliminated Section 292(b) and the plaintiff argued that the Government had breached an implied-in-fact contract by eliminating the <em>qui tam</em> provision.  <u>Id.</u> at 627.  The Federal Circuit rejected this argument because "nothing in [the] language creates or speaks of a contract between the United States and [the plaintiff]."  <u>Id.</u> at 631 (citations omitted).  The Government's reliance on <u>Brooks</u> stops there.  <u>See</u> Gov.'s Mot. at 46; Gov.'s Reply at 26; Oral Arg. Tr. at 76.  However, the Federal Circuit went on to look at "whether the circumstances surrounding the statute's passage manifested any intent by Congress to bind itself contractually."  <u>Brooks</u>, 702 F.2d at 631.  The Federal Circuit found that the plaintiff had "not pointed to any legislative history, <em>or any other evidence</em>" suggesting that Congress intended to enter into a contract when passing Section 292(b).  <u>Id.</u> (emphasis added).  Thus, <u>Brooks</u> did not hold that only textual evidence from the statute or legislative history can qualify as relevant "circumstances surrounding [a] statute's passage."  <u>Id.</u>

Next, the Government cites <u>Hanlin v. United States</u>, 316 F.3d 1325 (Fed. Cir. 2003), in which a plaintiff lawyer agreed to represent a veteran in proceedings before the Department of Veteran Affairs.  <u>Id.</u> at 1326.  The plaintiff executed a fee agreement which "specifically authorized the Secretary of Veterans Affairs to make direct payment of the

41

attorney's fee to [plaintiff] in the event of a favorable decision." Id. (citations omitted). When the Government instead made full benefit payments to the veteran, the plaintiff sued the Government for breach of an implied-in-fact contract. The statute at issue was 38 U.S.C. § 5904(d)(2) which states that "[a] fee agreement . . . is one under which the total amount of the fee payable to the agency or attorney is to be paid to the attorney by the Secretary directly . . . ." Id. at 1328. The Government cites Hanlin for the proposition that there is "no contract where 'the statute is a directive from Congress to the [agency], not a promise from the [agency] to' a third party." Gov.'s Mot. at 46 (citing Hanlin, 316 F.3d at, 1329. The Government does not fully explain the reasoning underlying Hanlin. The Court of Federal Claims denied the plaintiff's claim, and the Federal Circuit affirmed, because:

> (1) there was *no course of dealing or custom or practice* from which a promise by the government could be inferred; (2) there were no words of promissory character in the statute or regulation that manifested an undertaking or commitment rather than a mere instruction, prediction or intention; and (3) there was no basis to hold the government as giving assent to a contract on the ground that the Secretary knew or should have known that Hanlin would construe the regulation as an offer, which could be accepted, thereby forming a contract, by Hanlin via submission to the DVA of his fee agreement.

Id. at 1329 (emphasis added). The Federal Circuit further held that the "[Department of Veterans Affairs] had no legal authority to pay attorney fees when the payment of the complete amount of the past-due benefits had already been made to the claimant . . . ." Id. at 1330.

The differences between Hanlin and the present case are many. The statute in Hanlin was definitional – merely describing the term "fee agreement" – while Section 1342 creates a program under which insurers are to receive payments. Compare 38 U.S.C. § 5904(d)(2)(A) (2000) with 18 USC § 18062(b). Hanlin involves a separate fee agreement between the plaintiff and a third party; this case does not. The Federal Circuit in Hanlin found the agency did not have authority to make payments, while authority to make payments is not at issue here. Hanlin is not analogous enough, in its facts or legal reasoning, to draw any meaningful conclusions regarding whether Congress intended to bind itself contractually in passing Section 1342. Moreover, not only is Hanlin unhelpful to the Government's argument, but it further shows that "course of dealing or custom or practice" can serve as evidence of the Government's promise. Hanlin, 316 F.3d at 1329.

Finally, the Government cites <u>Bay View, Inc. v United States</u>, 278 F.3d 1259 (Fed. Cir. 2001), for the claim that if "there is no express language in the statute, you have to find the intent [] to contract in the legislative history." Oral Arg. Tr. at 77:10-15.[18]   In <u>Bay View</u>, the Alaska Native Claims Settlement Act ("ANCSA") extinguished all claims of aboriginal title in Alaska and allocated land and timber rights to "native-owned Regional Corporations." 278 F.3d at 1262. Section 1606(i) of the ANCSA required the Regional Corporations to share revenues stemming from land or timber activities with smaller "Village Corporations" in their respective regions. 42 U.S.C. § 1606(i). Bay View, a Village Corporation, disputed how the Regional Corporations were calculating their revenue under Section 1606(i) and brought a federal suit to compel the Regional Corporations to include certain tax deductions in those calculations. <u>Bay View</u>, 278 F.3d at 1262. Congress later amended Section 1606(i) to explicitly allow Regional Corporations to exclude those deductions from their revenue calculations. <u>Id.</u> at 1263. Bay View then sued the Government for breach of an implied-in-fact contract.

The entirety of the Federal Circuit's implied-in-fact contract analysis is as follows:

> In this case, the only alleged contract is ANCSA itself. Because ANCSA does not purport to create an express contract between the United States and Bay View, the record of ANCSA's enactment would have to support an implied contract. Although it extinguished aboriginal title to land and, at the same time, gave the United States some rights to share in resource exploitation, ANCSA does not meet the requirements for a contract. For instance, ANCSA evinces no offer from the Alaska natives accepted by United States with ample consideration to show a contractual agreement. The Alaska natives participated in the legislative process leading up to ANCSA, but nothing in the Act or its enactment history suggests that they made a specific offer to the United States. Nor does the Act or the record show that the United States made a specific defined offer to the natives. Neither alleged contractual party accepted these nonexistent offers. Rather ANCSA, while seeking to "settle" aboriginal claims, was a unilateral act by the United States. Accordingly, ANCSA is not a contract between the United States and the Alaska natives (or native corporations such as Bay View).

---

[18] The Government cited <u>Bay View</u> for the first time during oral argument on July 12, 2017.

Id. at 1266.   Like Hanlin, this case is simply not helpful to the Government.  The bulk of the Federal Circuit's analysis hinges on whether there was any offer and acceptance, with the Government acting as the alleged offeree, not mutuality of intent to contract.  Moreover, the Government quite literally was not required to do anything under Section 1606(i).  The Federal Circuit only refers to "the Act or its enactment history" in noting that the Alaskan natives never made any offer to the United States.  The Court can hardly infer that Congress's intent to contract must be clearly manifested in the text of the statute or the legislative history from the holding in Bay View.

While the Government faults the Court in Moda Health Plan for its reliance on "older cases," the newer cases relied on by the Government are inapposite.  Gov.'s Mot. at 47.  Thus, the test established by the Court of Claims in Radium Mines is still the proper legal test to determine whether Congress has clearly manifested an intent to bind itself contractually.

The "circumstances surround[ing]" the passage of the ACA, Brooks, 702 F.2d at 631, "clear[ly] indicat[e]", Nat'l R.R., 470 U.S. at 465, an intent to contract.  The Government, through HHS, repeatedly confirmed that Section 1342 was intended to "protect against uncertainty in rates for qualified health plans by limiting the extent of issuer losses and gains." 77 Fed. Reg. 73,118, 73,119 (Dec. 7, 2012); see also 78 Fed. Reg. 72,322, 72,379 (Dec. 2 2013); 79 Fed. Reg. 13,743, 13, 829 (Mar. 11, 2014).  Further, the risk corridor program was a "mechanism for sharing risk" between the Government and insurers.  77 Fed. Reg. 17, 219, 17, 236 (Mar. 23, 2012); 79 Fed. Reg. 13, 743, 13, 829 (Mar. 11, 2014).  These statements, made before Molina and similar insurers agreed to offer plans on the Exchanges, were designed to instill confidence in the Government's promise to actually share the risks of the ACA and actually protect against potential losses.  If not, then participation in the risk corridor program "would have indeed been madness." Oral Arg. Tr. at 92:12.    The function of the risk corridor program, and HHS's interpretation of it, along with the clear mandate that the Secretary of HHS make full risk corridor payments, manifest nothing but an intent to bind Congress to its word in exchange for insurers' participation in the Exchanges.  It cannot be forgotten that the success of the ACA depended in no small part on insurers like Molina agreeing to take a significant risk – a risk they thought they would be sharing with their Government.

In conclusion, there is no genuine dispute that the Government entered into an implied-in-fact contract with Molina when it agreed to pay Molina a specified portion of its losses if Molina sold QHPs.  Molina sold QHPs, suffered losses, yet the Government refuses to make the full payments it promised to Molina.  Thus, there is also no genuine dispute that the Government is in breach.  Accordingly, this Court GRANTS Molina's motion for partial summary judgment on Count III and DENIES the Government 12(b)(6) motion to dismiss Count III.

In addition, since Molina's implied-in-fact contract claim survives dismissal and the Court finds that the Government is in breach, Molina also plausibly alleges a breach of the implied covenant of good faith and fair dealing.  See Gov.'s Mot. at 49, n. 32 ("Because Molina's express and implied contract claims fail as a matter of law, its claim for breach of an implied covenant of good faith and fair dealing (Count IV) also must be dismissed."). Therefore, the Court DENIES the Government's Rule 12(b)(6) motion to dismiss Count IV.[19]

### 4.   Molina's Breach of Express Contract Claim Fails to State a Claim upon which Relief may be Granted.

Molina alleges that the Government breached the 2014 and 2015 QHP agreements when it failed to make full annual risk corridor payments.  Compl. at ¶ 316.  The Government seeks the dismissal of Molina's breach of express contract claim (Count II) on the basis that nothing in the QHP agreements commits the Government to make risk corridor payments.  Gov.'s Mot. at 41-45.

Molina's breach of express contract claim rests on its interpretation of two clauses. The first states: "CMS will undertake all reasonable efforts to implement systems and processes that will support [QHP] functions.  In the event of a major failure of CMS systems and processes, CMS will work with [QHP offerors] in good faith to mitigate any harm caused by such failure."  Compl., Ex. 6 at § II.d.  According to Molina, a promise to "implement systems and processes" amounts to a promise to make risk corridor payments under Section 1342.  Molina stretches the meaning of this clause too far.  Section II of the QHP agreements concerns the standard rules of conduct to "maintain access to the CMS Data Services Hub Web Services."  Id. at § II.a.  Thus, read in context, the promise at issue "must relate to the electronic system that HHS and the [QHP offerors] will be using, and the processes that support this electronic system."  Land of Lincoln, 129 Fed. Cl. at 109; see also BCBS, 131 Fed. Cl. at 478.

The second clause Molina refers to states: "This Agreement will be governed by the laws and common law of the United States . . . ."  Compl., Ex. 6 at § V.g.  This standard clause cannot be fairly interpreted as incorporating Section 1342.  A court may not "find that statutory and regulatory provisions are incorporated into a contract with the government unless the contract explicitly provides for that incorporation."  St. Christopher Assoc., L.P. v. United States, 511 F.3d 1376, 1384 (Fed. Cir. 2008).  This general reference to the laws of the United States does not specifically incorporate Section 1342, and

---

[19] However, Molina is unlikely to pursue Count IV any further given that it will recover all of its damages under either Count I or Count III.

therefore the QHP agreements do not incorporate the Government's obligation to make risk corridor payments.

For these reasons, the Court GRANTS the Government's Rule 12(b)(6) motion to dismiss Count II.

### 5. Molina's Takings Claim Fails to State a Claim upon which Relief may be Granted.

Finally, Molina alleges that the Government's failure to make full annual risk corridor payments amounts to a taking of its property without just compensation in violation of the Fifth Amendment.  Compl. at § 361.  According to Molina, "the Government entered into [contracts] with [insurers], like Molina, regarding risk corridor payments, and thus Molina possesses a legally cognizable property interest that was taken by the Government in the violation of the Fifth Amendment."  Pls.' Reply at 37 (citing Moda Health Plan, 130 Fed. Cl. at 465-66).  The Government, unsurprisingly, seeks the dismissal of Molina's takings claim because "Molina has no contractual right to risk corridor payments."  Gov.'s Mot. at 50.

Molina is correct that it has a "legally cognizable property interest" in the contracts between it and the Government, however that property interest has not been taken because Molina still has the ability to enforce its contract.  This Court recently had the opportunity to address this precise issue:

> If a plaintiff claims he is owed something to which he also claims a contractual right, he cannot also allege a takings claim because he is not alleging that the Government has "taken" his contract remedy.  Under such circumstances, the plaintiff is claiming he entered into a contract with the Government that the Government subsequently breached, leaving the plaintiff with contract damages.  The amount of those damages is also the property the plaintiff claims was taken.  In other words, "[t]he property rights allegedly taken were the contractual rights themselves, not a separately existing property interest."  Therefore, the plaintiff's remedy lies in contract, and he cannot pursue a takings claim to recover his alleged contract damages.

Snyder & Associates Aquisitions LLC v. United States, -- Fed. Cl. --, 2017 WL 2990005 (July 13, 2017) at *5 (quoting Westfed Holdings, Inc. v United States, 52 Fed. Cl. 135, 152 (2002)) (other citations omitted).  Molina's successful motion for partial summary judgment is precisely why its takings claim fails. For these reasons, this Court GRANTS the Government's Rule 12(b)(6) motion to dismiss Count V.

### C. Damages Owed to Molina

Molina submits that there is no genuine dispute regarding the amount of Molina's damages under Counts I and III. Pls.' Mot. at 48. For the 2014 plan year, the Government announced that it owed Molina of Florida $39,035.74, but would only make a prorated payment of $4,925.48. CMS, "Risk Corridor Payment and Charge Amounts for Benefit Year 2014" (Nov. 19, 2015) at Table 10-Florida. For the 2015 plan year, the Government announced that it owed Molina a total of $52,339,075.46, but would not make any payments until the entirety of 2014 payments were made. CMS, "Risk Corridor Payment and Charge Amounts for the 2015 Benefit Year" (Nov. 18, 2016) at 3-4, 12-13.[20] Therefore, the total amount of risk corridor payments for 2014 and 2015 owed to Molina is $52,378,111.20.

However, the parties seem to dispute how much in risk corridor payments Molina has received to date. According to Molina, it has received $5,913.45. Pls.' Mot., Decl. at ¶17. According to the Government, it has paid Molina $6,024.64. Gov.'s Mot. at 14, n. 9. Thus, there is a $111.19 discrepancy between the Government and Molina's characterization of Molina's damages. This is surely a calculation error which the parties can easily resolve. In the meantime, the Court holds that Molina is owed $52,378,111.20 less payments already received.

### Conclusion

Nothing has changed on the risk corridors front in the six months since the Court issued the Moda Health Plan decision. The Government is liable for its breach of a statutory and contractual obligation to make full annual payments to insurers who participated in the risk corridor program. Accordingly, Molina's motion for partial summary judgment is GRANTED on Counts I and III and the Government's motion to dismiss these Counts is DENIED. In addition, the Government's motion to dismiss Count IV is DENIED, while the Government's motion to dismiss Counts II and V is GRANTED. Finally, Molina's request for declaratory relief is DENIED.

---

[20] Molina in California is owed $1,784,227.07. Molina in Florida is owed $25,417,985.09. Molina in Utah is owed $3,557,849.34. Molina in Washington is owed $238,552.08. Molina in Wisconsin is owed $21,340,461.88.

The Court requests the parties to submit a joint status report on or before August 25, 2017 indicating Molina's final damages and proposing steps for the final resolution of this case.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge